FILED
2007 Oct-26  PM 03:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**MICHAEL BRANDON SAMRA,**

       **Petitioner,**                     **CIVIL ACTION**

**v.**                                     **No.**        **No Execution**
                                                    **Date Set**

                                            **CAPITAL CASE**

**KENNETH L. JONES**
**Warden, Donaldson Correctional Facility**

       **Respondent.**

## FIRST PETITION FOR WRIT OF HABEAS CORPUS IN A CAPITAL CASE

Now comes Petitioner, Michael Brandon Samra, now incarcerated at the William E. Donaldson Correctional Facility, 100 Warrior Lane, Bessemer, AL 35023, through his attorneys, Alan Freedman of the Midwest Center for Justice, and Steven Sears, 655 Main Street, Montevallo, AL 35115,  and petitions this Court for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  In support thereof, petitioner states as follows.

## <u>STATEMENT OF THE CASE</u>

Mr. Samra was charged by indictment with the murder of two or more persons by one act or pursuant to one scheme or course of conduct, under Ala. Code § 13A-5-40(a)(10) (1975).  Trial was held before Judge J. Michael Joiner of the Shelby County Circuit Court, Case No. CC-97-384.  Mr. Samra was convicted and the jury recommended a sentence of death.

On May 6, 1998, a sentencing hearing was held in Shelby County Circuit Court, at which no additional evidence was presented.  Mr. Samra was sentenced to death by electrocution.

On June 18, 1999, the Alabama Court of Criminal Appeals affirmed Mr. Samra's conviction and sentence.  Samra v. State, 771 So. 2d 1108 (Ala. Crim. App. 1999).  Mr. Samra's application for re-hearing was denied on August 6, 1999.  The Alabama Supreme Court granted certiorari.

On March 3, 2000, the Alabama Supreme Court affirmed Mr. Samra's conviction and sentence.  Ex parte Samra, 771 So. 2d 1122 (Ala. 2000).  On May 5, 2000, the court denied Mr. Samra's application for rehearing.

On October 10, 2000, the United States Supreme Court denied Mr. Samra's petition for writ of certiorari.  Samra v. Alabama, 531 U.S. 933 (2000).

On October 1, 2001, Samra filed a petition for post-conviction relief pursuant to Rule 32 of the Alabama Code of Criminal Procedure.  An evidentiary hearing was held on one portion of the claim of ineffective assistance of trial counsel, the failure to adequately investigate and introduce evidence of organic brain damage and brain dysfunction. Following the evidentiary hearing in November, 2003, the Circuit Court denied the Rule 32 Petition on January 12, 2005.

Thereafter, on February 9, 2005, Samra filed an appeal in the Alabama Court of Criminal Appeals, which was denied August 24, 2007.  Samra v. State, No. CR-04-0879.  Petitioner filed a petition for rehearing on September 6, 2007, and it was denied on September 28, 2007.

On September 27, 2007, Samra filed a Successor Rule 32 Petition for Post-Conviction Relief, alleging that the fact that the death sentence imposed on his more culpable co-defendant – Duke – was reversed due to solely to the fact that he was 16 years old at the time of the crime violated Samra's Eighth and Fourteenth Amendment rights.  That successor petition is still pending in the Alabama state courts.

On October 11, 2007, Samra filed a Petition for Writ of Certiorari in the Alabama Supreme Court. That petition is still pending in the Alabama Supreme Court.

## STATEMENT OF THE FACTS RELEVANT TO THE ISSUES

**Facts Concerning the Denial of the Change of Venue Issue**

Trial counsel filed a motion for change of venue due to the undue prejudice concerning the media coverage.  TR. 1-99.  Natalie Davis testified on behalf of petitioner. Dr. Davis, a media expert and statistical expert, provided uncontroverted testimony to the court that there had been a prejudicial effect of the media coverage on the venire members.  (RT-1229, 1233, 1235).  Dr. Davis conducted an extensive pre-trial poll of the citizens of Shelby County, to determine the extent of the pre-trial coverage by the media. (TR-1226, 1229, 1233).  Dr. Davis' conclusions indicated a complete saturation of pretrial publicity on the inhabitants of Shelby County.  The telephone poll she conducted showed that 83% of the potential jurors had heard information about the case.  Of those surveyed, 26.6% stated that they believed, without having heard any evidence, that Mr. Samra was either guilty or probably guilty.  The trial court denied the motion for change of venue.  TR. 1-99.

**Trial and Sentencing Hearing**

On March 23, 1997, the dead bodies of Randy Gerald Duke, Dedra Mims Hunt, and Ms. Hunt's two daughters, Chelisa Nicole Hunt and Chelsea Marie Hunt were found in Mr. Duke's house. TR 1494.[1] Mr. Duke and Ms. Mims had been shot multiple times, while the other two died as a result of lacerations to their necks. TR 1498, 1501-02.

According to statements obtained from the four codefendants, the plan for killing the four individuals arose the day before, following an argument between Mark Duke and his father, Randy Gerald Duke, concerning the father's refusal to allow his son to use his pick-up truck. Following the argument, Mark Duke told his three friends - Samra, David Collum, and Michael Ellison - that he was going to murder his father because of the argument. TR 1967-68. The boys went to Ellison's house for three hours where they planned the killings. They obtained two pistols and then returned to Mr. Duke's house that evening. Ex. 107 (Ex. 107 is Samra's statement which was added as a supplement to the record in the direct appeal.)

At the house, Mark Duke shot his father in the shoulder and then in the head, killing him. Ex. 107. Samra shot Ms. Hunt in the cheek, and then she and her children ran upstairs. Mark Duke then pursued them and shot Ms. Hunt in the head, killing her, and slit one of the children's throat with a kitchen knife, killing her. Ex. 107. Mark Duke then tried to kill the other child with a knife but, when she resisted, Duke demanded that Samra assist him. Samra complied by holding the child down and killing her by slitting

her throat. Ex. 107. Upon being questioned by police officers, Samra admitted his involvement in the crimes and helped locate the weapons. Ex. 107.

Defense counsel filed a motion for change of venue.  TC 73.  A hearing was held where  evidence was presented of a telephone poll in Shelby County showing that 83.9% of the potential jurors had heard information about the case, and that 26.6% of those surveyed stated that they believed, without having heard any evidence, that Mr. Samra was either guilty or probably guilty. TR 1226-1235.  The trial court denied the motion. TC 486.

Samra was indicted for capital murder. TC 7. The indictment alleged that Samra committed capital murder by intentionally causing the death of two or more people. On October 16, 1997, Samra filed a motion for an order requiring the State to provide him with notice of the statutory aggravating circumstances set forth in Ala. Code 1975, § 13A-5-49 that the State intended to prove at the sentencing hearing. TC 320. At the argument on the motion, the prosecutor stated that he was not required to provide such notice. TR 94. The prosecutor proceeded to say, however, that "the aggravating circumstances are very straightforward in the indictment." TR 95. The trial court denied Samra's motion. TR 95. The indictment was amended on March 11, 1998, to specify that Samra committed the offense of capital murder due solely to the fact that two or more people were killed by one act or pursuant to one scheme or course of conduct. TC 484.

---

[1] "C" refers to the clerk's record from the Rule 32 proceedings. "R" refers to the reporter's transcript from the Rule 32 proceedings. "TC" refers to the clerk's record from the 1998 trial. "TR" refers to the reporter's transcript from the 1998 trial.

Samra's trial counsel, Richard Bell, recognized that there was a small chance of winning the guilt phase of the trial and thought the sentencing phase was the main event. R 266. He had hoped to develop Samra's brain dysfunction as the major focus of his case against the death penalty. R 266. However, he was unsuccessful in his efforts to obtain that evidence. Mr. Bell's efforts in this regard consisted of obtaining the assistance of Dr. Charles L. Scott, whom Mr. Bell described as being "the most preeminent forensic psychiatrist I have ever met." R 267, 297.

Dr. Scott told Mr. Bell that he needed a SPECT or PET scan to be conducted on Samra. R 267. Mr. Bell prepared an affidavit for Dr. Scott, in which Dr. Scott recommended a SPECT or PET scan and a neuropsychological exam be conducted on Samra. R 268-69, C 1039-40. Mr. Bell abandoned the idea of getting a SPECT test when he could not locate a hospital in Birmingham that performed SPECT scans, although one existed in Nashville, Tennessee. R 269. If he had a SPECT scan that indicated Samra had abnormal blood flow in his brain, he would have used the results in the case to show the jury mitigating factors on behalf of Samra. R 269-70. Mr. Bell similarly abandoned the idea of having neuropsychological testing done on Samra, as Dr. Scott had requested, because a neuropsychologist he had contacted could not do it for some reason that Mr. Bell did not know. R 270.

Instead of relying upon such evidence, Mr. Bell chose a strategy of showing that Samra was a member of a gang that worshipped Satan, distributed drugs, had a strong presence in prison, and rewarded members who killed their own mothers, "because it

appeared that that was the only thing I had." R 271. If he had evidence of brain dysfunction, he would certainly have used that instead. R 271.

Trial counsel began to pursue this strategy based upon Samra's gang and satanic activity even before the trial began, and continued to emphasize these factors throughout his trial and up to and including penalty phase closing arguments. During voir dire, trial counsel questioned the potential jurors regarding their knowledge of organized gang activity. TR 1312. Specifically, he asked if any of the potential jurors had knowledge of the gang known as FOLKS, or "Forever our Lord King Satan." TR 1313-14. Then, in his opening argument during the guilt phase, counsel argued that Samra was in a "sinister" gang that "involve[d] satanic worship [and] satanic symbols." TR 1488. The prosecution pointed out in a bench conference that counsel's references to gang activity were "opening doors we didn't have open." TR 1490. Counsel said he understood this, TR 1490, and the proceedings continued.

Counsel continued to make reference to Samra's satanic gang activity during his cross-examination of prosecution witnesses Sergeant Hall, TR 1587-88, 1602-04, Officer Walker, TR 1711-12, and Captain Thomas, TR 1659-60, 1672. He questioned each officer regarding the symbols found on the walls of Mark Duke's bedroom. In so doing, counsel prompted Captain Thomas to say that the symbols were gang related, TR 1660, and prompted Sergeant Hall to state that he thought FOLKS stood for Followers of Our Lord King Satan or Forever Our Lord King Satan, TR 1641. Hall also remarked that the FOLKS gang in Birmingham was associated with another gang, the Insane Gangster Disciples, TR 1639-40, the founder of which was in prison, TR 1639.

Trial counsel called three witnesses for the defense at trial. His first witness was Dr. Kathleen Ronan, who testified that Samra was a member of a gang, TR 1893, had no psychological disorders, TR 1912, understood the difference between right and wrong, TR 1913, was not mentally retarded, TR 1913, did not act under the domination of another person, TR 1913, lacked emotionality, remorse and a conscience, TR 1924-26, and that the killings at issue were not gang-related, TR 1917.

Trial counsel's second defense witness was Dr. George Twente, whose testimony served to emphasize the nature of the FOLKS gang and its connection to drug distribution and the prison system. TR 1932-51. Upon trial counsel's prompting, Dr. Twente further explained that rising in the ranks of the gang required killing someone. TR 1935. To rise to the highest level, the "set king," a gang member had to kill his own mother. TR 1935. Trial counsel also made a point of connecting members of the gang to satanic worship. TR 1938. Under cross-examination, Dr. Twente stated that gang killings were usually over drug-related matters. TR 1951. Dr. Twente testified on redirect that the FOLKS gang maintained a presence in the prison system.

The final defense witness was Sara Woodruff, a former FOLKS member. Much of her testimony consisted of a re-telling of the details of the crime at issue. TR 1967-69.

Samra was convicted of capital murder on March 16, 1998, based solely on the fact that two or more people were killed by one act or pursuant to one scheme or course of conduct. TR 2080. Upon commencement of the capital sentencing hearing, the prosecutor announced for the first time that the sole statutory aggravating circumstance that he would be relying upon to establish Samra's eligibility for the death sentence

would be that the crime was "heinous, atrocious and cruel." TR 2095. The jury recommended that Samra be sentenced to death, TR 2186, and the trial court agreed, finding Samra eligible for the death penalty based solely on the statutory aggravating factor that the capital offense was especially heinous, atrocious, or cruel. TR 2196.

**Facts Pertaining to Ineffective Assistance of Appellate Counsel Claim**

On April 6, 1998, the United States Supreme Court granted certiorari in the case of Jones v. United States to consider the relationship between "elements" of a criminal offense and "sentencing enhancements" under the federal carjacking statute. See 523 U.S. 1045 (1998). Samra's appellate counsel, who was the same attorney who represented Samra at trial (and so was the same attorney who had filed the motion seeking pre-trial notice of the statutory aggravating factors that the State would be relying upon to establish Samra's eligibility for the death penalty) failed to raise on appeal the claim that the State's failure to provide pre-trial notice of the statutory aggravating factors that it would be relying upon violated Samra's right to due process under the Eighth and Fourteenth Amendments. Counsel failed to do so, even though the Supreme Court handed down its decision in Jones on March 24, 1999, 526 U.S. 227 (1999), prior to the date that counsel filed Samra's notice of appeal with this Court. It is also worth noting that Apprendi v. New Jersey, 530 U.S. 466 (2000) -- which reinforced the principle that, when a fact increases a sentence beyond the maximum authorized statutory sentence – regardless of the term that is used to describe that fact – such fact "is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict" – was handed down on June 26, 2000, while Samra's petition for writ of

certiorari following the Alabama Supreme Court's decision on direct appeal was still pending in the United States Supreme Court.

**Post-Conviction Proceedings**

On October 1, 2001, Samra filed a petition for post-conviction relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. The petition was amended three times, with the Third Amended Petition being filed on August 16, 2002. Supplemental Record 1-24. The Third Amended Petition included a number of claims of ineffective assistance of counsel, all except one of which were resolved without an evidentiary hearing. The one claim warranting an evidentiary hearing was that Samra's trial and appellate counsel were ineffective for failing to investigate and present evidence of Samra's organic brain damage and brain dysfunction. The following is a summary of the evidence that was introduced at that hearing concerning Samra's organic brain damage and brain dysfunction.

**Samra's Witnesses**

Michael Gelbort, Ph.D.

Dr. Michael Gelbort testified to his February 3, 2002 neuropsychological examination and evaluation of Michael Samra. Dr. Gelbort has had extensive education and training to be qualified as a neuropsychologist, including an American Psychological Association approved internship, a Ph.D. in psychology, and a diplomate in forensic neuropsychology. R 102, 115. Importantly, he meets the national standards for a neuropsychologist, including a post-doctoral fellowship in neuropsychology and extensive, years long course work in such areas as neuroanatomy, functional

neuroanatomy, and neuropsychology. R 103-05. He practices in his specialty area,

performing and interpreting neuropsychological evaluations for over 20 years, conducting

some 500 neuropsychological examinations each year, and following up with treatment

of some patients for up to a decade or more. R 110-12. Dr. Gelbort distinguished between

a Ph.D. psychologist and a neuropsychologist as to training, education and areas of

specialization. R 117.

Dr. Gelbort described the results of the neuropsychological testing and evaluation

of Samra. First, he testified that on the Categories Test--a test of ability for complex

reasoning, problem solving and judgment--Samra was "way into the impaired range,"

with 51 errors, and he noted that the State's expert, Glen King, Ph.D., reported a

remarkably similar 52 errors in his testing of Samra. R 136-37, 141. The significance of

this extreme error rate was illustrated when Dr. Gelbort used a "normal curve" to

illustrate that with 95% confidence, there is no mistake that on this test, Samra shows

brain impairment. R 137-39. Dr. Gelbort made the point that you do not interpret brain

damage from any one single test, but rather from the aggregate of test scores.

Next, Dr. Gelbort distinguished between Samra's I.Q. scores and the results of his

neuropsychological testing.  Samra's full scale I.Q. is just above the 10th percentile,

meaning 88 percent of people have a higher I.Q. This translates to one standard deviation

[-1] on the normal curve. R 152. Neuropsychological testing, by contrast, looks at the

brain from front to back, side to side, top to bottom to determine if there is an

abnormality, where it is, and what it effects. R 150. Mostly, I.Q. tests tap overall thinking

abilities whereas neuropsychological tests look at the diffuse brain pattern and at

particular areas, frontal lobe, left side, right side. R 181. In Samra, the whole thing, the

whole I.Q. is suppressed but "there are parts that are even worse, and that's what you see

in Samra's pattern" of neuropsychological data. R 182.

Dr. Gelbort compared Samra's IQ score to his Categories test score stating:

Intellectually, [I.Q.score] when you lump a bunch of things together which
have to do with can you focus your attention, can you solve simple word
problems, he is below eighty-eight people out of a hundred.

When you get into more complex reasoning and problem solving and
judgment, the things that category test is made up of, now he's probably below
ninety-five out of a hundred people. He is further down the continuum. All of his
scores for the most part are at or below the middle of the average range, but many
of them especially ones having to do with neuropsychological function and higher
cognitive abilities, frontal lobe activities are pushed way down the continuum and
hence the eventual conclusion that his brain does not come from the normal
population.

R 152-53. Dr. Gelbort stated that whether you are retarded with 51 errors on the

categories test or if you are quite bright with a 51 score because of brain injury, you don't

think very well in that area. You have problems. R 257.

Most of Samra's neuropsychological test scores hovered at the deficient to

impaired range, overall, the bottom five percent of the population. R 153-54. For

example, the Trailmaking test results were in the bottom five percent, in the mildly

impaired range. R 158-59. The Memory scores were also consistent with the scores from

the Category and Trails tests. R 161. The MMPI scores dovetailed with the rest of the

tests. R 164.

Dr. Gelbort stated that in his opinion, to a reasonable degree of neuropsychological expertise, Samra suffers from brain dysfunction especially in portions of the brain including the frontal lobe, and these deficits date to his childhood. R 167-71.

Dr. Gelbort testified that his test results compared favorably to those of the State's expert, Dr. King, and show good test retest reliability. This in fact strengthens Dr. Gelbort's opinion because the results overlap. R 179. For example, the results of the WAIS were well below average, with lots of scores in the impaired range, a similar overlap with the scores Dr. Gelbort reported. R 179. Dr. King reached the same conclusion in his Impairment Index test results of .7, which "is clearly into the brain damaged or brain impaired range." R 178-79. Moreover, Dr. Gelbort noted that even though Dr. King used the WAIS outdated version the scores showed a similar overall pattern with Dr. Gelbort's results. R 179.

James Mountz, Ph.D., M.D.

Dr. Mountz testified as to his August 1, 2002 Radiology Report and films of the SPECT brain test on Samra. His Report corresponds with his testimony concerning a larger region of the brain to which he assigned -1 standard deviation ["SD"] below normal.[2] R 332, C 1110-11. During his testimony, Dr. Mountz stated that the -1 SD referred to a general area, but he focused repeatedly on Defense Exhibit 5, Sections 22, 23 and 24 of Samra's scans, honing in on the right side, at the nine o'clock position,

---

[2] Dr. Mountz testified that at -1 Standard Deviation Samra is within the lowest 15% of brain blood flow/brain functioning, and 85% of the population have a brain that is better functioning than Samra's. R 358-59.

where he found there exists an obvious abnormality to which he did not assign a numerical standard deviation. R 328-29.

Dr. Mountz explained that neuroimaging experts who have looked at thousands of scans are qualified to look at a SPECT scan and make a diagnostic interpretation. R 343, 346. Dr. Mountz stated that clinical standards do not require that standard deviation values be attributed to the resulting interpretation. Just as on an X-Ray where a radiologist sees a fracture "you don't need I don't think a normal database to look at that and say, well, there's an abnormality here. . . . [T]hat's the subjective aspect of this. So we look at these scans and we use both semi-quantitative and visual interpretation to interpret whether its abnormal by understanding the normal blood flow pattern." R 327. Referring to the abnormality found on Samra's SPECT scan, Dr. Mountz stated:

> I really don't believe for clinical purposes and I don't believe that most institutions actually do this in PET or SPECT. . . . A visual interpretation by an expert medical physician is usually sufficient to detect or describe abnormalities, at least what's normal, bottom range of normal and abnormal.

R 346.

Dr. Mountz stated unequivocally referring to Sections 22, 23 and 24 of Samra's scans, at the nine o'clock position, that this area of the brain is abnormal. R 328-30. Dr. Mountz had no choice in doing the SPECT test because he was required to do so by a court order. R 352. Dr. Mountz has never testified in any death penalty proceeding, indeed, he has never testified in any criminal proceeding whatsoever. R 310.

Dr. Mountz knows the difference between *clinical* diagnostic standards and *research* standards.[3] They are not the same, and they ought not to be confused with one another. Dr. Mountz made a *clinical* diagnosis of Samra in his clinical capacity at the UAB. He, like other neuroimaging experts, does not assign *research*-bound standards such as the statistical concept of standard deviations, to each and every finding in his clinical diagnoses. R 345-47.

Dr. Mountz explained that in making his diagnostic determination he both compares individual patients to a normal database and also subjectively interprets the scan to see if there are any areas of either increased or decreased blood flow beyond the normal range. "And that's done by again experience, by looking at many of these scans." R 326-27. Dr. Mountz believes that his clinical diagnosis of the abnormal findings on Samra's brain scan would be the same diagnosis reached by any objective expert who is experienced in interpreting brain scans. R 347-48.

Dr. Mountz distinguished a brain SPECT scan from an MRI: an MRI scan shows brain *structure*, gray and white matter; the SPECT scan shows blood flow to areas of the brain--brain *function*--by single proton emission computer tomography. SPECT scans measure function or activity of the brain, while MRI scans merely show anatomy. R 316. It is not uncommon for SPECT scans to show abnormalities that are not picked up on

---

[3] Dr. Mountz is eminently qualified to distinguish between clinical and research standards:  he chose a residency at the University of Michigan to focus on functional brain imaging; he ultimately became director of neuro nuclear medicine at the University of Michigan; and he developed the brain imaging protocol for the University of Alabama at Birmingham where he remained for over 10 years. He is equally qualified as a research scientist in the area of

MRI scans. This is because there may not be an anatomical [MRI] change, but there may be functional, physiologic changes in the function of the cells or of the arterial blood flow. SPECT scans are more sensitive, for they look at the actual molecular process as opposed to simply number of cells, the anatomy. R 317-18. Dr. Mountz testified that SPECT scans were available at UAB since 1988, 10 years prior to Samra's trial. R 320.

**State's Witnesses**

Glen King, Ph.D.

Glen King is a clinical psychologist and attorney. He attended a three-day training session, plus an examination, and in this way became a "forensic examiner" for the Alabama department of mental health and mental retardation. R 378-79. He conducts "neuropsychological test batter[ies]," although he has very limited experience in doing so in a forensic, legal setting. R 385. He does not hold a diplomate in neuropsychology from the American Board of Professional Psychology or from any other national group.[4] He has never been in a formal program for neuropsychological training. R 438-39. Dr. King does not call himself a neuropsychologist, and was not testifying in this case as one. R 433.

Dr. King conducted a neuropsychological test battery on Samra. Samra could do simple arithmetic, but starts having trouble with fractions and does not know how to do

brain imaging. His dense, 59 page resume lists more than 100 full manuscripts and some 250 published articles concentrating primarily on research in brain imaging. R 307-10, C 1045.

[4] Dr. King applied for admission to the American Board of Professional Psychology for a Diplomate in forensic psychology, but his work sample was rejected by the board committee,

any algebra. R 392. Dr. King also gave Samra an I.Q. test, determining that Samra had a full scale I.Q. of 79 and functioned at a borderline level of intelligence. R 396. On a test of sensory perception, Samra did "quite poorly" on a fingertip number writing exercise. Dr. King noted that this result was consistent with a test administered to Samra at age 8 at Emory University where he had "exceptional difficulty" with that task. R 399. On the test of language function, Samra showed signs of construction dyscrasia, the inability or difficulty in copying a shape, as well as right left disorientation and, again, he was unable to do arithmetic problems. R 402-03. On visual-spatial testing, he did poorly, leading Dr. King to conclude, "overall his visual spatial area probably is an area of impairment in my opinion." R 404.

On tests of cognitive function, Samra scored in the abnormal range with 52 errors on the category test. The category test, Dr. King said, "is probably the most sensitive of all the tests on the Retian battery for impairment." In addition, normal performance is 15 minutes or less. Samra's time was 33 minutes. "He was quite slow on that and showed impairment." R 405-06.

On the trail-making test Part A, he took sixty-one seconds "which is in the slightly impaired range," according to Dr. King. On Part B of the trailmaking test, Samra also did poorly. "[R]elative to other people who take the test, he was in the mildly impaired range on that as well. . . There is some impairment in his overall level of abstract reasoning, concept formation, problem solving ability." R 407.

---

and ultimately he "figured it would be better to be an attorney than a forensic psychologist. R 439.

Dr. King asked Samra about the crime, and concluded that "he appeared to me to be genuinely and extremely remorseful." R 417. Dr. King concluded that at the time of the offense, Samra was not suffering from any serious mental illness or mental defect that would render him incapable of understanding the nature and quality of his actions and the consequences of his behaviors. R 418.

Dr. King then stated that Samra did not have any brain disease like a brain tumor or vascular accident, but there was an argument in the field about whether somebody who is of borderline intelligence or mental retardation range is brain impaired. He then concluded that Samra has impairment of functioning consistent with one who is in the borderline range of intellectual abilities. R 421.

On cognitive abilities, Dr. King opined that Samra is functioning "certainly below average and probably in that borderline range of intellectual ability." R 422. Dr. King agreed with the findings of Dr. Gelbort, that on the test that was most sensitive to brain damage, the Categories test, that his results were essentially the same as Dr. Gelbort's. Dr. King's scores also agreed with Dr. Gelbort's on other tests, and in some instances showed an even greater indicia of impairment. R 441. For example, on the Trail Making test, Dr. King's results showed more impairment than did Dr. Gelbort's results. R 441-42. Dr. King also found an increase in the impairment index. R 442.

Helen Mayberg, M.D,

Dr. Mayberg is a neurologist. R 446. She described the importance of experience in interpreting the SPECT scan, stating that:

> Generally, the analysis of a brain scan or brain SPECT is done by virtually looking at the picture.  It's very personal but that you have learned over time what the normal distribution is of blood flow under the conditions that you are studying someone of what it should look like.
>
> . . .
>
> [T]here is a history of study of what the normal scan looks like that you then develop in your mind's eye as a clinician of what you expect to see….and that's clinical experience.  The more you see, the more you know like anything else.

R 456. She also described another possible option in reading SPECT scans, namely using a set of normative comparative groups who are healthy individuals, a higher standard. R 457-58.

Dr. Mayberg reviewed Dr. Mountz's SPECT report and found that it was a complete report containing all the elements expected in a SPECT report. R 462. She remarked that Dr. Mountz used such a normative control group, "as many particularly academic nuclear departments have." R 462. There are no scientific standards that help determine how big a normal control group should be. R 466.

Dr. Mayberg then discussed research standards relative to the use of probability in science and required to publish. Asserting that one standard deviation [-1 SD] was not an abnormality, Dr. Mayberg stated that if this was a scientific paper, you could not get it published because the standard for publishing is .05. R 471-72. Dr. Mayberg prefers -2SD (-2SD equals the lowest 2.5% of the population) and asserts that this is the scientific standard for finding an abnormality. R 472. Dr. Mayberg opined that at -1 SD (-1 SD equals the lowest 15% of the population), it's possible that a healthy individual could be mischaracterized as abnormal. R 472.

Dr. Mayberg admitted she mostly did research, and her control groups are research-related. R 469. She stated that it was not bad to write a clinical SPECT report without placing number values in the report, and there actually is no cutoff number the way there is on a test such as cholesterol level. R 473-74.

Dr. Mayberg criticized the use of SPECT tests to detect brain damage, but described her use of SPECT scans in experiments with healthy people who are made sad, made afraid, their mood altered because she is interested in depression and the areas of the brain that regulate mood. If she sees something indicating brain damage, it is too nonspecific. "Doctors want to know more than that. They already have something in their mind as to what they think the working diagnosis is." R 481.

Dr. Mayberg wrote an article in the Journal of Nuclear Medicine about her first experience testifying in a baby killer case in which a PET scan was used, in which she criticized the use of SPECT and PET scans in criminal trials. R 504, C 1112. She said that the opinion expressed in the article is still her opinion today. R 504.

Dr. Mayberg knows Dr. Mountz, and believes that he is a qualified nuclear medicine expert, and that he is qualified to look at a SPECT scan, as he did in this case, and make a determination as to abnormality. R 501.

**Facts Relevant to Successor Post-Conviction Proceedings**

On March 1, 2005, the United States Supreme Court decided <u>Roper v. Simmons</u>, 543 U.S. 551, prohibiting the execution of juvenile offenders (under 18 years of age), and overturning <u>Stanford v. Kentucky</u>, 492 U.S. 361 (1989), which had upheld the death penalty for offenders who were 16 years of age or older at the time of the crime.  Due to

Roper v. Simmons, co-defendant Michael Anthony Duke's death sentence was ultimately

vacated on May 27, 2005, because he was 16 years of age at the time of the occurrence of

the events.  See Duke v. State, 922 So.2d 179 (Ala. Crim. App. 2005).


### GROUNDS SUPPORTING PETITION FOR RELIEF

### I.  MR. SAMRA WAS DENIED HIS RIGHT TO A FAIR AND IMPARTIAL JURY UNDER THE SIXTH AND FOURTEENTH AMENDMENTS WHEN THE TRIAL COURT DENIED HIS MOTION FOR A CHANGE OF VENUE

A criminal defendant is entitled to a trial by an impartial jury "free from outside

influences."  Sheppard v. Maxwell, 384 U.S. 333, 351 (1966).  Due process mandates that

when there is pervasive, inflammatory pre-trial publicity, Rideau v. Louisiana, 373 U.S.

723 (1963), a defendant is entitled to a change of venue.  At trial, the defense presented

evidence of a telephone poll in Shelby County showing that 83.9% of the potential jurors

had heard information about the case.  Of those surveyed, 26.6% stated that they

believed, without having heard any evidence, that Mr. Samra was either guilty or

probably guilty.  Given the extensive pre-trial publicity in Shelby County concerning

these gruesome murders, due process dictated that a change of venue be granted.  The

trial court denied the motion to change the venue.  TR. 1-99.  The Alabama Criminal

Court of Appeals' (Samra v. State, 771 So.2d 1108 (Ala. Crim. App. 1999) and the

Alabama Supreme Court's decision denying Samra's motion for a change of venue, Ex

parte Samra, 771 So.2d 1122 (Ala. 2000) constituted an unreasonable application of, and

was contrary to, the United States Supreme Court's decisions in cases such as Sheppard

and Rideau; and it also involved an unreasonable determination of the facts in light of the

21

evidence in the record.  Consequently, Samra is entitled to a writ of habeas corpus,

vacating his conviction and granting a new trial.

## II.  MR. SAMRA WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF HIS TRIAL

The Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), set forth a

two-prong standard for evaluating ineffective assistance of counsel claims. See id. at 687,

696. First, the defendant must show that counsel's performance was deficient. Id. at 687.

While more specific guidelines are not appropriate, the inquiry must concern the

reasonableness of counsel's assistance considering all of the circumstances. See id. at

688-89. Moreover, the defendant must overcome the presumption that a challenged

action might be considered sound strategy. See id.

Second, the defendant must show that the deficient performance prejudiced the

defense; there must be a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different. See id. at 687, 694. In

making the determination whether the specified errors resulted in the required prejudice,

a court should presume that the decision maker is reasonably, conscientiously, and

impartially applying the standards that govern the decision. See id. at 695.

As was set forth above in the Statement of Facts, Samra suffers from organic brain

damage and brain dysfunction. Unfortunately, although Samra's trial counsel had hoped

to rely upon such evidence as his primary means of defeating the death penalty, he failed

to obtain such evidence due to his inadequate and ineffective investigation. Compounding

this problem, trial counsel then chose to pursue an alternative, bizarre strategy of

portraying his client as a Satan-worshipping, gang-banger without a conscience (an argument that one would expect the prosecution to make in favor of the death penalty) and not objecting to the prosecution's improper introduction of evidence that supported this theory. As described below, each of these actions – inadequately investigating and failing to present evidence of organic brain damage and brain dysfunction, arguing that his client was a Satan-worshipping gang-banger without a conscience, and failing to object to the prosecution's improper introduction of evidence — constituted ineffective assistance of counsel by themselves and cumulatively.

### A. Samra was Denied Effective Assistance of Counsel By Counsel's Failure to Adequately Investigate and Introduce Evidence of Organic Brain Damage and Brain Dysfunction

#### 1.  The Evidence is Clear That Samra Suffers From Organic Brain Damage and Brain Dysfunction

As described above in the Statement of Facts, Dr. Gelbort conducted a neuropsychological examination on Samra and, based on the results, concluded that Samra suffers from brain dysfunction. Moreover, Dr. Gelbort's test results were consistent in many respects with those of the State's expert, Dr. Glen King. R 179, 441-42.

In addition to Dr. Gelbort's conclusions, the testimony of James Mountz, Ph.D., M.D., showed that Samra had abnormally diminished blood flow to his brain as compared to normal, and in addition, a more pronounced abnormality, on Sections 22, 23 and 24 of Samra's scans, at the nine o'clock position. Dr. Mountz stated that his clinical diagnosis of the abnormal findings on Samra's brain scan would be the same diagnosis

reached by any objective expert experienced in interpreting brain scans. R 347-48. He made his diagnostic determination as do experienced neuroimaging experts who have looked at thousands of SPECT scans--using a visual interpretation. R 326-27, 343, 346. He also assigned a quantitative interpretation of -1 Standard Deviation [SD] to one brain area showing diminished blood flow. R 332, C 1110-11. In other words, Samra's brain damage put him at least in the bottom 15% of the population. R 358-59.

### 2.  Counsel's Failure to Investigate and Introduce This Powerful Mitigating Evidence Was Deficient

Although trial counsel stated that he relied on his expert Dr. Scott, and believed Dr. Scott was "a preeminent forensic psychiatry expert," counsel never followed up on Dr. Scott's clear, specific and pointed recommendations for further evaluation and testing including neuropsychological testing, and neuroimaging of Samra's head, which would include either a positron emission tomography [PET] or SPECT test. Although trial counsel prepared Dr. Scott's affidavit recommending SPECT scan and neuropsychological testing, trial counsel did not comply with these recommendations-- even though Dr. Scott stated in that Affidavit that these tests were necessary for a complete medical and psychiatric evaluation of Samra. R 268; C 1039-40.

In failing to reasonably investigate[5] Samra's organic brain damage as outlined by Dr. Scott, trial counsel's performance was deficient under Strickland. See 466 U.S. at 688. A number of jurisdictions have recognized that failure to perform testing that is

_____

[5] Trial counsel testified that he was told that SPECT scans were not available at the time of trial.  However, Dr. Mountz testified that he established the protocols for SPECT scans at the

requested by experts constitutes deficient performance and ineffective assistance of counsel. See e.g. Lockett v. Anderson, 230 F.3d 695 (5th Cir. 2000); Bean v. Calderon, 163 F.3d 1073 (9th Cir. 1998); Bloom v. Calderon, 132 F.3d 1267 (9th Cir. 1997); Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997); see also Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988) (finding IAC where counsel failed to present evidence of mental capacity in sentencing hearing); Blanco v. Singletary, 943 F.2d 1477 (11th Cir. 1991); Horton v. Zant, 941 F.2d 1449 (11th Cir. 1991).

The facts in Lockett are virtually indistinguishable from those in Samra's case. See 230 F.3d at 695. In Lockett, the defendant's mother retained a psychiatrist who informed counsel that an EEG, CT, and neuropsychological studies "were essential to providing a thorough and complete evaluation [of] the defendant." Id. at 712.  This language is almost identical to the language Mr. Scott used in his affidavit. C 1040 (stating that "these tests [neurological and neuropsychiatric testing, an MRI, and a PET or SPECT test] need to be conducted and the professionals consulted in order for Mr. Samra to have a complete and thorough psychiatric examination").

When counsel in Lockett made the decision to forego this testing, he was aware of the doctor's recommendation as well as the defendant's history of seizures and head trauma. Lockett, 230 F.3d at 712, 713. Despite the fact that counsel did perform some preliminary testing (including an MMPI), the Fifth Circuit found counsel's performance to be deficient. Id. at 712. As proof of counsel's inadequate investigation, and thus

University of Alabama at Birmingham medical center, and that SPECT scans were available there since 1988, 10 years prior to Samra's trial. R 320.

inadequate performance, the court considered a psychiatrist's testimony at the habeas proceeding that, had he been called as an expert, he would have recommended the medical testing that the trial doctor had recommended. Id.

As in Lockett, Samra's counsel was aware of his client's history of seizures and tremors and his own expert, Dr. Scott's, need for further neurological testing to complete his evaluation. C 989-90, 991, 1039. Had the results of the neurological testing performed by Dr. Gelbort and of the SPECT scan performed by Dr. Mountz been available to Dr. Scott at trial, his diagnosis of Samra more likely than not would have been that he suffered from brain damage. But like the recommendations of the psychiatrist in Lockett, Dr. Scott's recommendation for further neurological, neuropsychological and SPECT or PET testing were ignored.[6]

Trial counsel's performance fell well outside an "objective standard of reasonableness." Strickland, 466 U.S. at 688. Strong mitigating evidence was available to counsel and he failed to reasonably and adequately investigate and present it. Instead, he presented aggravating evidence at the sentencing hearing even though he thought that the sentencing phase was the main event because there was little chance of winning at the guilt phase. R 266.

### 3. Counsel's Performance Did Not Constitute a Reasonable Strategic Decision

---

[6] Lockett strongly suggests that trial counsel's belief that Dr. Scott's testimony would have been harmful, R 285, does not save his performance from being deficient, and in no way justifies not performing the necessary tests. See Lockett, 230 F.3d at 715, 716. Furthermore, the testing Dr. Scott recommended in his affidavit was independent of his report, and did not necessarily require Dr. Scott to testify.

Trial counsel thought that the sentencing phase was the main event because there was little chance of winning at the guilt phase. R 266. Counsel's failure to investigate and perform the testing that Dr. Scott found necessary does not constitute a reasonable strategy. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91; see Baxter v. Thomas, 45 F.3d 1501, 1514 (11th Cir. 1995). Moreover, trial counsel admitted that the court granted every request he made for experts. C 122-23. Failure to request testing when the court has granted every request for experts that was made is beyond the bounds of "reasonable professional judgments."

In Wiggins v. Sewall, 123 S. Ct. 2527 (2003), trial counsel failed to investigate the inmate's background and present mitigating evidence of his unfortunate life history at his capital sentencing proceedings. The evidence would have shown severe privation and abuse in the early years of his life, and diminished mental capacities. The Supreme Court held that counsel's decision not to expand their investigation beyond the pre-sentence report and social service department records fell short of professional standards.

The Court held that counsel have a duty to make reasonable investigations. A decision not to investigate "must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 2535. Focusing on the question of whether counsel's investigation supporting the decision not to introduce mitigating evidence of Wiggins' background was itself unreasonable, and

27

the Court concluded that the scope of counsel's investigation was unreasonable in light of what counsel discovered in the social service records. Id. at 2536. The Court stated that this unreasonableness of counsel for failure to investigate *thoroughly* resulted from "inattention" not reasoned strategic judgment. Id.

Here, as in Wiggins, counsel's failure to thoroughly investigate Samra's brain damage was not a strategic decision. This is especially so here in light of the testing recommendations of counsel's own preeminent expert, Dr. Scott, of trial counsel's belief that the main event was the sentencing phase, and of the trial court's unflinching willingness to grant counsel every request for expert assistance. Rather, Samra's counsel, like the counsel in Wiggins, abandoned the possibility of presenting brain damage as mitigation evidence and "put on a halfhearted mitigating case . . . taking . . . [a] shotgun approach." Id. 2537. Samra's counsel abandoned the recommendation of Dr. Scott to have neuropsychological testing conducted and having a SPECT or PET scan performed. Counsel's only explanation is that he was told that the UAB medical center lacked SPECT scan facilities, which of course, is patently false as Samra's own expert was working at and conducting SPECT scans at this facility for nearly 10 years prior to and for several years after Samra's trial. Counsel never stated that neuropsychological testing was unavailable at the time of trial. Counsel merely chose to abandon his investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible. Id. at 2527.

This decision was also not reasonable in light of the court's "approv[al] [of] every request for expert and investigative assistance that [trial counsel] made." C 303-04. In

fact, the trial court ultimately approved the neuropsychological and SPECT testing conducted on Samra in post-conviction. It would have been *reasonable* to assume from the court's generosity that it would also grant leave for a PET or SPECT scan. There is, however, no explanation for why Samra was not examined by a neurologist or neuropsychologist.

The benefit of hindsight, however, is not required here to see that more testing was necessary to constitute a full and reasonable investigation of Samra's mental condition. When faced with the recommendations of a psychiatrist, and a court that has granted requests for experts without exception, "no competent counsel" would have decided not to pursue further examination and testing. See Chandler v. U.S., 218 F.3d 1305, 1315 (11th Cir. 2000).

His "strategic decision" to cease investigation into Samra's mental defects was a "strategic choic[e] made after less than complete investigation." Strickland, 466 U.S. at 690-91. No "reasonable professional judgments support[ed] the[se] limitations on investigation." Id.

### 4. Counsel's Failures Prejudiced Samra

Counsel's failures prejudiced Samra's defense at the capital sentencing hearing in that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the proceedings." Wiggins at 123 S. Ct at 2542.

Had Samra's sentencing phase jury and court been confronted with this powerful mitigating evidence, there is a reasonable probability that it would have returned a different sentence. "Clearly, there [can be] no more mitigating evidence than some sort of organic brain damage or mental deficiency." Mincy v. Head, 206 F.3d 1106, n. 26 (11th Cir. 2000). See also Frazier v. Huffman, 343 F.3d 780 (6th Cir. 2003)(ineffective assistance for failure to investigate and present evidence of functional brain impairment in mitigation phase); Glen v. Tate,  71 F.3d 1204 (6th Cir. 1995)(prejudice clear where counsel failed to investigate evidence of Samra's organic brain damage); Brewer v. Aiken, 935 F.2d  850, 861-62 (7th Cir. 1991)(Easterbrook, J., concurring, citing empirical that, while juries tend to distrust claims of insanity, they are more likely to react sympathetically when their attention is drawn to organic brain problems); Loyd v. Whitley, 977 F.2d 149, 159-160 (5th Cir. 1992)(failure to present mitigating evidence of substantial mental defects "undermines our confidence in the outcome"); Smith v. Singletary, 61 F.3d 815(11th Cir. 1995)(sentencer's failure to consider evidence of, *inter alia*, brain damage as mitigation had a substantial and injurious effect on sentencing); Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988)(where counsel failed to present evidence of mental capacity in sentencing hearing "the resulting prejudice is clear"); Blanco v. Singletary, 943 F.2d 1477 (11th Cir. 1991)(prejudice requirement "clearly met" by counsel's failure to present evidence of organic brain damage); Horton v. Zant, 941 F.2d 1449 (11th Cir. 1991).

As described more fully below in Section II(B) of this Brief, the sentencing court and jury heard only one mitigating factor, which was actually an aggravating factor,

namely that Samra was a member of a gang that worshiped Satan, distributed drugs, and elevated members who killed their own mothers. Trial counsel brought this up during cross of prosecution witnesses, devoted all defense witness testimony to emphasizing this association, and carried it through his closing arguments in both the guilt and penalty phases.[7] He also presented expert testimony that Samra lacked a conscience and remorse. This strategy was unreasonable, and Samra was severely prejudiced by it. Samra was nineteen at the time the crime was committed, he had been enrolled in special education classes from second through eighth grade, he suffers from organic brain damage, and Samra had not previously been involved in any violent crime. See Bean, 163 F.3d at 1081 (finding prejudice where the jury had no knowledge of childhood developmental delays, including placement in classes for the "educable mentally retarded"). Instead of arguing organic brain damage, which he could have easily substantiated by conducting the testing recommended by counsel's expert, Dr. Scott, counsel chose to argue that Samra was a devil-worshipping, drug-selling, potentially mother-killing, gang-banger. This decision could hardly have been more prejudicial. Clearly, there is at least a reasonable probability that the result of the sentencing hearing would have been different, had that evidence been introduced.

---

[7] While many of these errors committed by counsel occurred during the guilt phase, in determining prejudice in the penalty phase, the Court must consider the "effect of events occurring during the [guilt phase] upon the jury's decision in the [penalty phase]." See Magill v. Dugger, 824 F.2d 879, 888, 889 (11th Cir. 1987) (citing Smith v. Wainwright, 741 F.2d 1248, 1255 (11th Cir. 1984)).

**5. The Decision of the Alabama Court of Criminal Appeals on This Issue was Contrary to, and Involved an Unreasonable Application of, the Supreme Court's Decisions in <u>Strickland v. Washington</u> and <u>Wiggins v. Sewall</u>**

The Alabama Court of Criminals Appeals affirmed the trial court's denial of Samra's claim for two reasons.

First, that court concluded that counsel's efforts did not fall below reasonable professional norms because the court believed that counsel had a coherent, well thought-out defense strategy, and had no reason to believe that additional testing and analysis were warranted. <u>Samra v. State of Alabama</u>, Memorandum Opinion at 12. However, as discussed above, counsel's own expert recommended that a SPECT test and further analysis be performed, and counsel simply failed to follow through on that recommendation. Under the Supreme Court's decisions in cases such as <u>Strickland</u> and <u>Wiggins</u>, strategic choices based on an incomplete investigation into mental health evidence can never be deemed to be reasonable; and the Alabama Court of Criminal Appeals' decision otherwise constituted an unreasonable application of, and was contrary to, the United States Supreme Court's decisions in those cases.

Second, the Alabama Court of Criminal Appeals believed that there was not a reasonable probability that the result of the sentencing hearing would have been different had this additional evidence been discovered by counsel. <u>Samra v. State of Alabama</u>, Memorandum Opinion at 12-16. As described above, however, that court's decision involved an unreasonable application of, and is contrary to, the Supreme Court's

decisions in cases such as <u>Strickland</u> and <u>Wiggins</u>, concerning the powerful impact that evidence of organic brain damage can have on capital sentencing determinations.

In sum, Samra was denied his right to effective assistance of counsel at his sentencing hearing due to his counsel's failure to investigate and introduce evidence of organic brain damage and brain dysfunction, and the Alabama Court of Criminal Appeals' decision to the contrary involved an unreasonable application of, and is contrary to, the Supreme Court's decisions in cases such as <u>Strickland</u> and <u>Wiggins</u>. Consequently, Samra is entitled to a writ of habeas corpus vacating his sentence of death.

## B.  Samra Was Denied Effective Assistance By Trial Counsel's Presentation of Mitigating Evidence That Was Actually Aggravating

Not only was counsel ineffective in failing to present available and appropriate mitigating evidence, as indicated above, but he also presented evidence that was in fact aggravating. As described in the Statement of Facts, trial counsel repeatedly argued to the jury that Samra was a member of a gang that worshiped Satan, distributed drugs, had a strong presence in prison, and elevated members who killed their own mothers. He alluded to it in voir dire, brought it up again during cross-examination of prosecution witnesses, devoted all defense witness testimony to emphasizing this association, and carried it through his closing arguments in both the guilt and penalty phases.  Counsel also presented expert testimony that Samra lacked a conscience, remorse, and emotionality. While presentation of the aggravating circumstances was done under the auspice of strategy, that strategy was unreasonable and the evidence presented severely prejudiced the defense. Thus, the assistance rendered by counsel was ineffective under

Strickland.[8] But for counsel's failures in both the guilt and penalty phases, there is a reasonable probability that Samra's penalty phase would not have resulted in a sentence of death. See Strickland, 466 U.S. at 694.

## 1. Trial Counsel's Performance was Deficient

Many courts have found that presentation by defense counsel of aggravating evidence constitutes deficient performance and ineffective assistance. See, e.g., Magill, 824 F.2d at 879(finding IAC where trial counsel's psychiatrist testified that the defendant was not suffering from any mental or emotional problems at the time of the crime); Horton, 941 F.2d at 1449(holding that counsel's performance was deficient where he attacked his client's character and "virtually encouraged the jury to impose the death penalty"); Thomas-Bey v. Nuth, 67 F.3d 296 (4th Cir. 1995)(finding IAC where counsel's failure to attend a psychiatric evaluation led to damaging testimony at trial); Moore v. Johnson, 194 F.3d 586 (5th Cir. 1999) (finding that defense counsel eliciting damaging testimony from a prosecution witness, that the state would not have otherwise presented, constituted ineffective assistance of counsel); Combs v. Coyle, 205 F.3d 269 (6th Cir. 2000) (finding assistance to be ineffective where defense counsel called a psychiatrist who testified that the defendant was emotionally distressed, but did not lack

---

[8] While many of the errors committed by counsel occurred during the guilt phase, the court must consider the "effect of events occurring during the [guilt phase] upon the jury's decision in the [penalty phase]." Magill, 84 F.2d at 888 (citing Wainwright, 741 F.2d at 1255). The guilt phase in Samra's case likely had a strong impact on the penalty phase, due in part to the court's instruction that the jury should consider all evidence from the guilt phase in the penalty phase. TR 2091-92. See Magill, 84 F.2d at 889 (finding that it was "likely that events during the guilt phase had an unusually strong impact upon the outcome of the penalty phase" where "the trial court specifically instructed the jury at the end of the penalty phase that it should

the requisite intent); <u>Acker v. State</u>, 787 So.2d 77 (Fla. Dist. Ct. App. 2001)(finding

ineffective assistance where defense counsel produced a witness that presented both

favorable and damaging testimony, regarding the defendant's whereabouts the night of

the crime); <u>Christy v. Horn</u>, 28 F. Supp. d 307 (W.D. Pa. 1998)(holding that counsel was

ineffective in presenting damaging character evidence); <u>State v. Nolan</u>, 605 N.E.2d 480

(Ohio Ct. App.), <u>appeal denied</u>, 602 N.E.2d 253 (Ohio 1992)(finding ineffective

assistance where trial counsel introduced evidence of defendant's involvement with the

Ku Klux Klan); <u>State v. Gunsby</u>, 670 So. 2d 920 (Fla. 1996) (finding ineffective

assistance where counsel presented experts that testified that the defendant had no

impairments when he was actually mentally retarded and had organic brain damage);

<u>Waldrop v. State</u>, 506 So. 2d 273 (Miss. 1987)(finding ineffective assistance where

counsel elicited prejudicial, inadmissible evidence of other crimes that were highly

prejudicial to the defense); <u>Warner v. State</u>, 729 P.2d 1359 (Nev. 1986)(counsel rendered

ineffective assistance when he presented a defense witness that was damaging to the

defendant).

     Under the standard laid out by the Eleventh Circuit in <u>Magill</u>, trial counsel's

performance was deficient. <u>See</u> 824 F.2d at 879. In <u>Magill</u>, the court found deficient

performance where trial counsel's psychiatrist presented the "devastating blow" that the

defendant felt remorse, but was not suffering from any mental or emotional problems at

the time of the crime. <u>Id.</u> at 881-82. The testimony of Dr. Ronan was far more harmful

---

consider the evidence presented during the guilt phase in making its sentencing
recommendation").

than that in <u>Magill</u>. Not only did Dr. Ronan testify that Samra suffered from no psychological disorder or mental disease, TR 1912, but she continued on to describe Samra as without a conscience, emotionality, or remorse, TR 1913, 1924-26. This testimony not only contradicted the valid mitigating theory that Samra was emotionally disturbed, but also presented new aggravating evidence that the prosecution had no intention of presenting. Dr. Ronan's testimony that the killings were *not* gang-related also contradicted trial counsel's strategy of showing that Samra was under the influence of a gang at the time of the offense.

Trial counsel should have been aware of the potentially damaging nature of Dr. Ronan's testimony before he decided to put her on the stand. In her report, Dr. Ronan plainly stated that Samra "does not suffer from any type of major psychiatric disorder" and understood the difference between right and wrong. TR 1912-13. While counsel may not have been aware that Dr. Ronan would testify that the offense was not gang-related (as it was not part of the doctor's affidavit), he had a duty to know this and was ineffective for not knowing it. <u>See Magill</u>, 824 F.2d at 887. Counsel's performance was deficient for presenting Dr. Ronan's testimony when counsel knew, or should have known, of the potentially damaging nature of her testimony. <u>See Id.</u> at 881-82; <u>Combs</u>, 205 F.3d at 269 (finding ineffective assistance where counsel presented a psychiatrist who presented both damaging and favorable testimony); <u>Acker</u>, 787 So. 2d at 77 (finding ineffective assistance where counsel called a witness who presented evidence that was both damaging to and favorable to the defendant).

## 2. Trial Counsel's Deficient Performance was *Not* Part of a Reasonable Strategy

While counsel based his decision to present this aggravating evidence on a chosen strategy, that strategy was egregiously unreasonable. Even though strategic decisions are "virtually unchallengeable," trial counsel's strategy failed to meet the requisite objective standard of reasonableness both on its face and in that it was based on limited investigation. See Strickland, 466 U.S. at 690-91; see also Baxter, 45 F.3d at 1514 ("[a]n attorney's decision to limit his investigation, however, must flow from an informed judgment"; rejecting the idea that "a strategic decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice among them" (internal quotations omitted)). This decision was especially unreasonable in light of the legitimate strategy that would have been available to counsel if a proper investigation and proper testing had been completed: that Samra's brain damage mitigated against imposition of the death penalty. Had trial counsel been effective in investigating evidence of Samra's organic brain dysfunction, trial counsel would not have abandoned his original strategy of arguing that Samra had a mental defect which made him less culpable. Consequently, due to trial counsel's ineffectiveness in investigating Samra's mental disabilities, trial counsel unreasonably bound himself to introduce damaging evidence of Samra's alleged background in its place.

Trial counsel's ultimate strategy consisted of two parts, both of which were unreasonable and highly prejudicial to Samra. At the guilt phase, counsel wanted to prove to the jury that Samra's gang involvement actually served as a mitigating factor to

explain why he was forced to commit the acts. TR 1901. This was not a reasonable

strategy in that the evidence served to *aggravate* rather than mitigate or explain, and

counsel's own witnesses contradicted counsel's theory. Then, at the penalty phase,

counsel wanted to "humanize Samra . . . [so the jury wouldn't] be left with the image that

the prosecutor had created of [him]." C 311. Following extensive testimony that Samra

followed Satan and was a member of a violent, satanic gang that distributed drugs, it was

severely *unreasonable* to attempt to "humanize" him in this way at the penalty phase.

        Counsel's strategy of arguing that the influence of the FOLKS gang was

responsible for the killings was not reasonable because it was aggravating and was not

supported by the evidence. Membership in a violent gang that sells drugs is a factor used

to support arguments *against* mitigation. The Supreme Court recognized the power of

this argument when it put limitations on prosecutorial admission of gang association. See

Dawson v. Delaware, 503 U.S. 159 (1992). In no part of the Dawson decision did the

Supreme Court mention potential introduction of gang evidence by defense counsel, thus

implicitly acknowledging that there would be no *reasonable* grounds for the defense's

use of such evidence. Membership in a gang that is violent and distributes drugs goes to

show that someone is criminal, not that someone is innocent or does not deserve the death

penalty. Even if counsel thought gang involvement could show that Samra was not

independently responsible for his actions, counsel has a duty to "minimize the dangers of

his decision[s]." Magill, 824 F.2d at 887. These strategic decisions involved nothing but

danger. All the defense witnesses primarily aided the prosecution and severely harmed

Samra's chances of receiving a sentence of life without parole.

The decision to devote the penalty phase to "humaniz[ing]" Samra was not at all reasonable in light of the evidence presented during the guilt phase. This strategy contradicted counsel's guilt phase strategy of presenting Samra as under the influence of the violent FOLKS gang, such that he was not responsible for his own actions. The penalty phase was too late in the process to start telling the jury what a "good, loving, obedient child," TR 2113, Samra was. Counsel had already succeeded in making Samra into an inhuman follower of evil who fraternized with people who rewarded killing one's own mother.

In fact, trial counsel had a very reasonable strategy available to him. He could have legitimately argued that Samra's organic brain damage was a mitigating factor. Counsel's affidavit demonstrated that counsel did in fact consider this strategy when he said that he wanted to "show that no sane person could have committed this crime." C 309. He made a conscious decision not to follow this strategic path when he ignored the advice of Dr. Scott and failed to conduct further investigation into Samra's brain damage. "Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91. Instead of arguing organic brain damage, which he could have easily substantiated through further testing, counsel chose to argue that Samra was a devil-worshipping, drug-selling, potentially mother-killing, gang-banger. Trial counsel's decision was therefore unreasonable.

### 3.  Trial Counsel's Deficient Performance Prejudiced the Defense

Counsel's repeated presentation of evidence regarding Samra's affiliation with a satanic gang prejudiced the defense such that there is a reasonable probability that, but for counsel's deficient performance, the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695-96.

The Eleventh Circuit has found prejudice where counsel failed to present evidence of actual emotional disturbance and chose instead to present an expert witness who testified that the defendant was *not* under the influence of any emotional disturbance. See Magill, 824 F.2d at 889-91.  Samra's case for prejudice is even stronger. Not only did counsel fail to investigate and present evidence of Samra's organic brain damage, but the aggravating information presented by Samra's counsel far surpassed the negative impact of the expert testimony in Magill. In addition to Dr. Ronan's testimony that Samra was not mentally ill, knew the difference from right and wrong, and lacked a conscience, remorse, and emotionality, trial counsel further prejudiced his own client's defense by belaboring Samra's satanic gang affiliation. Even the prosecution had no intention of presenting this evidence before trial counsel decided to "ope[n] doors [they] didn't have open."  TR 1490.

The argument in favor of finding prejudice appeals not just to precedent, but also to logic. Where a jury hears the defendant's own counsel, who is supposed to be the defendant's strongest advocate, stating over and over again that the defendant worships the devil, was a member in a gang where elevation in the ranks involved killing one's

own mother, and the gang was involved in drug distribution, it is difficult *not* to find

prejudice. Trial counsel portrayed Samra as exactly the kind of person that the jurors

would want to sentence to death. Trial counsel described Samra to the jury as evil and

dangerous. Trial counsel said Samra associated with people who celebrated murder and

illegal drug distribution. Trial counsel was perhaps the strongest advocate *for* imposition

of a death sentence on Samra.

   Trial counsel's statements led the jury to conclude that the crime was committed

by a gang-banger who worshipped the devil and had no conscience, making the crime

"heinous, atrocious, and cruel." Thus, trial counsel's performance exacerbated the single

aggravating factor that the jury considered, and argued against potential mitigating

factors (such as organic brain damage and no previous history of violent activity).

   "The jury's weighing of aggravating and mitigating circumstances is always a

delicate process, and it is difficult to predict with certainty the effect which constitutional

errors had upon that weighing process." <u>Magill</u>, 824 F.2d at 890 (internal citations

omitted).  Under the circumstances of Samra's trial, one cannot help but doubt the

reliability of the outcome. <u>See</u> <u>Strickland</u>, 466 U.S. at 694. In light of trial counsel's

inadequate investigation and actual presentation of aggravating evidence, there is more

than a "negligible chance" that a reasonable jury would have recommended and a

reasonable jury would have decided against a death sentence. <u>Miller v. Anderson</u>, 255

F.3d 455, 459 (7th Cir. 2001) (citing <u>Strickland</u>, 466 U.S. at 694). But for trial counsel's

presentation of Samra as a gang-banger who worshipped Satan, coupled with counsel's

failure to present evidence that Samra suffered from absence seizures and organic brain

damage, there is a reasonable probability that the result of the sentencing hearing would have been different, and Samra would not have been sentenced to death.

>    **4.  The Decision of the Alabama Court of Criminal Appeals on This Issue was Contrary to, and Involved an Unreasonable Application of, the Supreme Court's Decisions in <u>Strickland v. Washington</u> and <u>Wiggins v. Sewall</u>**

The Alabama Court of Criminal Appeals adopted the trial court's conclusion for rejecting Samra's claim, who in turn had dismissed this claim for the reasons described above with respect to Section II(A) of this Petition:  the trial court believed that trial counsel had no choice but to pursue the strategy that he did.  <u>Samra v. State</u>, No. CR-04-0879. Memorandum Opinion at 17-21.  For the reasons described above, Samra submits that there was ample additional evidence that trial counsel could have introduced, had he only followed the recommendations of his expert, Dr. Scott; and for the reasons described above, the Alabama Court of Criminal Appeals' decision rejecting the claim involved an unreasonable application of, and is contrary to, the Supreme Court's decisions in cases such as <u>Strickland</u> and <u>Wiggins</u>.  Consequently, Samra is entitled to a writ of habeas corpus vacating his sentence of death.

>    **C.  Samra Was Denied Effective Assistance By Trial Counsel's Failure to Adequately Object to the Admission of Pictures of Wall Etchings, "Gang-Type" Writings, and Tattoos on Samra's Arms, in Violation of the Eighth Amendment.**

Trial counsel's ineffectiveness in introducing aggravating evidence was exacerbated by his failure to adequately object to the improper admission of a videotape and slides depicting etchings and "gang-type writings" in Mark Duke's bedroom, TR. 1587-88, 1602-03, as well as photographs of Samra's tattoos, TR 1619-20. Federal Rule

of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. First, it is not clear that Samra's involvement in the FOLKS gang is relevant to guilt or sentencing determinations for the murders at issue. See U.S. v. Hands, 184 F.3d 1322, 1327 (11th Cir. 1999)(finding that photographs depicting spousal abuse committed earlier by defendant are irrelevant to cocaine distribution and conspiracy charges.)

Even if Samra's gang affiliation is relevant, this evidence fails the balancing test set out in Federal Rule of Evidence 403. When the probative value of evidence is outweighed by its prejudicial effect, such evidence may be excluded. The nature of the evidence presented by the State has minimal probative value, considering that Samra conceded his involvement in the FOLKS gang. See Hands, 184 F.3d at 1328 (minimal probative value attached to photographs of spousal abuse when defendant conceded to committing such action.)

However, the prejudicial effect of the visual evidence of gang involvement is considerable, given the "'public stigma'" attached to gang membership. See Hands, 184 F.3d at 1329, quoting, State v. Zamudio, 57 Ore. App. 545, 551 (1982). Such a stigma is "'particularly likely to incite a jury to an irrational decision,'" Hands, 184 F.3d at 1328, quoting, U.S. v. Church, 955 F.2d 688, 702 (11th Cir. 1992). But for the admission of this evidence, the outcome of Samra's sentencing phase would have been different.

The Alabama Court of Criminal Appeals adopted the trial court's conclusion for rejecting Samra's claim, who in turn had dismissed this claim for the reasons described

above with respect to Sections II(A) and II(B) of this Petition: the trial court believed that trial counsel had no choice but to pursue the strategy that he did. <u>Samra v. State</u>, No. CR-04-0879. Memorandum Opinion at 21-22. For the reasons described above, Samra submits that there was ample additional evidence that trial counsel could have introduced, had he only followed the recommendations of his expert, Dr. Scott; and for the reasons described above, the Alabama Court of Criminal Appeals' decision rejecting the claim involved an unreasonable application of, and is contrary to, the Supreme Court's decisions in cases such as <u>Strickland</u> and <u>Wiggins</u>. Consequently, Samra is entitled to a writ of habeas corpus vacating his sentence of death.

### 4. The Cumulative Effect of Each of These Instances of Ineffectiveness Prejudiced Samra

As described above, each of these instances of ineffectiveness violated Samra's rights under the Sixth and Fourteenth Amendments. However, if this Court disagrees, Samra submits that the cumulative effect of these instances deprived him of a fair sentencing proceeding, and the Alabama Court of Criminal Appeals' decision rejecting the claim involved an unreasonable application of, and is contrary to, the Supreme Court's decisions in cases such as <u>Strickland</u> and <u>Wiggins</u>. Consequently, Samra is entitled to a writ of habeas corpus vacating his sentence of death.

## III.. MR. SAMRA WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL

The right to effective assistance of counsel also applies to direct appeal. <u>Evitts v. Lucey</u>, 469 U.S. 387 (1985). The test for evaluating "prejudice" in claims of ineffective

assistance of appellate counsel is whether there is a reasonable probability that the claim would ultimately prevail. Clark v. Crosby, 335 F.3d 1303, 1312 n.9 (11th Cir. 2003).

It has long been clear that, under the Due Process Clause of the Fourteenth Amendment, a criminal defendant is entitled to pre-trial notice of the elements of the crime with which he is charged so that he has a fair opportunity to meaningfully address those elements. See Olsen v. McFaul, 843 F.2d 918, 931 (6th Cir. 1988), citing Cole v. Arkansas, 333 U.S. 196, 201 (1948). As the Sixth Circuit explained in Olsen, 843 F.2d at 931:

> The due process clause of the Fourteenth Amendment mandates that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him to permit adequate preparation of his defense. See, e.g., In Re Ruffalo, 390 U.S. 544, 88 S. Ct. 1222, 20 L. Ed. 2d 117 (1968); Blake v. Morford, 563 F.2d 248 (6th Cir. 1977); Watson v. Jago, 558 F.2d 330, 338 (6th Cir. 1977). This requires that the offense be described with some precision and certainty so as to apprize the accused of the crime with which he stands charged. Such definiteness and certainty are required as will enable a presumptively innocent man to prepare for trial. Combs v. Tennessee, 530 F.2d at 698.

In federal prosecutions, the Fifth Amendment requires that this notice be provided via indictment. In state prosecutions, notice may be provided via indictment or other means, so long as notice is provided sufficiently in advance of the proceeding to enable the defendant a meaningful opportunity to prepare a defense. See Denton v. Duckworth, 873 F.2d 144, 149 (7th Cir. 1989); Koontz v. Gloss, 731 F.2d 365, 369 (6th Cir. 1984).

Samra specifically moved that the State be required to identify the statutory aggravating circumstances set forth in Ala. Code 1975, § 13A-5-49 that the State intended to prove at the sentencing hearing. TC 320. The prosecutor initially refused, TR

94, but then proceeded to incorrectly state that "the aggravating circumstances are very straightforward in the indictment," TR 95. In fact, the indictment only set forth the elements necessary to convict Samra of capital murder under Ala. Code 1975, § 13A-5-40(a)(10): it did not address in any way which aggravating circumstances (if any) the State intended to prove at the sentencing hearing to establish Samra's eligibility for the death penalty.[9] The trial court denied Samra's motion, TR 95, and so no notice was ever provided to Samra prior to the sentencing hearing of the statutory aggravating circumstances that the prosecutor would be relying on.

On April 6, 1988, the United States Supreme Court agreed in the case of Jones v. United States to consider the relationship between "elements" of a criminal offense and "sentencing enhancements" under the federal carjacking statute. See 523 U.S. 1045 (1998). The case followed a long line of cases where the Court had suggested that

> [U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.

Jones v. United States, 526 U.S. 227, 243 n.6 (1999).

As the Court subsequently explained in Apprendi, this principle means that, when a fact increases a sentence beyond the maximum authorized statutory sentence –

---

[9] The indictment specified that that Samra committed the offense of capital murder due solely to the fact that two or more people were killed by one act or pursuant to one scheme or course of conduct. See TC 7 (original indictment), TC 484 (amended indictment). Of course, at that time, the fact that two or more people were killed by one act was not an aggravating circumstance under Ala. Code 1975, § 13A-5-49, see Ponder v. State, 688 So.2d 280, 283-85 (Ala. Crim. App. 1996), and so nothing in the indictment provided Samra with notice of which statutory aggravating circumstance the State would be relying upon to establish Samra's eligibility for the death penalty.

regardless of the term that is used to describe that fact – such fact "is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an 'element' of the offense." Apprendi, 530 U.S. at 494 n. 19 (citing Thomas, J., concurring, Id. at 500-501).

In sum, longstanding Supreme Court caselaw makes clear that (1) criminal defendants have a procedural due process right to advance notice of the elements of the crimes for which they are charged, (2) this advance notice must be provided via indictment in federal prosecutions but, in state prosecutions, may be provided in other ways, and (3) the "elements" of a crime include any fact (other than prior conviction) that increases the maximum penalty for a crime.

Ala. Code 1975, § 13A-5-45(f) provides that, "[u]nless at least one aggravating circumstance as defined in Section 13A-5-49 exists, the sentence shall be life imprisonment without parole," and that aggravating circumstance must be established beyond a reasonable doubt. Therefore, the aggravating circumstances in Section 13A-5-49 (Ala. Code 1975, § 13A-5-49) are "elements" of the crime under Alabama's capital sentencing scheme. Hence, under the due process principles described above, Samra was entitled to pre-trial (or at least pre-sentencing hearing) notice of the statutory aggravating circumstance or circumstances that the State would be relying upon in attempting to prove his eligibility for the death penalty.

Samra's trial counsel recognized Samra's right to advance notice of the statutory aggravating circumstances that the prosecutor was intending to prove because he

specifically filed a motion requesting such notice. TC 320. It is inexplicable that counsel

subsequently failed to raise this issue on direct appeal, particularly in light of the fact that

the Supreme Court had granted certiorari in <u>Jones v. United States</u> on April 6, 1998 (523

U.S. 1045 (1998)), one full month before the Samra's Notice of Appeal was filed with

this Court on direct appeal. Counsel's failure to do so constituted ineffective assistance of

counsel. <u>See</u> <u>Richey v. Mitchell</u>, 395 F.3d 660, 681 (6th Cir. 2005) ("counsel can even be

ineffective for failing to raise a legal claim that turns on an unresolved question of law, so

long as counsel is aware that an unresolved issue exists").

     The Alabama Court of Criminal Appeals correctly articulated Samra's claim:  that

Samra received ineffective assistance of appellate counsel by failing to argue that his

rights were violated under the Eighth and Fourteenth Amendments when "the prosecutor

failed to provide advance notice of the statutory aggravating circumstances that the State

would be attempting to prove in order to establish Samra's eligibility for the death

penalty." <u>Samra v. State</u>, No. CR-04-0879, Memorandum Opinion at 7.  As described

above, Samra's claim is based primarily on longstanding precedent and the Supreme

Court's decision in <u>Jones</u>; this claim is not based or dependent on the Supreme Court's

subsequent decision in <u>Ring v. Arizona</u>, 536 U.S. 584, 589 (2002), which held that

"capital defendants . . . are entitled to a jury determination on any fact on which the

legislature conditions an increase in their maximum punishment."  The Alabama Court of

Criminal Appeals, however, rejected Samra's argument, because the Alabama Court of

Criminal Appeals mischaracterized Samra's claim as being that counsel could not have

been ineffective in not anticipating the Supreme Court's decision in <u>Ring</u> pertaining to

the need for jury determination on facts which increase the maximum punishment.

Samra v. State, No. CR-04-0879, Memorandum Opinion at 7-8.  In short, the Alabama

Court of Criminal Appeals simply did not adjudicate the merits of Samra's claim, which

was based upon the prosecutor's failure to provide notice of the statutory aggravating

factors.

   Under these circumstances, the standards for adjudication set forth in Section

2254(d) simply do not apply:  the proper standard of review for this Court to apply in

these habeas proceedings is de novo.  Davis v. Crosby, 341 F.3d 1310, 1313 (11th Cir.

2003) (per curium). Alternatively, the Alabama Court of Criminal Appeals' decision

constituted an unreasonable application of, and was contrary to, the United States

Supreme Court's decisions in cases such as Jones and Cole; and it also involved an

unreasonable determination of the facts in light of the evidence in the record.  In any

event, Samra is entitled to a writ of habeas corpus, vacating his sentence of death.

## IV. SAMRA'S SENTENCE OF DEATH VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS GIVEN THAT HIS MORE CULPABLE CO-DEFENDANT HAD HIS DEATH SENTENCE VACATED AND IS NOT ELIGIBLR TO BE SENTENCED TO DEATH

   The less culpable Samra remains on death row awaiting his execution while his

more culpable co-defendant, Duke, has had his death penalty vacated, and indeed is not

eligible to be re-sentenced to death.  Courts in Alabama – specifically the Shelby Circuit

Court in Gamble v. State, Final Order, September 5, 2007 [hereafter "Gamble Final

Order"] – have held that such circumstances would violate the Eighth Amendment.  That

Court held that to allow a co-defendant to be sentenced to death while the more culpable

co-defendant is prohibited from being sentenced to death based on his age would be arbitrary, disproportionate, and fundamentally unfair. <u>Gamble</u> Final Order at 130-131.

As he did in <u>Gamble</u>, the Attorney General, in his amici curiae brief on behalf of the State of Alabama to the United States Supreme Court in <u>Roper v. Simmons</u>, used Samra and Duke as examples of the inequities that would result if the Court were to bar the execution of juveniles offenders:

> Both Duke and Samra were sentenced to death for their roles in the quadruple murders. ...Under the bright-line rule advanced by respondent, Duke—who was by all accounts the mastermind and ring-leader of the attack, and was in any event the trigger-man (or knife-wielder, as the case may be) in three of the four murders— would escape capital punishment, while his minion, Samra, would not.  That, at least in principle of constitutional law, is nonsensical.

Amicus Curiae brief by Attorney General, Troy King, in <u>Roper v. Simmons</u>, No. 03-633, (April 20, 2004) at 7.

Samra submits that, for the reasons set forth in the <u>Gamble</u> Final Order and the State of Alabama Attorney General's amicus brief in <u>Roper</u>, it would violate the Eighth and Fourteenth Amendments for his death sentence to stand under these circumstances where the death penalty for his more culpable co-defendant was overturned due solely to his age.  This claim is currently being litigated in Alabama State courts in Samra's currently pending successor petition.

### ADDITIONAL INFORMATION REQUIRED BY RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURT

**Exhaustion:**

All claims are in the process of being exhausted in the Alabama state courts.  A petition for writ of certiorari is currently pending in the Alabama Supreme Court, raising

Claims I-III from this Petition. A successor petition for post-conviction relief is currently pending in the state trial court pertaining to Claim IV. Petitioner has filed this protective petition under the principles of <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 416 (2005) and <u>Rhines v. Weber</u>, 125 S. Ct. 1528 (2005). The petitioner has file, contemporaneously with this habeas petition, a Motion for Stay and Abeyance.

**Petitioner's Prior Attorneys:**

The following attorneys have represented the petitioner:

      A.      At trial by Richard W. Bell and Richard W. Vickers;

      B.      On direct appeal to the Court of Criminal Appeals of Alabama, Richard W. Bell, Richard W. Vickers, and John W. Wiley, III;

      C.      In the Alabama Supreme Court, by Richard W. Bell, Richard W. Vickers, and John W. Wiley, III;

      D.      On cert petition to the United States Supreme Court, by Richard W. Bell, Richard W. Vickers, and John W. Wiley, III;

      E..      In Post-conviction, by Alan M. Freedman and Carol Heise, and Mark Sabel (local counsel);

      F.      On petition for writ of certiorari to the Alabama Supreme Court by Alan M. Freedman and Carol Heise, and Steven Sears (local counsel), and Mark Sabel (local counsel);

      G.      On successor Rule 32 post-conviction petition, by Alan M. Freedman and Carol Heise, and Steven Sears (local counsel).

H.      On Petition for Writ of Habeas Corpus, by Alan M. Freedman, and Steven

Sears.

## REQUEST FOR RELIEF

WHEREFORE, Petitioner respectfully prays that this Court:

(A)     Grant Petitioner the authority to issue subpoenas in forma pauperis for witnesses and documents necessary to prove the facts as alleged in the petition to this Court;

(B)     Grant Petitioner leave to conduct necessary discovery, and grant leave to supplement the record;

(C)     Order the respondent to file the complete direct appeal record and complete post-conviction record with the District Court;

(D)     Conduct a full evidentiary hearing at which Petitioner may offer proof of the allegations of this petition;

(E)     Provide Petitioner, who is indigent, with sufficient funds to present witnesses, and other evidence in support of the allegations in his petition;

(F)     Issue a writ of habeas corpus to have Petitioner brought before this Court to the end that he may be discharged from his unconstitutional confinement and restraint;

(G)     Issue a writ of habeas corpus to have Petitioner brought before this Court to the end that he may be relieved of his unconstitutional sentence;

(H)     Grant such other further relief as may be just, equitable, and proper.

Respectfully submitted this 27 day of October, 2007,


Alan M. Freedman
Counsel for Mr. Samra

Steven Sears
Local Counsel for Mr. Samra


Alan M. Freedman
Counsel for Mr. Samra
Midwest Center for Justice, Ltd
.831 Main Street
Evanston, IL 60202
(847) 492-1563 (phone)
847) 492-1861 (fax)
fbpc@aol.com

Steven Sears
Local Counsel
655 Main Street
Montevallo, AL 35115
(205) 665-1211 (phone)
montevallo@charter.net

53

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MICHAEL BRANDON SAMRA,

        Petitioner,                       CIVIL ACTION

v.                                      No.       **No Execution Date Set**

                                       CAPITAL CASE

KENNETH L. JONES
Warden, Donaldson Correctional Facility

        Respondent.

VERIFICATION OF MICHAEL BRANDON SAMRA

I, MICHAEL BRANDON SAMRA, under penalty of perjury, declare that the information given on the proceeding pages is true and correct.

michael Brandon Samra          10/27-07
MICHAEL BRANDON SAMRA          DATE