**FILED**

2014 Sep-05  PM 04:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL BRANDON SAMRA, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | )          2:07-cv-1962-LSC |
| | ) |
| | ) |
| CHERYL C. PRICE, | ) |
| Warden, Donaldson Correctional | ) |
| Facility, | ) |
| | ) |
| Respondent. | ) |

## MEMORANDUM OF OPINION

Petitioner Michael Brandon Samra ("Samra"), now incarcerated at William E. Donaldson Correctional Facility in Bessemer, Alabama, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Samra challenges the validity of his 1998 capital murder conviction and death sentence on the following grounds:

    1)     Samra was denied his right to a fair and impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution when the state trial court denied his motion for a change of venue due to pretrial publicity;

    2)     Samra was denied his Sixth Amendment right to effective assistance of trial and appellate counsel; and

    3)     Samra's death sentence violates the Eighth and Fourteenth

Amendments to the United States Constitution because his co-defendant's death sentence was vacated due to the fact that he was less than eighteen years old at the time of the murders.

Upon thorough consideration of the entire record and the briefs submitted by the parties, the Court finds that Samra's petition for habeas relief is due to be denied.

## I.   THE OFFENSE CONDUCT

The evidence at trial established that on March 23, 1997, Samra, then aged 19, and his friend Mark Anthony Duke ("Duke"), then aged 16, killed Duke's father, Randy Duke; Randy Duke's girlfriend, Dedra Hunt; and Dedra Hunt's two daughters, six-year-old Chelisa Hunt and seven-year-old Chelsea Hunt.   Samra and Duke committed these murders pursuant to a plan hatched the day before, after Duke and his father had a heated argument because Randy Duke would not allow Duke to use his truck.   Following the argument with his father, Duke told three of his friends—Samra, David Collums, and Michael Ellison—that he wanted to kill his father. According to a statement Samra later gave to police, the four friends then obtained two handguns and began developing a plan to murder Randy Duke.  Samra stated that the plan included killing the other members of the household (Dedra Hunt and her daughters) because Duke did not want to leave any witnesses alive.  Having established a plan, Samra and his three friends drove to Randy Duke's house.  Samra

and Duke got out of the car and entered the house.  Michael Ellison and David Collums then left; however, they agreed to meet up with Duke and Samra later at a prearranged location.

After Samra and Duke entered the house, Duke killed his father by shooting him with a .45 caliber pistol.  Meanwhile, Samra aimed his gun at Dedra Hunt and pulled the trigger.  Although Samra shot Dedra Hunt in the face, she managed to flee upstairs with her daughters.  Dedra Hunt and her daughter Chelisa sought shelter in an upstairs bathroom; Dedra Hunt's other daughter, Chelsea, retreated to a bedroom and attempted to hide under the bed.  According to Samra's statement to police, Duke chased Dedra Hunt upstairs, kicked in the bathroom door, and shot Hunt, killing her. Samra and Duke then killed Hunt's two daughters.  Because they ran out of bullets, however, they used kitchen knives to kill the girls.  After shooting Hunt in the bathroom, Duke murdered six-year-old Chelisa, who was hiding behind the shower curtain, by cutting her throat with a knife.  Samra killed seven-year-old Chelsea, who had been hiding under a bed.  Despite her pleas for mercy, Duke held Chelsea down and Samra cut her throat.  Both girls died as a result of their throats being hacked with a dull knife until, as the trial court found, they "drown[ed] in their own blood." Samra and Mark Duke emptied drawers and displaced items in the home to make it

appear that the house had been burglarized; that, too, was part of the plan according to Samra. They then left to dispose of the weapons. Upon being questioned by law enforcement officials, Samra helped locate the weapons and made a statement in which he admitted his involvement in the murders.

## II.   PROCEDURAL HISTORY

Samra was charged by indictment with capital murder of two or more persons by one act or pursuant to one scheme or course of conduct, under Ala. Code § 13A-5-40(a)(10) (1975). Trial was held before Judge J. Michael Joiner of the Shelby County Circuit Court ("the trial court"). Richard Bell ("Bell"), an experienced criminal defense attorney who had handled numerous capital cases, was appointed to represent Samra at trial and on appeal.

Prior to trial, Bell moved for an order requiring the State to provide him with notice of the statutory aggravating circumstances set forth in Ala. Code § 13A-5-49 (1975) that the State intended to prove at sentencing that would make Samra eligible for the death penalty. At oral argument on the motion, the prosecutor stated that he was not required to provide such notice and stated that the "aggravating circumstances are very straightforward in the indictment." The trial court denied Samra's motion. Samra contends that it was not until the penalty phase of Samra's

trial that Bell was notified that the State would be attempting to prove the existence of one aggravating circumstance in order to establish Samra's eligibility for the death penalty: that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses.

Bell also filed a motion for change of venue prior to trial, arguing that the media coverage of the case led to undue prejudice against Samra in the makeup of the venire. The trial court held a hearing on the motion, at which point Bell presented articles from local newspapers and video recordings of portions of local newscasts that covered Samra's case. Bell also presented testimony from Dr. Natalie Davis, a media and statistical expert. Dr. Davis had conducted a pre-trial poll of the citizens of Shelby County to determine the extent of the pre-trial coverage by the media and its effect on potential jury members. Bell requested that the trial court hold judgment on the motion until after voir dire. The trial court ultimately denied Samra's motion for a change of venue.

In light of learning that the statement Samra had given to police recounting his involvement in the murders would be admissible at trial, Bell focused on investigating possible mitigating evidence. Bell decided that his two main areas of concern were to investigate Samra's mental condition and the degree of gang influence exerted upon

Samra by Duke.  Bell requested funds from the court for a mental health expert to evaluate Samra.  He did this on an ex parte basis, to protect the confidentiality of his trial strategy.  After researching different psychiatrists based on the recommendations of nationally-known defense attorneys, Bell retained Dr. Charles L. Scott to evaluate Samra and to serve as an expert in developing mitigating evidence relating to Samra's mental state.  Bell described Dr. Scott as being "the most preeminent forensic psychiatrist I have ever met."  In addition, he said that he settled on Dr. Scott because he believed Dr. Scott was immune from being labeled a "defense-oriented" expert.  Dr. Scott performed a forensic psychiatric examination of Samra and wrote a 21-page report detailing his findings.  Dr. Scott's report showed that Dr. Scott believed Samra capable of committing a similar crime again; that Samra reported that he did not feel bullied by Duke; that Samra understood that what he had done was wrong; and that he acknowledged trying to cover up the crime.  Dr. Scott also recommended that Samra be subjected to "a complete neuropsychological evaluation, neurology consultation and brain imaging (such as MRI or PET scanning)."[1]  Bell had an MRI performed on Samra, but the findings were negative for any lesions or pathology.  Bell

---

[1] MRI is an acronym that stands for "magnetic resonance imaging."  PET is an acronym that stands for "positron emission tomography."  A PET scan measures the rate at which different parts of the brain metabolize glucose.

inquired about the possibility of having a PET test performed, but after making inquiries, was told that this kind of test was not available in Birmingham.  At one point, Bell prepared an affidavit for Dr. Scott's signature that would have accompanied a motion for funds. Although Dr. Scott's report never recommends that a SPECT scan be done, the affidavit requests funds for a SPECT scan and additional neurological testing.[2]  However, the affidavit was never signed nor submitted to the trial court.  Bell contacted another expert about conducting neuropsychological testing, but that did not work out for reasons he cannot remember.  Bell ultimately decided not to present Dr. Scott's testimony at trial because it would have been harmful to Samra's defense.

Bell's investigation also showed that Samra's grades began to drop when he started hanging out with a bad crowd and that Samra was kicked out of his house by his father because he would not agree to go to a drug rehabilitation clinic. Bell also had access to Samra's school and medical records and to Samra's family and friends who provided details on Samra's background.  A forensic evaluation of Samra was also done prior to trial, showing that Samra "fell within the Borderline range of intelligence with a Full Scale IQ of 73."

---

[2] "SPECT" stands for "single photon emission computed tomography" and is a test that is used to measure blood flow in the brain.

Upon conclusion of his investigation, and without any evidence that Samra was insane, Bell chose to base his mitigation argument upon the combination of gang influence and Samra's low IQ.  Thus, at trial, Bell presented the testimony of Dr. Kathleen Ronan, a clinical psychologist and certified forensic examiner who evaluated Samra at Taylor Hardin Secure Medical Facility, and Dr. George Twente, a psychiatrist who worked primarily with adolescents and had expertise concerning gangs and their influence on young people.  At the penalty phase, Bell presented testimony from Samra's family to show that Samra did not have a violent background and that he was loved.

Dr. Ronan testified at trial that she found that Samra appeared to be functioning within the borderline range of intelligence, meaning between low average intelligence and mild mental retardation, which was consistent with the IQ test that he was given during the previous week.  On a personality inventory, Samra demonstrated that he was dependent on others and that he was insecure in his interpersonal interactions.  Samra's test responses also indicated that he could become confused under times of severe stress.  Dr. Ronan asked Samra whether he was affiliated with a gang, and he told her he was affiliated with the FOLKS ("Forever Our Lord King Satan") gang.  However, he stated that the murders had nothing to do with a gang, as far as he knew.

On cross examination, Dr. Ronan testified that she found no evidence that Samra suffered from a psychiatric impairment or mental disease that would have prevented him from understanding right from wrong; that Samra was polite, cooperative, and did not show a great deal of emotionality; and that the lack of emotionality could be attributed to Samra simply not caring about the fact that the murders occurred.

Dr. Twente testified at trial that most of the adolescents he worked with who were involved in gangs were from broken homes, did not do well in school, and felt they did not fit in, and that the gang offered a sense of identity. He stated that he reviewed the symbols that had been carved into Duke's bedroom walls and stated that they were similar to some he had seen in his work with adolescents involved with the FOLKS gang. Finally, Dr. Twente testified that he had never spoken with Samra, and he had not made any determination as to whether there was any gang involvement in the murders.

Bell also presented the testimony of Sara Woodruff at the trial.  Woodruff testified that she knew Samra and his co-defendants.  She stated that she had been a member of the FOLKS gang.  Woodruff stated that Duke told her that the killings had nothing to do with gangs or gang activity, and that they were the result of a dispute he had with his father.  The jury ultimately found Samra guilty of capital murder as

charged in the indictment.

At the penalty phase, Bell presented three witnesses on Samra's behalf.  The first witness was Theola Babe Samra, Samra's aunt.  She testified that she had known Samra all of his life, that he was a loving person who had never displayed any violence, and that there was nothing in his life that would have foretold any violent or deviant behavior on her nephew's part.  The second witness was Charles Samra, Samra's father.  He testified that Samra was several months behind in development as a child, based on his own opinion from books he had read.  He said that his son attended regular classes at school, but did take some "special education" classes.  He also said that Samra, until the age of sixteen, was never a behavioral or disciplinary problem.  However, after Samra had completed his junior year in high school, he discovered that this son was using marijuana, and after a few incidents involving marijuana use, and after he attempted to assist Samra, he told Samra that he could seek professional help to stop using marijuana, or he could leave the house. Samra chose to leave home and dropped out of high school his senior year.  Samra's father testified that, based on the way his son dressed, he suspected that he might be hanging around "gang-type people," but Samra denied this to him.  Bell then called Sabrina Samra, Samra's mother. She testified that, during her child's early years, there were no indications of

violent tendencies on his part. She stated that Samra was easily frustrated and a little slower than other children and that he was diagnosed with having learning disabilities.

After the penalty phase, the jury recommended that Samra be sentenced to death by a 12-0 vote. The trial court followed the jury's recommendation, finding the existence of the statutory aggravating factor—that the crime was especially heinous, atrocious, or cruel, when compared to other capital offenses—in it sentencing order:

> Evidence showed at trial that the victims in this case were killed in a very cruel and heinous manner. The minor children's throats were actually cut and according to testimony of the medical examiner, they drowned in their own blood. The photographs and other demonstrative evidence in this case leads to one and only one conclusion, that the manner in which the victims were killed was much more heinous and atrocious and cruel than would be necessary in any killing.

> This case stands out as particularly heinous, atrocious and cruel when it is considered that at least one victim, according to the admission of Defendant, begged not to be killed. All of the victims died very painful and brutal deaths. The victims apparently struggled for life and breath and that very struggle caused one or more of the victims to drown in their own blood.

(C.R. Vol. 49, at 5.)[3] The trial court's sentencing order also found the existence of six mitigating circumstances:

---

[3] References to the state court record are designated "C.R." The Court will list any page number associated with the court records by reference to the portable document format "pdf" page number within the volume, as those numbers are the most readily discoverable for purposes of expedient examination of that part of the record.

Defendant's lack of significant criminal history is a mitigating circumstance, and that the age of Defendant at the time of the crime, that is the age of nineteen(19) is a mitigating circumstance and that no other statutory mitigating circumstances exist. . . the Court has considered all additional mitigating circumstances supported by the evidence . . . including but not limited to the age and maturity of Defendant, the learning difficulties and disabilities of Defendant, the family history and background and caring nature of Defendant, the effect of gang or group involvement on Defendant, the immediate and continuing truthfulness and cooperation of Defendant with law enforcement officers, the remorse of Defendant expressed in statements to law enforcement officers and, the fact that there are no other aggravating circumstances other than the one listed . . .

(C.R. Vol. 49, at 3-4.)   The trial court ultimately determined that the aggravating circumstance outweighed the mitigating factors, and thus imposed the death sentence.

Bell continued to represent Samra on direct appeal[4] and raised, among many other issues, the claim that the motion for change of venue was erroneously denied. On June 18, 1999, the Alabama Court of Criminal Appeals ("ACCA") affirmed Samra's murder conviction and death sentence. *Samra v. State*, 771 So. 2d 1108 (Ala. Crim. App. 1999).  Samra's application for re-hearing was denied on August 6, 1999.

The Alabama Supreme Court granted automatic certiorari and on March 3, 2000, affirmed Samra's conviction and sentence. *Ex parte Samra*, 771 So. 2d 1122

---

[4] Samra raised an ineffective assistance of trial counsel claim in a motion for new trial and on direct appeal.  The trial court appointed counsel other than Bell to raise that claim in the trial court and to argue that claim on appeal.

(Ala. 2000).   On May 5, 2000, the Alabama Supreme Court denied Samra's application for rehearing.

Samra sought review from the United States Supreme Court, but on October 10, 2000, the United States Supreme Court denied Samra's petition for writ of certiorari. *Samra v. Alabama*, 531 U.S. 933 (2000).

On October 1, 2001, Samra filed a state post-conviction petition pursuant to Rule 32 of the Alabama Rules of Criminal Procedure ("Rule 32 Petition") in the Shelby County Circuit Court ("Rule 32 Court").   Samra claimed ineffective assistance of trial and appellate counsel on multiple grounds. On all but one claim—ineffective assistance of trial and appellate counsel for not investigating and presenting evidence of Samra's purported "brain damage and organic brain dysfunction"—Samra conceded that an evidentiary hearing was unnecessary. On that claim, an evidentiary hearing was held on November 3 through 5, 2003, in which Samra's post conviction counsel called three witnesses: Dr. Michael Gelbort, a neuropsychologist who conducted a neuropsychological examination and evaluation of Samra on February 3, 2002; Dr. James Mountz, a radiologist who conducted a court-ordered SPECT brain scan on Samra on August 1, 2002; and Bell, Samra's trial and appellate counsel.  The State also called witnesses at the hearing: Dr. Glen King,

a clinical psychologist who conducted a neuropsychological test battery on Samra, and Dr. Helen Mayberg, a board-certified neurologist employed at Emory University who reviewed Dr. Mountz's SPECT report.

Dr. Gelbort, who is not board certified by the American Board of Professional Psychology, testified that the results of his tests showed that Samra had a verbal IQ of 79, nonverbal IQ of 87, and a full scale IQ of 81.  Dr. Gelbort testified that he did not perform the entire Halstead-Reitan Test Battery on Samra.   One of the neuropsychological tests that Dr. Gelbort performed was the Categories Test which measures " whole brain functioning" such as " conceptualization" and " reasoning." Dr. Gelbort found that Samra made 51 errors on this test and that this score placed him in the bottom range of normal or the top range of the brain-impaired population. Dr. Gelbort testified that a brain dysfunction can affect a particular ability and that people with high IQ scores can overcome those dysfunctions while those with lower IQ scores are less adaptive to overcoming those dysfunctions.  Dr. Gelbort testified that the variability of Samra's IQ scores shows that there may be brain damage because a normal brain will be consistent throughout, or that Samra is not doing his best on the tests.  Dr. Gelbort testified that Samra's scores in the Trail Making Test, which measures the subject's speed and efficiency in processing information, were on

the "cusp" between low-normal and mild impairment.  Dr. Gelbort testified that Samra's score on the Wechsler Memory Scale was in the borderline-to-mildly-impaired range.  In the Minnesota Multiphasic Personality Inventory ("MMPI"), Dr. Gelbort found that Samra showed signs of depression, but no other serious psychiatric problems.

Dr. Gelbort opined that Samra's brain is not normal; that Samra has some kind of brain dysfunction that affects his verbal information processing; that Samra is less able than normal people, although not grossly impaired, to use problem-solving skills and judgment to modify his future behavior based on past experience; that Samra has impaired frontal lobe activity; and, that Samra does not think fast on his feet and needs a controlled environment.  Dr. Gelbort reviewed the test results of radiologist Dr. Mountz and found that his findings of low blood flow to the front and middle part of Samra's brain was consistent with the neuropsychological test results derived by Dr. Gelbort.

Dr. Gelbort candidly admitted that he only testifies on behalf of criminal defendants and that he has testified approximately 50 times for criminal defendants.  Dr. Gelbort admitted that he had not asked Samra about the crime or read his statement given to law enforcement.  Counsel for the State confronted Dr. Gelbort

with Samra's school records and childhood medical records which Dr. Gelbort stated

he had reviewed.  These records showed that Samra had some developmental delays

and a tremor at age seven, so his parents took him to a doctor who performed a CT

scan and EEG and found the results of those tests to be within the normal range.

School records showed where Samra had been in learning disability classes for speech

and language, but that he was no longer in those classes after the eighth or ninth grade

because these problems got better.  Samra's high school grades showed that he made

A's, B's, and C's. Samra's work history showed that he held several different jobs,

one of which required him to run a cash register.  Further, the State showed on cross-

examination that Dr. Gelbort gave zero points, rather than partial credit, for questions

when Samra substantially answered with an almost complete correct response.  Dr.

Gelbort, even though testifying that the results he received on the tests he performed

were consistent with the results of the SPECT test performed on Samra by Dr.

Mountz, candidly admitted that he does not know what a SPECT test is measuring.

        Dr. Mountz then testified about the results of the SPECT scan he performed

on Samra.  He stated that an MRI looks for structural abnormalities in the brain, i.e.,

gray and white matter, which is different from measuring blood flow to the brain,

which is what the SPECT scan does.  Dr. Mountz testified that a person may have a

normal MRI result because there is no structural abnormality, but still have an abnormal SPECT result because of reduced blood flow in the brain.  Dr. Mountz testified that the SPECT test was available in Birmingham in 1990.

In performing a SPECT scan on Samra, Dr. Mountz found two areas of his brain that were receiving diminished blood flow.  One of the abnormalities was so mild that Dr. Mountz admitted it was still within the normal range.   The second abnormality showed decreased blood flow in the posterior frontal superior temporal region of Samra's brain; Dr. Mountz stated that it was on the low range of normal. Dr. Mountz expressed no opinion on how this could affect Samra's brain function, but nevertheless stated that this result was not inconsistent with Dr. Gelbort's finding of mild impairment.

On cross-examination, Dr. Mountz testified that there has been no research methodology to show how a SPECT scan result can lead to drawing conclusions about what compels a person to commit murder.  Dr. Mountz further testified that this type of brain scan is not relevant to showing whether Samra appreciated the wrongfulness of his actions or whether he planned the murders or whether he tried to hide evidence of the murders.  Dr. Mountz testified that reading SPECT scans is a subjective process where you compare the subject's brain scan to that of other known normal

scans; Dr. Mountz considers an "abnormal" result to be below one standard deviation of the "normal" scans.

Dr. Mountz testified that the area of Samra's brain that had low blood flow was the area that is normally associated with motor functioning, sensation, perception, and the inputting of visual information; further detailed testing would be required to see what that exact area controls in Samra's brain. Dr. Mountz added that Samra's brain may have looked different in 1998, the time when Samra committed the murder, from how it looked at the time of the SPECT test in 2002. Further, Dr. Mountz testified that he had no idea if Samra consumed caffeine, alcohol, drugs, or nicotine before the test and that those items can affect the results.

Finally, Bell testified about his investigation into the possibility of Samra having a mental defect. In discussing how he came to hire Dr. Scott, Bell testified that he would not have hired an expert such as Dr. Gelbort because he always testified on behalf of criminal defendants and has never testified for a prosecutor. Bell also reviewed Dr. Scott's report while testifying, and stated that Dr. Scott never recommended a SPECT test be done but rather, that a PET test be performed.

The State then called Dr. King, who testified that he is board certified in clinical psychology by the American Board of Professional Psychology, the only

board-certification body recognized by the American Psychological Association, and that he testifies in favor of criminal defendants approximately 40% of the time. Unlike Dr. Gelbort who only performed part of the Halstead-Reitan Test Battery, Dr. King performed the entire test battery on Samra. On the Wide Range Achievement Test, 3rd edition, Samra scored an 86 on reading, 97 on spelling, and 79 on math. Dr. King explained that a person with an average IQ would be expected to score approximately 100 in each of those areas, but that the lower scores were expected because Samra was a high school dropout; Dr. King also found that Samra exhibited good literacy skills. In administering the MMPI test, Dr. King stated that Samra showed signs of mild clinical depression, mild anxiety, and immature interpersonal development; but the test detected no psychosis or serious mental illness. Dr. King testified that Samra's depression could affect his neuropsychological test scores because it could slow his response time.

Dr. King testified that the result of Samra's IQ testing—79—put Samra in the low-average to high-borderline category. Dr. King testified that the performance part of the IQ test is a sensitive measure for brain damage; however, Samra scored higher on the performance part than the verbal part. Dr. King testified that Samra's sensory perception functioning was intact, but that he did have some fine motor difficulties.

Dr. King testified that Samra had some signs of construction dyscrasia—a term describing difficulty with copying designs—and trouble with arithmetic problems. Dr. King also testified that Samra showed some impairment on the visual spatial test. Dr. King testified that on the categories test, Samra made fifty-two errors. Dr. King testified that he found some impairment overall in Samra's level of abstract reasoning, concept formation, and problem-solving abilities. According to Dr. King, however, this level of impairment is consistent with a person who is in the borderline range of intellectual ability.

Dr. King testified that Samra reported no prior mental health treatment, no serious physical problems, that he did not recall ever having been rendered unconscious; that Samra started drinking at age 17 and smoking marijuana at age 18; that Samra had a stable family history; that Samra reported that he was not really in a gang, but just hung out with a group of four friends; and that Samra appeared remorseful. Dr. King testified that Samra understood the nature and quality of his actions at the time of the crime and that he was not suffering from any mental illness or defect that would have prevented him from such an understanding; Dr. King based his opinion from the police reports and Samra's rendition of the crime.

Based upon his examination, Dr. King found that Samra's neuropsychological

test scores showed a level of impairment consistent with a person who has an IQ score in the borderline range of intellectual ability, but that this level of impairment did not adversely affect Samra's ability to appreciate the wrongfulness of his acts. Dr. King further found that Samra's adaptive functioning was higher than indicated by his test scores because he could hold down jobs; although Samra quit several jobs, he did so out of boredom and not out of a lack of ability. As a result, Dr. King classified Samra's adaptive functioning in the low-average range. Dr. King also testified that Samra's testing indicated no frontal lobe damage and that his overall level of functioning was in the borderline range. Dr. King testified that at the time of the offense, Samra was not suffering from any serious mental illness or mental defect that would render him incapable of understanding the nature and quality of his actions and the consequences of his behaviors.

Dr. Mayberg then testified that the SPECT scan had only been approved by the federal government for the purposes of diagnosing stroke, evaluating patients for dementia, and for identifying abnormalities in those known to have temporal lobe epilepsy. Dr. Mayberg testified that the conditions of administering the test can affect the result and that the analysis of the results is done by looking at it and comparing it with others that are known to be normal. Dr. Mayberg testified that there are no fixed

rules for reviewing SPECT results, but it was her opinion that Dr. Mountz's use of only twelve normal scans was not enough to establish a range of normal. Dr. Mayberg testified that a larger control group was needed to establish the range of normal and that a scan should not be considered abnormal unless it falls below two standards deviations of the normal control group. Dr. Mountz had classified one part of Samra's brain as abnormal because the blood flow was one standard deviation below the range of normal. According to Dr. Mayberg, defining those who fall below one standard deviation from the normal as "abnormal" would classify many healthy people as abnormal. Further, Dr. Mayberg testified that even though Samra's SPECT scan may have shown one area of the brain to receive a low-normal amount of blood flow, such an indication of "low-normal" is still within the range of normal.

According to Dr. Mayberg, "brain damage" is a catch-all term and the SPECT scan is too sensitive to minor blood flow variations to be a practical screening test. Additionally, Dr. Mayberg stated that "brain damage does not have a singular identifying pattern." Depending upon the state of the person at the time of the SPECT scan, blood flow levels can deviate amongst healthy subjects, especially if they are anxious or did not have a good night of sleep. Dr. Mayberg testified that the SPECT scan in 2002 does not reflect what Samra's brain looked like at the time of the

offense in 1997.  Further, Dr. Mayberg testified that a SPECT or PET scan performed one to two years after the commission of a crime should not be used as evidence of what the defendant was thinking at the time of the offense.

Dr. Mayberg testified that she had reviewed Samra's medical records which indicated certain medical tests were performed during Samra's childhood.  According to Dr. Mayberg, Samra's parents took him to a childhood neurologist out of concern that Samra was developmentally delayed.  In her review of the medical records, Dr. Mayberg stated that one neurologist thought that Samra might have a form of childhood epilepsy, but that the second neurologist disagreed.  Dr. Mayberg surmised that Samra may have had some neurological deficits in childhood that improved over time and that, because Samra was under the care of specialists, the condition would have been followed if it had persisted.  Because of the CT scans performed on Samra as a child, the normal results of his MRI show that Samra's brain has no old scars, developmental anomalies, or acquired lesions.

Dr. Mayberg testified that the findings made by Dr. Scott, that Samra had attention deficit disorder, alcohol abuse, cannibis abuse, and adult antisocial behavior disorder, cannot be diagnosed by a SPECT scan.  Dr. Mayberg testified that Dr. Gelbort's findings, that Samra has borderline intellectual functioning, reading

disorders, and math disorders, cannot be diagnosed by a SPECT scan. Dr. Mayberg testified that the area of reduced blood flow found by Dr. Mountz was in the motor sensory cortex, which would have nothing to do with the neuropsychological deficits found by Dr. Gelbort's tests. Dr. Mayberg testified that Samra's difficulty in not performing the neuropsychological tests quickly could be attributed to his depression. Dr. Mayberg concluded that Samra's SPECT scan was normal because it did not fall below two standard deviations from an established norm.

Following the evidentiary hearing, the Rule 32 Court ultimately denied Samra's Rule 32 Petition on January 12, 2005. Samra appealed, and on August 24, 2007, the ACCA affirmed the Rule 32 Court's denial of Samra's Rule 32 Petition. *Samra v. State*, 14 So. 3d 196 (Ala. Crim. App. 2007) (table decision). Samra filed an application for a rehearing, but it was denied on September 28, 2007. *Samra v. State*, CR-04-0879 (Ala. Crim. App. Sept. 28, 2007). Samra filed a petition for a writ of certiorari in the Alabama Supreme Court, but it was denied on September 19, 2008. *Ex parte Samra*, No. 1070068 (Ala. Sept. 19, 2008).

On September 27, 2007, Samra filed a second Rule 32 petition for post-conviction relief in the Shelby County Circuit Court ("Successive Rule 32 Petition"). At the time of this filing, his appeal from the denial of the first Rule 32 Petition was

still pending in the ACCA, awaiting a ruling on his application for a rehearing.  In the

Successive Rule 32 Petition, Samra argued that due to the fact that the death sentence

imposed on his more culpable co-defendant, Duke, had been reversed pursuant to

*Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183 (2005), Samra's death sentence

violated his Eighth and Fourteenth Amendment rights and was excessive and

disproportionate.[5]  After hearing oral argument the State's motion to dismiss the

Successive Rule 32 Petition, the Rule 32 Court granted the motion to dismiss and

summarily dismissed the Successive Rule 32 Petition in an order dated July 28, 2008.

Samra appealed that order on August 20, 2008.  On August 29, 2008, the ACCA

issued an order directing the Rule 32 Court to set aside its order and hold the case in

---

[5]   Duke was 16 years old and Samra was 19 years old at the time of the murders.  Samra was sentenced to death in May 1998.  Duke was sentenced to death in November 1998.  On March 1, 2005, the United States Supreme Court decided *Roper*, holding that the execution of individuals who were under 18 years of age at the time of their capital crimes is prohibited by the Eighth and Fourteenth Amendments.  543 U.S. at 575, 125 S. Ct. at 1198.  Because Duke's case was pending on certiorari to the United States Supreme Court when the *Roper* decision was released, the holding of the case applied to him.  *See United States v. Johnson*, 457 U.S. 537, 545, 102 S. Ct. 2579, 2584 (1982) ("[A]ll defendants whose cases were still pending on direct appeal at the time of the law-changing decision should be entitled to invoke the new rule.").  The Supreme Court granted Duke's petition for certiorari, vacated the judgment of the ACCA upholding the death penalty for Duke, and remanded Duke's case for further consideration in light of *Roper*.  *See Duke v. Alabama*, 544 U.S. 901, 125 S. Ct. 1588 (2005) (mem.).  On remand, the ACCA upheld Duke's conviction but remanded for the Shelby County Circuit Court to set aside Duke's sentence of death and to re-sentence him to life imprisonment without the possibility of parole, which is the only other sentence available for a defendant convicted of capital murder, *see* Ala. Code § 13A-5-45(a)(1975).  *See Duke v. State*, 922 So. 2d 179, 180-81 (Ala. Crim. App. 2005).  Duke's death sentence was ultimately vacated on May 27, 2005.

abeyance until a certificate of judgment was issued from the ACCA concerning Samra's still-pending appeal from his first Rule 32 Petition.  Accordingly, the Rule 32 Court vacated its July 28, 2008 order and held Samra's Successive Rule 32 Petition in abeyance until the ACCA issued the certificate of judgment on the first Rule 32 Petition.  Samra's appeal from his first Rule 32 Petition became final when a certificate of judgment was issued on September 19, 2008.

Once the stay was lifted on the Successive Rule 32 Petition, the State again moved to dismiss it, and the Rule 32 Court summarily dismissed the successive petition in an order dated September 19, 2011.  The ACCA affirmed that dismissal on August 10, 2012, and denied Samra's application for rehearing.  Samra filed a Petition for Writ of Certiorari and Extraordinary Writ in the Supreme Court of Alabama.  These petitions were denied on September 20, 2013.

Samra filed the instant federal habeas corpus petition pursuant to § 2254 on October 26, 2007, while his Successive Rule 32 Petition was still pending in the state court.  On the same date, Samra filed a motion to hold the instant petition in abeyance to allow him to exhaust his claim in the state courts.  This Court stayed the action while Samra exhausted his state remedies, ordering monthly status reports.

After being apprised that Samra had exhausted his state remedies, on January

23, 2014, this Court lifted the stay and issued an order setting deadlines for the filing of briefs and an amended petition.  In compliance with that order, Samra filed an amended petition on February 21, 2014, to which the State responded and Samra replied.  The petition is now ripe for review.

## III.   STANDARDS OF FEDERAL HABEAS REVIEW

Because Samra filed his federal habeas corpus petition after April 24, 1996, this action is governed by 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Guzman v. Sec'y, Dept. of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011).  Pursuant to § 2254(a), a federal district court is prohibited from entertaining a petition for writ of habeas corpus " in behalf of a person in custody pursuant to the judgment of a State court" unless the petition alleges "he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  In other words, this Court's review of habeas claims is limited to federal constitutional questions.  Claims pertaining solely to "an alleged defect in a [state] collateral proceeding" or to a "state's interpretation of its own laws or rules" do not provide a basis for federal habeas corpus relief under § 2254.  *Alston v. Dept. of Corr., Fla.*, 610 F.3d 1318, 1325-26 (11th Cir. 2010) (quotation marks and citations omitted).

A.     Exhaustion and Procedural Default

Under § 2254(b) and (c), a federal court must limit its grant of habeas applications to cases where an applicant has exhausted his state remedies. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). The purpose of this requirement is to ensure that state courts are afforded the first opportunity to correct federal questions affecting the validity of state court convictions. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998); *see also Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) ("Federal courts are not forums in which to relitigate state trials.") (citation omitted)). Moreover, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Snowden*, 135 F.3d at 735 (quoting *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S. Ct. 276, 277 (1982)).

"[A]n issue is exhausted if 'the reasonable reader would understand the claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y for Dept. of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (quoting *Kelley v. Sec'y for Dept. of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)) (brackets in original omitted). If a petitioner fails to raise his federal claim to

the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits, i.e., " the petitioner will have procedurally defaulted on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). Moreover, " a state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)). " Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594 (1991).

Yet as the Eleventh Circuit has noted, a claim will only be procedurally defaulted in the following circumstance:

> [A] state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon " adequate and independent" state grounds. *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995) (citation omitted).

> We have " established a three-part test to enable us to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Judd*, 250 F.3d at 1313. " First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Id.* Second, the state court's decision must rest entirely on state law grounds and not be

intertwined with an interpretation of federal law. *See id.* Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied "in an arbitrary or unprecedented fashion." *Id.*

*Ward*, 592 F.3d at 1156–57 (footnote omitted).

There are also instances where the doctrines of procedural default and exhaustion intertwine. For instance, if a petitioner's federal claim is unexhausted, a district court will traditionally dismiss it without prejudice or stay the cause of action to allow the petitioner to first avail himself of his state remedies. *See Rose v. Lundy*, 455 U.S. 509, 519-20, 102 S. Ct. 1198, 1204 (1982). But "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, a court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (citation omitted).

B.     Exceptions to the Procedural Default Doctrine

"[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749–50, 111 S. Ct. 2546, 2564-65 (1991) (citations and

internal quotation marks omitted); *see also Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 2649 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.").

The "cause and prejudice" exception is framed in the conjunctive, and a petitioner must prove both cause and prejudice. To show cause, a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously. *Carrier*, 477 U.S. at 488, 106 S. Ct. at 2645. Examples of such objective factors include:

> . . . interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel. In addition, constitutionally ineffective assistance of counsel . . . is cause. Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default.

*McCleskey v. Zant*, 499 U.S. 467, 493–94 , 111 S. Ct. 1454, 1470 (1991) (internal quotation marks and citations omitted). As for prejudice, a habeas petitioner must show "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 1596 (1982) (emphasis in original).

A petitioner may also escape a procedural default bar if he "can demonstrate a sufficient probability that [the court's] failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451, 120 S. Ct. 1587, 1591 (2000). To make such a showing, a petitioner must establish that either: (1) "a constitutional violation has probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537–38, 106 S. Ct. 2661, 2668 (1986) (quoting *Carrier*, 477 U.S. at 496, 106 S. Ct. at 2650), or (2) the petitioner shows "by *clear and convincing* evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323, 115 S. Ct. 851, 865 (1995) (emphasis in original) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336, 112 S. Ct. 2514, 2517 (1992)).

C.     AEDPA Review of State Court Decisions Under § 2254(d)

Because most of the claims upon which Samra seeks habeas relief under § 2254 were adjudicated on the merits in state courts, this Court is restricted in its ability to grant relief on those claims by § 2254(d). The AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Guzman*, 663 F.3d at 1345 (internal quotation marks and citation omitted). To grant Samra's habeas petition, this Court must not

only find that his constitutional claims are meritorious, but also that the state court's

resolution of those claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see also Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir. 2010)

(quoting § 2254(d)).  The burden of showing that an issue falls within § 2254(d)(1) or

(d)(2) is upon the petitioner.  *See Woodford v. Visciotti*, 537 U.S. 19, 25, 123 S. Ct. 357,

360 (2002).  Section 2254(d)(1)'s "contrary to" and "unreasonable application of"

clauses have independent meanings.  *See Alderman v. Terry*, 468 F.3d 775, 791 (11th

Cir. 2006) ("[T]he 'contrary to' and 'unreasonable application' clauses are

interpreted as independent statutory modes of analysis.") (citation omitted).  A state

court's decision is contrary to "clearly established precedents [of the Supreme Court

of the United States] if it applies a rule that contradicts the governing law set forth in

[the Court's] cases, or if it confronts a set of facts that is materially indistinguishable

from a decision of th[e] Court but reaches a different result." *Brown v. Payton*, 544

U.S. 133, 141, 125 S. Ct. 1432, 1438 (2005) (citation omitted).  On the other hand, to

determine whether a state court's decision is an "unreasonable application" of clearly

established federal law, the Supreme Court has stated:

> The pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable . . . For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself.

> A state court's determination that a claim lacks merits precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision.  And as the [Supreme Court] has explained, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785-86 (2011) (citation and

quotation marks omitted) (emphasis in original); *see also Schriro v. Landrigan*, 550 U.S.

465, 473, 127 S. Ct. 1933, 1939 (2007) ("The question under the AEDPA is not

whether a federal court believes the state court's determination was incorrect but

whether that determination was unreasonable—a substantially higher threshold.");

*Guzman*, 663 F.3d at 1346 ("Ultimately, before a federal court may grant habeas relief

under § 2254(d), 'a state prisoner must show that the state court's ruling on the claim

being presented in federal court was so lacking in justification that there was an error

well understood and comprehended in existing law beyond any possibility for

fairminded disagreement.'") (quoting *Harrington*, 131 S. Ct. at 786-77).[6]

D.   *De Novo* Review When the State Courts Fail to Resolve the Merits of a Claim Adequately Raised

When a state court does not resolve the merits of a claim that has been adequately presented to it by a petitioner, § 2254(d)(1)'s requirement that the federal court defer to state court decisions that are not contrary to, or an unreasonable application of, clearly established federal law, does not apply.  As explained by the Eleventh Circuit:

> As the Florida courts failed to resolve the merits of Davis's claim, the present controversy falls outside of § 2254(d)(1)'s requirement that we defer to state court decisions that are not contrary to, or an unreasonable application of, clearly established federal law.  *See* [28 U.S.C. § 2254(d)(1)]; *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 2542, 156 L. Ed.2d 471 (2003) (When a state court denies relief by making an unreasonable application of the first prong of the test for ineffective assistance of counsel and thus never reaches the second prong, application of the second prong in federal habeas proceedings is de novo.); *Wright v. Sec'y for the Dep't of Corr.*, 278 F.3d 1245, 1254 (11th Cir. 2002) (interpreting § 2254(d)(1)'s requirement of deference with respect to federal claims "adjudicated on the merits in State court proceedings" (internal quotation marks omitted)), cert. denied, 538 U.S. 906, 123 S. Ct. 1511, 155 L. Ed. 2d 225 (2003).

---

[6] It is also worth noting that a state court's factual determination is entitled to a presumption of correctness under § 2254(e)(1)).  And commensurate with the deference accorded to a state court's factual findings, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'"  *Ward,* 592 F.3d at 1155-56 (alterations in original) (quoting § 2254(e)(1)).  However, Samra states that he is not attempting to submit any new evidence in this federal habeas proceeding, so § 2254(e)(1) is not implicated.

*Davis v. Sec'y for Dept. of Corr.*, 341 F.3d 1310, 1313 (11th Cir. 2003) (per curiam).  Under these circumstances, this Court's review of such a claim is *de novo.  See id.*

The court now turns to Samra's constitutional claims with these principles in mind.

## IV.   SAMRA'S CLAIMS

### A.   Samra's claim that he was denied his right to a fair and impartial jury under the Sixth and Fourteenth Amendments when the trial court denied his motion for a change of venue

Samra's first claim is that the trial court's denial of his motion for a change of venue on grounds of prejudicial pretrial publicity deprived him of an impartial jury and a fair trial.  Samra raised this claim on direct appeal before the ACCA, and the ACCA denied it on the merits.  *See Samra*, 771 So. 2d at 1113-16.  At the time, the Alabama Supreme Court automatically granted certiorari review, but the Court did not comment further on the venue issue and only made a general statement of affirmance. *See Ex Parte Samra*, 771 So. 2d at 1122 ("We have found no error in either the guilt phase of the trial or the sentencing phase of the trial that adversely affected the defendant's rights.").

Because the ACCA's determination was on the merits, the claim is subject to AEDPA review by this Court.  *See* 28 U.S.C. § 2254(d).  Samra contends that the ACCA's decision is contrary to, or involved an unreasonable application of, the United States Supreme Court's decisions on prejudicial pretrial publicity, particularly *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507 (1966), *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417 (1963), *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639 (1961), and *Murphy v. Florida*, 421 U.S. 794, 95 S. Ct. 2031 (1975).  He also argues that the decision involved an unreasonable application of the facts in light of the evidence in the record because the ACCA failed to consider the "totality of the circumstances" of Samra's case and the surrounding media attention.

In analyzing whether a defendant's trial was deprived of fundamental fairness by pretrial publicity or an inflamed community atmosphere, courts consider both an "actual prejudice" standard and a "presumed prejudice" standard.  *See Coleman v. Zant,* 708 F.2d 541, 544 (11th Cir. 1983) (citing *Irvin*, *Sheppard*, *Rideau*, and *Murphy*, *supra*).  On direct appeal, the ACCA addressed both standards, stating: "'In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated "actual prejudice" against him on the part of the jurors; 2) when there is "presumed prejudice" resulting from

community saturation with such prejudicial pretrial publicity that no impartial jury can be selected.'" *Samra*, 771 So. 2d at 1113 (quoting *Hunt v. State*, 642 So.2d 999, 1042–43 (Ala. Crim. App. 1993) (citing, in turn, *Sheppard, Rideau*, and *Coleman*, *supra*)).

The ACCA first discussed presumed prejudice, noting that under *Sheppard* and *Rideau*, Samra had to meet the "heavy burden" of establishing "1) that the pretrial publicity is sufficiently prejudicial and inflammatory and 2) that the prejudicial pretrial publicity saturated the community where the trials were held." *Id.* at 1114-15. The ACCA held that Samra failed to meet this burden:

> In support of his motion for a change of venue, [Samra] introduced testimony concerning a telephone poll of 305 Shelby County citizens about the case. Of the people responding to the poll, 83.9 percent indicated that they had heard of the case. Of the 83.9 percent who had heard of the case, 20 percent indicated that they thought [Samra] was guilty, 6.6 percent thought [Samra] was probably guilty, 2.3 percent thought [Samra] was probably not guilty, and 5.9 percent thought [Samra] was not guilty. However, a majority, 65.2 percent, were uncertain as to [Samra's] guilt at that time. Also, the people conducting the poll did not ask the respondents whether they could set aside what they had heard about the case and decide it based solely on the evidence presented in court. [Samra] also introduced numerous newspaper articles from local newspapers and portions of newscasts by local television stations covering the case from its inception through the trial, including information as to the area covered by the media.
>
> Although [Samra] presented evidence that indicated that many of the citizens of Shelby County had heard about the case through the

media, he has not shown that the information presented by the media was prejudicial. We have examined the media materials presented to the trial court, and we find that most of the reports were factual and relatively objective rather than accusatory, inflammatory, or sensational. Therefore, we conclude that the materials did not contain prejudicial information. Further, [Samra] did not prove that the media attention inflamed or saturated the community so that there was an emotional tide against him. Thus, he has not shown that the pretrial publicity in this case was so inherently or presumptively prejudicial as to constitute one of those "extreme situations" that warrant a presumption of prejudice from pretrial publicity.

*Id.* at 1115.

The ACCA next evaluated whether the jury was actually prejudiced against Samra, noting that to establish actual prejudice under *Irvin, supra*, Samra must show that "one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty" and that "these jurors . . . could not have laid aside these preformed opinions and rendered a verdict based on the evidence presented in court." *Id.* (citation and internal quotation marks omitted) (brackets in original omitted).   The ACCA held that Samra had not established actual prejudice:

[Samra] has not shown any actual prejudice resulting from the pretrial publicity. Through the use of a jury questionnaire and individual voir dire, the trial court and the attorneys extensively questioned the veniremembers about their knowledge about the case and any effect pretrial publicity may have had on their ability to be fair and impartial. Many of the veniremembers were familiar with the facts of, and the

circumstances surrounding, this offense. However, only three indicated that they were biased against [Samra] based on information they obtained from the media, and the trial court excused those veniremembers for cause. The remainder of the jurors who had become familiar with the case through the media indicated, upon further questioning, that they could set aside anything they had read or heard about the case and render a fair and impartial verdict based solely upon the evidence presented at trial. In denying [Samra's] motion, the trial court specifically stated:

> "With that said, the court will deny the motion for change of venue. Specifically, the court finds the best standard by which to measure that question or that issue is the standard of the statement of the jurors. We have had 70 some-odd jurors who have told us that they can decide this without regard to what they may have seen or heard.
>
> There is no evidence from which the court can infer that any of those jurors are being anything other than completely truthful. And, in fact, the court finds that there is a basis to infer that they are being truthful.
>
> With that sai\d, the motion for change of venue is denied."

(R. 1391–92.) Thus, [Samra] has not shown that any of the jurors were actually prejudiced against him.

*Id.* at 1116.

Nothing in the ACCA's decision is contrary to, or involved an unreasonable application of, clearly established federal law. Samra's invocation of the Supreme Court's landmark cases on prejudicial pretrial publicity falls short, as it was not unreasonable for the ACCA to conclude that the evidence of trial publicity in this case

did not rise to the level of the "carnival atmosphere" discussed in *Sheppard*, 384 U.S. at 354, 86 S. Ct. at 1518 ("For months the virulent publicity about Sheppard and the murder had made the case notorious. Charges and countercharges were aired in the news media besides those for which Sheppard was called to trial. In addition, only three months before trial, Sheppard was examined for more than five hours without counsel during a three-day inquest which ended in a public brawl. The inquest was televised live from a high school gymnasium seating hundreds of people."); *Rideau*, 373 U.S. at 725-27, 83 S. Ct. at 1418-20 (describing as a "spectacle" the fact that "[w]hat the people of Calcasieu Parish saw on their television sets was Rideau [the defendant], in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff" and thus deciding not to examine the voir dire for actual prejudice because the trial was but a "hollow formality"); or *Irvin*, 366 U.S. at 727, 81 S. Ct. at 1645 ("An examination of the 2,783–page voir dire record shows that 370 prospective jurors or almost 90% of those examined on point . . . entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty . . . . A number admitted that, if they were in the accused's place in the dock and he in theirs on the jury with their opinions, they would not want him on the jury. . . . [O]f the voir dire

examination of a majority of the jurors finally placed in the jury box[,] [e]ight out of the 12 thought petitioner was guilty.").

Nor was the ACCA's decision based on an unreasonable determination of the facts in light of the evidence presented.  In support of his argument that presumed prejudice existed, Samra argues that the articles from local newspapers, portions of video newscasts covering Samra's case, and the statistical evidence provided by Dr. Davis should have demonstrated to the state courts that an overwhelming number of prospective jurors believed Samra to be guilty before they were even empaneled. With regard to Dr. Davis's poll establishing the existence of presumed prejudice, none of the individuals polled were asked whether they could set aside any preconceived notions and decide the case based only on the evidence before them.  With regard to the media exhibits, this Court has examined them and agrees with the ACCA that they are largely objective in nature rather than inflammatory or prejudicial. " The fact that a case generates widespread publicity does not, in and of itself, warrant a change of venue." *Baldwin v. Johnson*, 152 F.3d 1304, 1314 (11th Cir. 1998).  Indeed, " the principle of presumed prejudice 'is rarely applicable and reserved for extreme situations.'" *Mills v. Singletary*, 63 F.3d 999, 1010 (11th Cir. 1995) (citation omitted). The Supreme Court has recently explained that in each of its cases where it

overturned a conviction due to a presumption of prejudice from pretrial publicity, those " 'conviction[s] [had been] obtained in a trial atmosphere that was utterly corrupted by press coverage.' " *Skilling v. United States*, 561 U.S. 358, 380, 130 S. Ct. 2896, 2914 (2010) (citation omitted) (alteration in original omitted).  The Court reiterated that those decisions, however, " 'cannot be made to stand for the proposition that juror exposure to . . . news accounts of the crime . . . alone presumptively deprives the defendant of due process.' " *Id.* (citation omitted); *see also Murphy*, 421 U.S. at 800 n.4, 95 S. Ct. at 2036 n.4 (distinguishing " largely factual publicity from that which is invidious or inflammatory," and noting that " [t]o ignore the real differences in the potential for prejudice would not advance the cause of fundamental fairness, but only make impossible the timely prosecution of persons who are well known in the community . . . ." ).  Samra emphasizes that the District Attorney was quoted in news articles stating that he would pursue the death penalty because of the horrific nature of the crime.  This fact does not show that the nature of the publicity was inflammatory, so as to lodge this case within the narrow band of " extreme situations" where prejudice may be presumed.  *See Gaskin v. Sec'y, Dept. of Corr.*, 494 F.3d 997, 1005 (11th Cir. 2007) (no habeas error in denial of petitioner's motion for change of venue, even though articles published in local paper " may have

been somewhat prejudicial or inflammatory").

The Court also finds that the ACCA's conclusion that no actual prejudice existed was not unreasonable in light of the evidence before the state courts.  The record reveals that the voir dire proceedings were extensive.  The trial court granted Samra's request to have the venire members complete questionnaires.  Questioning of the potential jurors lasted four days.  The trial court questioned each juror individually about any opinion the juror had of the death penalty, and any knowledge the juror might have had of the facts of the case.  Counsel for Samra and for the State were then allowed to question each potential juror.  Many of the prospective jurors stated that they had heard something about the murders when they occurred one year earlier, but many did not remember details of the crime.  Importantly, despite some being familiar with the media coverage of the case, none of the actual jury members stated that they could not render a verdict based solely on the evidence before them.  As discussed by the Supreme Court, such a fact precludes a finding of actual prejudice:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective jurors' impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 723, 81 S. Ct. at 1642-43; *see also Murphy*, 421 U.S. at 799-800, 95 S. Ct. at 2036 ("Qualified jurors need not [ ] be totally ignorant of the facts and issued involved."). Here, as in *Murphy*, "[t]he voir dire . . . indicates no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside." 421 U.S. at 800, 95 S. Ct. at 2036.

Accordingly, habeas relief is unavailable with regard to this claim because the state courts' treatment of the change of venue issue is not contrary to, or an unreasonable application of, Supreme Court precedent; nor was it an unreasonable determination of the facts based on the evidence before it. *See* 28 U.S.C. § 2254(d).

B.     Samra's claim that he was denied his Sixth Amendment right to effective assistance of trial and appellate counsel

Samra's second claim is that Bell's performance was constitutionally ineffective for various reasons. Before addressing these claims, a discussion of the general standard for ineffective assistance of counsel claims is warranted.

1.     General Standard for Ineffective Assistance of Counsel Claims

In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), the Supreme Court established the following two-pronged standard for judging, under the Sixth Amendment, the effectiveness of attorneys who represent criminal defendants at trial

or on direct appeal:

>A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.   First,  the  defendant  must  show  that  counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed  the  defendant  by  the  Sixth  Amendment.   Second,  the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S. Ct. at 2064 .

Because *Strickland*'s  preceding  two-part  test  is  clearly  framed  in  the

conjunctive, a petitioner bears the burden of proving both "deficient performance"

and "prejudice" by "a preponderance of competent evidence."   *Chandler v. United*

*States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc); *see also Holladay v. Haley*, 209

F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in

order to show a violation of the Sixth Amendment, the court need not address the

performance prong if the defendant cannot meet the prejudice prong, [ ] or vice

versa."). Further, when assessing ineffective assistance of counsel claims:

>[I]t is important to keep in mind that in addition to the deference to counsel's performance mandated by *Strickland*, the AEDPA adds another layer of deference—this one to a State court's decision—when

we are considering whether to grant federal habeas relief from a State court's decision. Thus, [a petitioner] not only has to satisfy the elements of the *Strickland* standard, but he must also show that the State court applied *Strickland* to the facts of his case in an *objectively unreasonable manner*.

*Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010) (brackets in original omitted) (citations and quotation marks omitted) (emphasis in original).

In order to establish deficient performance, a habeas petitioner " must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064. That reasonableness is judged against " prevailing professional norms." *Id.*, 104 S. Ct. at 2065. Moreover, under *Strickland*, lower federal courts must be " highly deferential" in their scrutiny of counsel's performance. As the *Strickland* court outlined:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to

provide effective assistance in any given case.  Even the best criminal
defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065 (citations and quotation marks
omitted).

Simply put, a habeas petitioner "must establish that no competent counsel
would have taken the action that his counsel did take" to overcome the presumption
that counsel's conduct fell within the wide range of reasonable professional assistance.
*Chandler*, 218 F.3d at 1315.  The reasonableness of counsel's performance is judged
from the perspective of the attorney, at the time of the alleged error, and in light of all
the circumstances.  *See, e.g.*, *Newland v. Hall*, 527 F.3d 1162, 1184 (11th Cir. 2008)
("We review counsel's performance 'from counsel's perspective at the time,' to
avoid 'the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S. at 689, 104
S. Ct. at 2065).

To satisfy the prejudice prong, a habeas petition "must show that there is a
reasonable probability that, but for counsel's unprofessional errors, the results of the
proceeding would have been different.  A reasonable probability is a probability
sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104
S. Ct. at 2068.  Stated differently, "[a] finding of prejudice requires proof of
unprofessional errors so egregious that the trial was rendered unfair and the verdict

rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (citations and quotation marks omitted). Further, the fact that counsel's "error had some conceivable effect on the outcome of the proceeding" is insufficient to show prejudice. *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067. Therefore, "when a petitioner challenges a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart v. Sec'y, Dept. of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2069).

Because *Strickland* and § 2254(d) both mandate standards that are "'highly deferential'", "when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S. Ct. at 788 (citations omitted). The inquiry is not then "whether counsel's actions were reasonable," but is instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* The court must determine "whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at 785. This "[d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective

assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Evans v. Sec'y, Fla. Dept. of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012).

Finally, "[s]tate court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)." *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001).

### 2. Samra's claim that he was denied effective assistance of trial counsel at the penalty phase

Samra raises three sub-claims to support his assertion that he received ineffective assistance of counsel at the penalty phase of his trial. The first of these claims is that Bell failed to investigate and introduce evidence of Samra's purported "brain damage and organic brain dysfunction" for mitigation purposes. The second claim is that Bell presented evidence in mitigation that had the unintended effect of becoming aggravating evidence. The third claim is that Bell failed to object to evidence regarding wall-etchings and gang-type writings on the wall of Duke's bedroom and tattoos on Samra's arm.

Samra presented each of these claims in his Rule 32 Petition and again to the ACCA on appeal from the Rule 32 Court's denial of his petition. The ACCA denied each of the claims on the merits. Accordingly, the claims are subject to AEDPA

review by this Court.

          a.      Samra's claim that Bell failed to adequately investigate and introduce evidence of "brain damage and organic brain dysfunction"

Samra contends that Bell's performance was deficient because he failed to follow the advice of Dr. Scott, the psychiatrist he hired to develop mitigating evidence, to have Samra submit to further neuropsychological testing. Samra argues that further investigation would have revealed that Samra suffers from "organic brain damage" and "brain dysfunction." To support his contention that he was prejudiced by Bell's alleged ineffectiveness, Samra refers to the testimony of the two doctors he offered as witnesses at the evidentiary hearing on this matter during his Rule 32 proceedings: Dr. Gelbort, who performed neurological testing on Samra, and Dr. Mountz, who performed a SPECT scan. Dr. Gelbort testified at the Rule 32 hearing that Samra was functioning in the bottom range of normal or the top range of the brain-impaired population, and Dr. Mountz testified that Samra had diminished brain flow (that was in the low range of normal) in the posterior frontal superior temporal region of the brain. Samra's position is that if the results of the neurological testing performed by Dr. Gelbort and of the SPECT scan performed by Dr. Mountz had been available to Dr. Scott at trial, his diagnosis of Samra more likely than not would have

been that Samra suffered brain dysfunction, Bell could have then presented the results to the jury in mitigation on behalf of Samra, and the jury would not have imposed the death penalty.

This Court's task under § 2254(d)(1) is to determine whether the ACCA's rejection of this claim was contrary to, or an unreasonable application of, the United States Supreme Court cases on ineffective assistance of counsel offered by Samra, namely *Strickland*, *supra*, *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527 (2003), *Porter v. McCollum*, 558 U.S. 30, 130 S. Ct. 447 (2009) (per curiam), *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495 (2000), *Tennard v. Dretke*, 542 U.S. 274, 124 S. Ct. 2562 (2004), and *Sears v. Upton*, 561 U.S. 945, 130 S. Ct. 3259 (2010) (per curiam). Thus, the Court first turns to the ACCA's decision.

In considering this claim, the ACCA discussed the *Strickland* standard and applied it to Samra's circumstances, as follows:

> Samra next argues that trial counsel was ineffective for not conducting an investigation on whether he was brain-damaged. Specifically, Samra argues that because an investigation would have established that he suffers from "organic brain damage" and "brain dysfunction," his counsel's failure to investigate this strategy prevented him from introducing this evidence at trial, thereby avoiding imposition of the death penalty. Thus, Samra argues, because trial counsel did not pursue this strategy, counsel rendered ineffective assistance.
>
> Samra's trial counsel, Richard Bell, executed a lengthy affidavit

concerning his strategy in preparing Samra's defense.  Bell offered additional evidence concerning his trial preparation, investigation, and strategy through testimony presented at the November 2003 evidentiary hearing on Samra's petition.  The record indicates that Bell was an experienced criminal defense attorney, and that he had tried a number of capital-murder cases.  He was aware that a crucial part of trial preparation was to determine whether Samra had any mental health conditions that could be presented through the testimony of a mental health expert in support of either an affirmative defense during the guilt phase of Samra's trial or as mitigation during the penalty phase.  To this end, Bell requested funds for a mental health expert.FN2  Bell then sought out an experienced mental health expert that would not be subject to an attack as merely a "hired gun."  After receiving recommendations from a number of nationally known criminal defense attorneys, Bell contacted Dr. Charles Scott, a forensic neuropsychiatrist affiliated with the Department of Psychiatry and Neurology at Tulane University Medical Center.  Bell traveled to New Orleans, Louisiana, to interview Dr. Scott.  Based upon that interview, Bell concluded that Dr. Scott would be a highly -qualified expert witness, and one who could not be attacked as simply "a hired gun."

> FN2.  This request was made on an ex parte basis, in order to protect the confidentiality of his trial strategy.

Dr. Scott then performed an extensive evaluation of Samra.  He interviewed Samra and his parents; he also reviewed Samra's educational and medical records.  Afterwards, Dr. Scott prepared a lengthy written report setting out Samra's social and educational history, alcohol and drug history, medical history, Samra's description of his involvement in the FOLKS gang, and Samra's mental history as it related to the crime.  However, Dr. Scott's ultimate conclusion was that Samra was not suffering from any psychiatric condition, and, further, that Samra was capable of assisting in the crime and that he knew the wrongfulness of his conduct.  Because Bell believed that Dr. Scott would be a highly credible witness, he concluded that if Dr. Scott were called to testify, his testimony would be very unfavorable testimony to Samra's

defense. Accordingly, Bell decided not to call Dr. Scott as a witness.

During the penalty phase of Samra's trial, Bell attempted to "humanize" Samra, in order to mitigate the atrocious facts of the crime. Bell's aim was to show the jury that Samra had a family and that his parents loved him. Bell presented the testimony of Samra's aunt, mother, and father. Samra's aunt testified that she had known Samra all of his life. According to her, Samra was a loving person who had never displayed any violence. To her knowledge, there was nothing in Samra's life that would have predicted any violent or otherwise deviant behavior.

Samra['s] parents likewise testified as to their son's background. Samra's father testified that although his son attended "regular" schools, he participated in "special education classes" as well, and was "behind" developmentally as a child. Mr. Samra testified that until the age of 16, Samra had no behavioral or disciplinary problems and was a loving and obedient child. However, Mr. Samra testified that after Samra's junior year in high school, he discovered that his son was using marijuana. After several incidents where Mr. Samra attempted to get his son to stop using marijuana, he told Samra that he could either seek professional assistance to stop using marijuana or else he could leave home. Samra elected to leave home, dropping out of high school during his senior year. Mr. Samra suspected that, based on the way his son dressed, he might be hanging around with "gang-type people." Samra, however, denied such involvement.

Samra's mother testified that during her son's early childhood, there were no indications of violence. Mrs. Samra stated that her son was "a little slower" than other children his age, and that he was easily frustrated. Additionally, he was diagnosed with having learning disabilities.

Bell had no evidence that Samra had ever been physically abused or otherwise mistreated by his parents. Based on Bell's investigation of Samra's background, he had a middle-class upbringing and was not subjected to the abject poverty that had been the situation in some of the

other capital cases that Bell had handled.

As a result, Bell's defense strategy at the guilt phase was twofold: (1) to present evidence to show that no sane person could have committed this crime; and (2) to present evidence that Samra was led into this crime by Mark Anthony Duke.  Specifically, Bell attempted to show that Samra was led into committing this crime due to his and Duke's involvement with the FOLKS gang.  To support this strategy, Bell presented the testimony of (1) Dr. Kathleen Ronan, a psychologist who had examined Samra at Taylor Hardin Secure Medical Facility; (2) Dr. George Twente; and (3) Sara Woodruff, Samra's friend and fellow gang member.  Drs. Ronan and Twente's testimony established that Samra functioned at the borderline between low average and mild mental retardation, and that he was led into committing this crime as a result of gang influence.  Bell then attempted to use Sara Woodruff's testimony to establish that Duke was the "ringleader" because he was angry with his father, and that Samra was merely influenced by Duke to commit this crime.

As evidenced from the aforementioned legal principles, when reviewing claims of ineffective assistance of counsel, this Court gives counsel's performance a high degree of deference, particularly where trial strategy is involved.  See Ingram v. State, [Ms. CR-03-1707, September 29, 2006] ___ So. 2d ___, ___ (Ala. Crim. App. 2006) (citing Strickland v. Washington, 466 U.S. at 690-91); accord Chandler v. United States, 218 F.2d 1305, 1314 (11th Cir. 2000).  A claim that trial counsel was ineffective because he failed to adequately investigate can constitute deficient performance when counsel totally fails to inquire into the defendant's past or present behavior or life history.  See, e.g., Whitehead v. State, [Ms. CR-04-2251, June 30, 2006] ___ So. 2d ___, ___ (Ala. Crim. App. 2006) (quoting Ex Parte Lane, 775 So. 2d 847, 853-54 (Ala. 2000)).  However, as we made clear in Ingram v. State: "'There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.'" ___ So. 2d at ___ (quoting Strickland v. Washington, 466 U.S. at 689).

Notwithstanding Bell's efforts to seek out a qualified expert witness such as Dr. Scott, Samra argues that trial counsel's performance was deficient because he ignored Dr. Scott's recommendations for additional testing.   Dr. Scott's report recommended a "complete neuropsychological evaluation, neurology consultation and brain imaging (such as MRI or PET scanning)."   ( C. 335.)  However, Dr. Scott's report did not mention a SPECT test be performed on Samra.FN3  Bell stated, that to the best of his recollection that an MRI was performed on Samra and that it showed no medical abnormalities.   Bell also investigated to see if any Birmingham-area hospital had a PET machine and discovered that no hospital had one.

> FN3. Some mention of a SPECT test was made in an unsigned affidavit prepared for Dr. Scott's signature that was to be filed with a motion for funds. However, this request was never made.

Clearly, this is not a case where counsel failed to conduct any investigation into possible mitigating evidence.  See Wiggins v. Smith, 539 U.S. 510 (2003).  There is absolutely no indication that this case falls within the scope of the Supreme Court's holding in Wiggins, or any of the other decisions cited by Samra in brief.  Indeed, after applying the factors used by the Supreme Court, we are unable to say that Samra's trial counsel rendered ineffective assistance.

First, we find no instances of attorney error or malpractice in this case.  Samra's trial counsel had a coherent, well thought-out defense strategy of showing that Samra was influenced by his co-defendant's more dominant personality and that Samra had no history of violent crime until becoming friends with Mark Anthony Duke.  Additionally, none of the public records corroborates Samra's claim that he had "organic brain damage," unlike in Wiggins, where public records corroborated the mitigating evidence.   Although Samra's medical records suggest some childhood neurological deficits, those records also indicate that, if additional treatment was mandated, he would have received further treatment.

Second, the additional mitigating evidence presented in this case is not as compelling as the evidence presented in Wiggins. Samra offered the testimony of Drs. Mountz and Gelbort at his Rule 32 evidentiary [sic]. Both men were retained expert witnesses who had testified on numerous occasions. Dr. Mountz's testimony could only establish that Samra had diminished brain flow that placed him in the low range of normal. Dr. Gelbort testified that the test results placed Samra in the borderline range of low-normal to mildly brain-impaired.

Third, when the gravity of the aggravating circumstances when [sic] reweighed against the additional mitigating evidence presented at the Rule 32 evidentiary hearing, we do not believe that this additional evidence would have influenced the jury's appraisal of Samra's moral culpability. Thus, the facts of this case do not fall within the scope of either Wiggins v. Smith or Williams v. Taylor, 529 U.S. 362 (2000). See also Rutherford v. Crosby, 385 F.3d 1300, 1315 (11th Cir. 2004), cert. denied, 544 U.S. 982 (2005). Quite simply, because the additional mitigating evidence was less than compelling and because it in no way altered the aggravating circumstance that was found by the sentencer, we conclude that there is no reasonable probability that the additional mitigating evidence offered during the Rule 32 evidentiary hearing would have resulted in a different sentence.

In short, this Court can find neither that Samra's trial counsel's performance was deficient nor that his defense was prejudiced as a result of counsel's performance. As previously noted, the fact that Bell chose to pursue a particular trial strategy, rather than the one proposed by Samra's Rule 32 counsel, does not render Bell's performance deficient. Nor does Bell's failure to offer additional evidence of Samra's mental capacities establish a level of prejudice that would warrant post-conviction relief. Indeed, given the circumstances of this case, we do not believe that there was any reasonable probability that the sentencer would have concluded that the balance of the aggravating circumstances against the mitigating circumstances would have warranted a sentence other than death. Strickland v. Washington, 466 U.S. at 695. Indeed, we note the circuit court's findings as to this matter:

There is no reasonable probability that the balance of aggravating and mitigating circumstances that led to the imposition of the death penalty in this case would have been different had trial counsel introduced the evidence complied and presented in this Rule 32 proceeding. The aggravating circumstance that was found at the penalty phase was the murder was especially heinous, atrocious, and cruel, especially when compared to other capital felonies. This Court made the following findings regarding the application of this aggravating circumstance:

> WHEREAS, the Court hereby finds that the offense was particularly heinous, atrocious and cruel when compared to other capital offenses. Evidence showed at trial that the victims in this case were killed in a very cruel and heinous manner. The minor children's throats were actually cut and according to testimony of the medical examiner, they drowned in their own blood. The photographs and other demonstrative evidence in this case leads to one and only one conclusion, that the manner in which the victims were killed was much more heinous and atrocious and cruel than would be necessary in any killing.

> This case stands out as particularly heinous, atrocious and cruel when it is considered that at least one victim, according to the admission of Defendant, begged not to be killed. All of the victims died very painful and brutal deaths. The victims apparently struggled for life and breath and that very struggle caused one or more of the victims to drown in their own blood.

> The record is clear that when compared to other capital cases, the circumstances in this case make it particularly heinous, atrocious and cruel.

Clerk's Record at 516.

In light of the brutal nature of this crime against two adult victims and two children, ages six and seven, who had their throats cut, this Court finds no reasonable probability that the mitigating circumstances gathered and presented in connection with Samra's Rule 32 proceedings would have altered the balance of aggravating and mitigating circumstances. First, none of the evidence developed in connection with these Rule 32 proceedings served to alter in any way the aggravating circumstance of a heinous and atrocious crime that supported the imposition of the death penalty. Samra offered mothering [sic] at the Rule 32 evidentiary hearing to alter the evidence that demonstrated he shot Dedra Hunt in the face and then went upstairs and cut the throat of one of the children while she was begging for her life and fighting for her life by trying to deflect the knife away from her throat.

Second, it is not [at] all clear how the evidence presented at the Rule 32 hearing would have been helpful to Samra's efforts to secure a life without parole sentence. Although the evidence presented at the Rule 32 evidentiary hearing was argued to be mitigating, it is not really clear that it would be accepted in that light. Dr. Mountz admitted that there was no research methodology to show that a SPECT scan result can allow anyone to draw conclusions about the reasons that compel an individual to commit murder. Dr. Mountz also said that the SPECT results are irrelevant to whether Samra appreciated the wrongfulness of his actions or whether he planned the

murders or whether he tried to hide evidence in an effort to conceal the murders.  Both Dr. Mountz and Dr. Mayberg stated that Samra's brain scan could have looked much different at the time of the crime.  There was no evidence presented as to how diminished brain flow contributes to a murderer's judgment or insight.

Third, some of the evidence presented at the Rule 32 evidentiary hearing was known to the jury and the sentencing judge. Samra's trial counsel presented evidence that his IQ scores were in the borderline range of intellectual functioning.  Given that the battery of neuropsychological tests only affirms this fact that was already before the jury, Samra's trial counsel's decision not to seek further neuropsychological testing did not prejudice Samra.  The trial court rejects the opinion that Samra suffers from organic brain dysfunction because the impairments shown on the neuropsychological testing is further evidence of his IQ and not any brain dysfunction; because the SPECT scan interpretation of Dr. Mayberg shows that the results were normal; because there is no evidence that this alleged condition of reduced blood flow to the brain existed at the time of the offense; and, because even if Dr. Mountz was correct in defining Samra's SPECT scan as abnormal, the abnormality was not in the portion of the brain that controls the functioning that Dr. Gelbort found as impaired.

In conclusion, this Court finds no reasonable probability that the balance of aggravating and mitigating circumstances underlying Samra's death sentence would have been different if the judge and jury had heard the evidence presented at the Rule 32 evidentiary hearing.  We note that many death penalty cases involve murders that are carefully planned, or accompanied by torture, rape or kidnapping.  Dobbs v. Turpin, 142 F.3d 1383, 1390 (11th

Cir. 1998) (citation omitted). " In these types of cases, this Court has found that the aggravating circumstances of the crime outweigh any prejudice caused when a lawyer fails to present mitigating evidence." <u>Id.</u> (citing <u>Francis v. Dugger</u>, 908 F.2d 696, 703-04 (11th Cir. 1990) (finding that the failure to present mitigating evidence of a deprived and abusive childhood did not prejudice capital defendant at trial for torture-murder of government informant). The less than compelling evidence offered by Samra does not mitigate this horrific crime that resulted in four murders.

( C. 793-797.)

Based on the foregoing, the circuit court correctly rejected Samra's claim that trial counsel was ineffective for not presenting additional evidence as to Samra's purported brain dysfunction.

(C.R. Vol. 49, at 113-21).

Nothing in the ACCA's well-reasoned opinion is contrary to, or an unreasonable application of, *Strickland* or its progeny. In applying the performance prong first, the ACCA reasonably concluded that Bell's investigation was not deficient. When considering a failure to investigate claim, the Supreme Court has said, " counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. " In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. The

investigation conducted by Bell, including his decision not to have Samra submit to a PET scan, satisfied all professional norms.   Bell, an experienced capital case attorney, knew that an important part of the pre-trial preparation was to see if Samra had any mental health deficiencies or abnormalities.   After searching for a well-regarded mental health expert who would be viewed as credible and not susceptible to attack as a criminal defendant oriented expert, including consulting nationally-known criminal defense attorneys, Bell hired Dr. Scott to evaluate Samra, who reported that Samra was not suffering from any psychiatric condition and that Samra was mentally capable of assisting in the crime and knew the wrongfulness of his conduct.   Dr. Scott recommended an MRI *or* a PET scan be done, and although Bell did not have a PET scan done, because Bell could not locate a hospital in the Birmingham area that performed the scans, Bell did follow Dr. Scott's recommendation to have an MRI done on Samra which showed he had no structural abnormalities in his brain.  Bell also investigated Samra's school and medical records and spoke with his friends and family.   Bell interviewed Samra and found him to be able to carry on an intelligent conversation and determined that he could function in every day society.

Yet Samra contends that his background, which was known to Bell at the time,

should have indicated to Bell that the most sophisticated technology and testing possible should be used to test for neurological deficiencies in his client.  As an initial matter, Samra does not cite to a Supreme Court case holding that trial counsel is ineffective for failing to follow up on every recommendation that a mental health expert makes.  Trial counsel is of course limited by time and financial resources.  *See Rogers v. Zant*, 13 F.3d 384, 387 (11th Cir. 1994) ("*Strickland* indicates clearly that the ineffectiveness question turns on whether the decision not to make a particular investigation was reasonable.  This correct approach toward investigation reflects the reality that lawyers do not enjoy the benefits of endless time, energy or financial resources.") (internal citation omitted); *Atkins v. Singletary*, 965 F.2d 952, 959-60 (11th Cir. 1992) ("At some point, a trial lawyer has done enough. . . . A lawyer can almost always do something more in every case.").  In any event, Samra's background does not raise the same kind of "red flags" that were present in other cases where trial counsel was found to be ineffective for failing to investigate.  Samra emphasizes that he had been enrolled in special education classes from second through eighth grade and that he had a history of seizures and tremors.  However, while Samra's medical records did indicate some developmental delays and seizure activity, Samra was treated by specialists at Emory University who did not note any more problems.  Dr.

Mayberg, who testified at the Rule 32 evidentiary hearing, stated that she had reviewed Samra's medical records which indicated certain medical tests were performed during Samra's childhood.  According to Dr. Mayberg, Samra's parents took him to a childhood neurologist out of concern that Samra was developmentally delayed.   Dr. Mayberg, in her review of the medical records, stated that one neurologist thought that Samra might have a form of childhood epilepsy, but that the second neurologist disagreed.  Dr. Mayberg surmised that Samra may have had some neurological deficits in childhood that improved over time and that, because Samra was under the care of specialists, the condition would have been followed up on if it had persisted.  Because of the CT scans performed on Samra as a child, the normal results of his MRI show that Samra's brain has no old scars, developmental anomalies, or acquired lesions.  Samra made A's, B's, and C's in high school.  He held several different jobs, one of which required him to use a cash register.

For these reasons, the Court can find no error in the ACCA's determination that this case has no similarities to *Wiggins*, where the Supreme Court determined that trial counsel was constitutionally ineffective for failing to investigate mitigating evidence.  *Wiggins* involved a situation where counsel received a one-page description of the defendant's personal history included in the pre-sentence report, which noted

the defendant's " misery as a youth" and described his background as " disgusting,"
as well as a record from the department of social services which revealed that the
defendant's mother " was a chronic alcoholic," that the defendant " was shuttled from
foster home to foster home," and that " on at least one occasion, [the defendant's]
mother left him and his siblings alone for days without food." 539 U.S. at 523, 123 S.
Ct. at 2536. Counsel failed to investigate these leads, but if he had, he would have
discovered " evidence of the severe physical and sexual abuse [the defendant] suffered
at the hands of his mother and while in the care of a series of foster parents." *Id.* at
516, 123 S. Ct. at 2533. The abuse occurred throughout Wiggins's childhood, teenage
years, and into early adulthood and was well-documented in medical, school, and
social services records. *Id.* at 516-17, 123 S. Ct. at 2533. For example, Wiggins's
mother frequently left Wiggins and his siblings home alone for days at a time, which
forced them to " beg for food and to eat paint chips and garbage." *Id.* at 517, 123 S. Ct.
at 2533. The mother routinely beat the children for breaking into the kitchen, which
she often kept locked. *Id.* On one occasion, Wiggins's mother forced his hand against
a hot stove burner, which resulted in an injury that required hospitalization. *Id.* When
he was six years old, Wiggins was placed in foster care where he was physically abused
by his first and second foster mothers. *Id.* Wiggins's second foster father repeatedly

molested and raped him. *Id.* To escape the abuse Wiggins ran away from one of his foster homes at age sixteen and was returned to a foster home where he was repeatedly raped by one of the foster mother's sons. *Id.* After leaving the foster care system, Wiggins entered a Job Corps program where he was sexually abused by his supervisor. *Id.* All of this evidence was presented in post-conviction proceedings, but because trial counsel never investigated it, all that he offered in mitigation was that the defendant had no prior convictions. *Id.* The Supreme Court held that "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Id.* at 525, 123 S. Ct. at 2537. In Samra's case, there was simply nothing akin to the well-documented evidence of a troubled childhood in *Wiggins* that should have been investigated by counsel.

Nor was the ACCA's decision an unreasonable application of *Porter*, cited by Samra. *Porter* involved a situation where counsel, confronted with a "fatalistic and uncooperative" client, conducted a truncated investigation and presented practically no mitigation evidence at sentencing. 558 U.S. at 40, 130 S. Ct. at 453. Indeed, counsel "had only one short meeting with Porter [the defendant] regarding the penalty phase . . . [and] did not obtain any of Porter's school, medical, or military

service records or interview any members of Porters's family." *Id.* at 39, 130 S. Ct. at 452. Because counsel ignored " pertinent avenues for investigation of which [counsel] should have been aware," the jury in sentencing " heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability." *Id.* at 40–41, 130 S. Ct. at 453-54. Here, Bell conducted an extensive investigation in preparing for the guilt and penalty phases of the trial. His efforts included hiring Dr. Scott to prepare a report, having an MRI done, examining school and medical records, and talking with Samra's friends and family. At the penalty phase, Bell had three witnesses testify, each of whom buttressed the humanization strategy he had chosen to pursue. Bell's performance stands in stark contrast to the performance in *Porter*, where the Supreme Court found counsel deficient for failing " to conduct some sort of mitigation investigation." *See id.* at 40, 130 S. Ct. at 453.

Samra also likens Bell's failure to follow up on all of Dr. Scott's recommendations to the deficient performance by counsel in *Lockett v. Anderson*, 230 F. 3d 695 (5th Cir. 2000). Of course, to establish a violation of § 2254(d)(1), Samra must cite decisions of the Supreme Court, and not to decision from the courts of appeals. *Renico v. Lett*, 559 U.S. 766, 778-79, 130 S. Ct. 1855, 1865-66 (2010). Even if this Court could consider *Lockett* in determining a violation of § 2254(d)(1), it is

easily distinguishable for several reasons.  In *Lockett*, defense counsel admitted he was overworked and distracted because he was dealing with his mother's illness and hospitalization.  230 F.3d at 711.  In addition, defense counsel ignored evidence of "repeated head injuries, black-outs, delusional stories, references to self as another name, family troubles, drug and/or alcohol addiction."  *Id.* at 714.  Indeed, even Lockett's confession contained several delusional statements.  *Id.* at 713.  Lockett also had a history of seizures that was ultimately attributed to temporal lobe epilepsy.  *Id.* All of these warning signs were ignored by defense counsel and were not further investigated.  In this case, the developmental delays and neurological problems that occurred in Samra's early childhood are not of the same caliber as the warning signs in *Lockett*, such that they should have caused trial counsel to conduct further investigation.

A further distinction with *Lockett* is that the mental health diagnosis in that case was specifically linked to the crime and the ability of the defendant to distinguish between the concepts of right and wrong.  The Fifth Circuit, in distinguishing *Lockett* on those grounds, stated "Lockett's experts specifically linked his temporal lobe epilepsy, which was evident in his confessions and through a long paper trail of prior medical problems, to Lockett's crime."  *Nixon v. Epps*, 405 F.3d 318, 327 (5th Cir.

2005).  Further, the Fifth Circuit noted that " [t]wo different experts stated explicitly that they did not believe Lockett would have committed his crimes if he did not have severe mental problems."  *Id.*  In contrast to the mental health findings in *Lockett*, the *Nixon* Court ruled that the mental health diagnosis would not have " prevented [the defendant] from knowing the difference between right and wrong."  *Id.*  In the present case, Samra has not presented any evidence that he has a mental illness or any connection between his purported " organic brain damage" and his participation in these murders.

It was also reasonable for the ACCA to conclude that Samra was not prejudiced by Bell's decision not to have a PET scan done.  When assessing prejudice, courts are required to " evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in re-weighing it against the evidence in aggravation."  *Williams*, 529 U.S. at 397-98, 120 S. Ct. at 1515.  " That same standard applies—and will necessarily require a court to 'speculate' as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase."  *Sears*, 130 S. Ct. at 3266-67.

Samra contends that the ACCA did not appreciate the impact of the additional

evidence he presented at the Rule 32 hearing, and in so doing violated *Strickland, Williams*, and *Sears.*   But Samra's additional mitigating evidence was less than compelling: it consisted of one expert (Dr. Mountz) stating that Samra had diminished blood flow in one area of the brain that placed him in the low range of normal and another expert (Dr. Gelbort), who only testifies on behalf of criminal defendants, stating that the test results he derived indicate that Samra was functioning in the bottom range of normal or the top range of the brain-impaired population.   In fact, after hearing this testimony firsthand, which was disputed by the State's experts, Drs. King and Mayberg, the Rule 32 Court ultimately rejected Samra's contention that he suffered from "organic brain dysfunction."   (C.R. Vol. 49, at 120.)   The Court is convinced that the ACCA, in affirming the Rule 32 Court's ruling, appropriately weighed the mitigating evidence presented at trial and during the post-conviction proceeding against the aggravating evidence.

First, the ACCA found that this additional evidence does not alter in any way the aggravating circumstances of the murders—Samra shooting Dedra Hunt in the face and cutting the throat of the one of the children while she was begging for her life.   Indeed, this is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak.   The jury heard how Samra and his friends

planned the murder of Duke's father and planned to kill Dedra Hunt and her two daughters so as to leave no witnesses.  The jury also heard how all of the victims died very painful and brutal deaths, struggling for life and breath such that one or more of the victims drowned in their own blood.  Finally, the jury knew that Samra cut one of the young daughter's throats while she begged for her life.  There is no reasonable probability that the jury, if only it had heard the testimony of Drs. Gelbort and Mountz, would have concluded that this planned, deliberate, and cruel murder was mitigated to any appreciable extent by the fact that Samra's brain was mildly impaired and had diminished blood flow in one area so as to place him in the low range of normal.

Second, the ACCA determined that it was not clear that the judge and jury would have viewed the additional evidence as truly mitigating because Dr. Mountz admitted that there was no research showing that the results of a SPECT scan can allow anyone to draw conclusions about the reasons that compel a person to commit murder.  Samra contends that this conclusion is contrary to law because there is no requirement that mitigation evidence must have a nexus to an individual's mindset in committing a crime before it may be presented.  Samra's argument is misplaced because, although the standard of what constitutes relevant evidence in the mitigation

phase of a capital case is indeed expansive, i.e., "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," *Tennard*, 542 U.S. at 284, 124 S. Ct. at 2570 (internal quotation marks and citation omitted), the ACCA was merely stating that, had the testimony of Drs. Gelbort and Mountz, and the results of their additional testing, been before the judge and jury, it is not clear that the judge and jury would have considered the evidence trustworthy enough to outweigh the aggravating circumstances surrounding these murders.

Third, and perhaps most importantly, the ACCA determined that all of the additional tests conducted on Samra during the post-conviction proceedings merely served to reiterate a fact that was already before the jury and judge: that Samra has a low IQ and was intellectually impaired. *See Strickland*, 466 U.S. at 699-700, 104 S. Ct. at 2071 (finding no prejudice when the evidence that petitioner says his trial counsel should have offered at sentencing "would barely have altered the sentencing profile presented to the sentencing judge"). This is not a case where the judge and jury heard no evidence about Samra's mental and emotional state. Drs. Ronan and Twente, along with Samra's father, mother, and aunt, testified about Samra's intellectual difficulties. There was also evidence before the jury of other possible mitigating

factors: Samra's age, his lack of significant criminal history, his truthfulness and cooperation with law enforcement officers, and the remorse he expressed in statements to law enforcement officers.  Under these circumstances, the ACCA reasonably concluded that the additional mitigating evidence would not have resulted in a sentence other than death.

For the foregoing reasons, the ACCA's decision was not contrary to, or an unreasonable application of, clearly established federal law, and habeas relief is not due to be granted on this claim.

> b.   Samra's claim that Bell presented mitigating evidence that was actually aggravating

Samra claims that when Bell presented evidence that Samra was a member of the FOLKS gang in an attempt to demonstrate that Samra was easily led by a stronger personality such as that of his co-defendant Duke, this evidence only served to inflame the jury and denigrate Samra.  Samra also contends that Bell's performance was deficient for presenting Dr. Ronan's guilt-phase testimony that Samra does not suffer from a psychiatric disorder, understood the difference between right and wrong, and lacked emotionality and a conscience.  According to Samra, the ACCA's determination that it was not constitutionally deficient for Bell to present this evidence is contrary to, or an unreasonable application of *Strickland*, *Wiggins*,

*Williams,* and *Sears*, *supra.*

In rejecting this claim, the ACCA quoted extensively from the Rule 32 Court's

findings, as follows:

> In Paragraph 8(B) of his petition, Samra claimed that his trial counsel was ineffective for presenting evidence at sentencing that had the unintended effect of becoming aggravating evidence. Specifically, Samra claims that his trial counsel acted deficiently by presenting evidence that he was a member of a gang and that he lacked conscience, remorse, or emotionality. In response to this claim, the State presented the affidavit of Richard W. Bell, who explained his trial strategy for introducing evidence of Samra's involvement in the FOLKS ("Forever Our Lord King Satan") gang:

>> Going into trial, I knew that the trial judge had determined the confession was admissible, therefore, I could not argue that Samra was innocent of the crime. My defense strategy at the guilt/innocence phase was to present evidence to show that no sane person could have committed this crime and that Samra was led into this crime by Mark Duke. More importantly, Samra was led into this crime due to his and Duke's involvement with the FOLKS gang.

>> To support this strategy, I called the following witnesses at the guilt phase of the trial: Dr. Kathleen Ronan, a psychologist who had examined Samra at the Taylor Hardin Secure Medical Facility, Dr. George Twente, and Sara Woodruff, Samra's friend and fellow gang member. The testimony of the two experts demonstrated that Samra was

functioning in the borderline between low average and mild mental retardation and that he was led into committing this crime because of the gang influence.  With the testimony of Sara Woodruff, I tried to demonstrate that Duke was the ringleader because he was angry with his father and that Samra was influenced by Duke to commit this crime.

Of course, I was limited in my presentation at the guilt phase because I did not have any evidence to show that Samra was insane or that due to mental retardation he could not appreciate the criminality of his conduct.  None of the expert witnesses that I consulted stated that Samra was mentally retarded.  I did not call Dr. Scott [the psychiatrist that performed an evaluation of Samra before trial] as a witness because he told me Samra was not suffering from any psychiatric condition and that Samra was mentally capable of assisting in the crime and knew the wrongfulness of his conduct.  I believed Dr. Scott to be a very credible expert who, if he testified, could have delivered very unfavorable testimony for Samra.  In addition to relying on the expert's conclusions, I observed Samra for any information regarding his intelligence.  In my discussions with Samra, I found him to be able to carry on an intelligent conversation and determined that he could function in everyday society.  Samra worked in fast food restaurants and, to the best of my recollection, had completed the eleventh grade.  I had no information to show that Samra was mentally retarded.

> At the penalty phase, I wanted to humanize Samra for the jury. I did not want the jury to be left with the image that the prosecutor had created of Samra. I wanted to show that Samra had a family and that his parents loved him. To that end, I called Samra's aunt, and his father or mother to testify on his behalf. I did not have any information that Samra was physically abused as a child or that his father mistreated him. Samra had a middle [class] upbringing and was not subjected to the abject poverty that has been the situation in some of the other capital cases I have handled. The jury could also consider at the penalty phase all of the defense testimony presented at the guilt phase. In the penalty phase closing argument, I tried to emphasize that Samra was a person who never committed a violent criminal act until he was influenced by his gang activities with Mark Duke.

Richard Bell's affidavit at pp. 8-10. Further, … Mr. Bell testified at the Rule 32 evidentiary hearing that Samra's gang activity influenced his participation in the crime and that Bell wanted to emphasize that at trial. R. 264. Mr. Bell testified that he was limited to presenting evidence of Samra's gang activity to establish a mental defect defense because he had no other evidence of any other mental defect. R. 289-91.

To establish a claim of ineffective assistance of trial counsel, the petitioner must allege facts and prove them by a preponderance of the evidence that trial counsel's performance was deficient. This Court must objectively and deferentially view counsel's conduct within the context

of the facts of the particular case and as of the time of the alleged misconduct without letting hindsight cloud that judgment. <u>Payne v. State</u>, 791 So. 2d 383, 399-400 (Ala. Crim. App. 1999) (internal citations omitted). Further, the Court of Criminal Appeals has recognized that there are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. <u>See</u> <u>Dobyne v. State</u>, 805 So. 2d at 743 (citing <u>Strickland v. Washington</u>, 466 U.S. at 689; <u>Ex parte Lawley</u>, 512 So. 2d 1370, 1372 (Ala. 1987)). To prevail on a claim that counsel was deficient in choosing a particular trial strategy, the petitioner must demonstrate the following:

> To uphold a lawyer's strategy, we need not attempt to divine the lawyer's mental processes underlying the strategy. "There are countless ways to provide effective assistance in any given case." <u>Strickland</u>, 104 S. Ct. at 2065. No lawyer can be expected to have considered all of the ways. If a defense lawyer pursued Course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of Course A was not a deliberate choice between Course A, Course B, and so on. The lawyer's strategy was Course A. And, our inquiry is limited to whether this strategy, that is, Course A, might have been a reasonable one. <u>See generally</u> <u>Harich v. Dugger</u>, 844 F.2d 1464, 1470-71 (11th Cir. 1988) (en banc) (concluding—without evidentiary hearing on whether counsel's strategy arose from his ignorance of law—that trial counsel's performance was competent because

hypothetical competent counsel reasonably could have taken action at trial identical to actual trial counsel).

See Chandler v. United States, 218 F.3d 1305, 1316, n. 16 (11th Cir. 2000).

The evidence presented in the affidavit and evidentiary hearing shows that attorney Richard Bell was an experienced criminal defense attorney; had experience in defending other capital murder defendants; consulted other criminal defense attorneys, experts, investigators, and other defense resources for this case; recruited two other lawyers and a law clerk to assist him in Samra's defense; and, that he spent a large amount of time on Samra's defense.  R. 262-98.  Under the circumstances of this case, where Mr. Bell had no other evidence that Samra was suffering from any other mental defect and no prior history of violence before his gang involvement, Mr. Bell's choice to present evidence that Samra committed this crime as a result of gang influence was a reasonable strategic decision.  As such, this choice did not constitute deficient performance.

(C.R. Vol. 49 at 122-26 (quoting Vol. 49 at 71-76)).

Counsel's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066.  Despite this principle, Samra's position is that Bell's strategy in presenting evidence that Samra was a member of the FOLKS gang was so egregiously unreasonable that it falls outside of the presumption of reasonableness afforded to counsel's strategic choices.  In support, Samra cites several decisions from

federal and state courts that he contends establish that presentation by defense counsel of aggravating evidence constitutes deficient performance and ineffective assistance.  As these are not United States Supreme Court decisions, they do not show that the ACCA's determination was contrary to federal law established by the Supreme Court of the United States.  *See Renico*, 559 U.S. at 778, 130 S. Ct. at 1866. This Court can conceive of a situation wherein trial counsel's performance is deficient when he or she presents no evidence in mitigation or presents mitigation evidence that is actually aggravating.  For example, in *Horton v. Zant*, 941 F.2d 1449 (11th Cir. 1991), cited by Samra, the Eleventh Circuit found that the petitioner/defendant was prejudiced by counsel's performance where he performed no pretrial investigation into mitigating circumstances, introduced no mitigating evidence during the trial, attacked his client's character during closing argument, and "virtually encouraged the jury to impose the death penalty."  *Id.* at 1462-63.  This is not that instance.  Here, after conducting a thorough investigation of Samra's background, which included commissioning an expert to evaluate the viability of a mental health defense, Bell determined that he had no evidence that Samra was insane or that due to mental retardation he could not appreciate the wrongfulness of his conduct.  Only then did Bell decide to present information concerning gang activity

in an effort to show that Samra was not violent until he became affiliated with the FOLKS gang and that he was led into committing this crime by Duke.  It simply cannot be said that Bell abjectly failed to consider his options such that this defense strategy is subject to challenge.

This is also not *Magill v. Dugger*, 824 F.2d 879 (11th Cir. 1987), also cited by Samra.  In that case, trial counsel met with his capital-defendant client for the first time for fifteen minutes on the morning of trial, utterly failed to prepare the defendant for either direct or cross-examination, did not give the defendant any advice on whether to testify in his own defense (and the defendant then twice admitted that the murder was planned), failed to object when the prosecutor asked the defendant to concede his guilt to capital murder, and conceded guilt in his opening statement without explaining the theory of the defense.  *Id.* at 888-91.  Then during the penalty phase, counsel inexplicably failed to call a doctor to testify who would have stated that the defendant exhibited serious signs of emotional problems at the age of thirteen, yet decided to present the testimony of a court-appointed psychiatrist who stated on cross-examination that the defendant was not under the influence of an extreme emotional or mental disturbance at the time of the crime.  *Id.* at 889.  During the habeas proceedings, that psychiatrist testified that he had never been interviewed by

counsel or even asked to examine the defendant regarding the applicability of the statutory mitigating circumstances. *Id.* The Eleventh Circuit found that the combined effect of these guilt and penalty phase failures affected the outcome of the penalty phase of the trial such that the defendant was prejudiced by counsel's performance.

Despite Samra's attempts to liken Dr. Ronan's testimony to that of the psychiatrist's in *Magill*, it cannot be said that Bell's performance fell to the level of incompetence as that exhibited in *Magill*. The Eleventh Circuit held that counsel's failure to discover the psychiatrist's opinion prior to calling him to the stand was one deficiency among many committed by counsel in *Magill*. In contrast here, after Dr. Ronan evaluated Samra at Taylor Hardin Secure Medical Facility and Bell examined her report, he decided to present her testimony in an attempt to show that Samra functioned at the borderline between low average intelligence and mild mental retardation and that he was led into committing the crime as a result of gang influence. Bell's decision to call Dr. Ronan was reasoned in light of the fact that her overall conclusions supported the defense theory. The fact that Dr. Ronan's assessment of Samra was not sufficient to cause the jury to recommend a life sentence does not mean that Bell's performance was ineffective.

For these same reasons, Samra's invocation of the Supreme Court's decisions in *Strickland, Wiggins, Williams*, and *Sears*, without further explanation, does not advance his argument that habeas relief is warranted.   Taken together, these cases make clear that once a court is satisfied that counsel conducted a thorough mitigation investigation, the particular strategic choices made by a fully-informed counsel will rarely, if ever, be subject to review.  *See Strickland*, 466 U.S. at 690-91, 104 S. Ct. at 2066 (strategic choices made after " less than complete investigation" are reasonable only to the extent that reasonable professional judgment supports the limitations on investigation); *Wiggins*, 539 U.S. at 522, 123 S. Ct. at 2535 (" [C]ounsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision . . . because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.' " ) (quoting *Williams*, 529 U.S. at 396, 120 S. Ct. at 1514-15); *Sears*, 130 S. Ct. at 3265 (although a specific mitigation " theory might be reasonable, in the abstract, [that fact] does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced" the defendant). Because Bell conducted a thorough investigation before deciding to offer evidence of Samra's involvement in the FOLKS gang for mitigation purposes, the

ACCA did not violate these precedents in rejecting Samra's claim that Bell's strategy was *per se* unreasonable so as to be constitutionally deficient.

In sum, Samra was not deprived of a fair trial or the counsel guaranteed by the Sixth Amendment, so habeas relief is not warranted on this claim under § 2254(d).

> c. Samra's claim that Bell did not adequately object to the trial court's admission of videos and pictures of "gang-type" writings on the walls of Duke's bedroom and photographs of the tattoos on Samra's arms

Samra's argument with regard to this claim begins with the premise that, under Alabama law, evidence of gang membership is presumptively prejudicial and inadmissible at trial where it has nothing to do with any issue in the case. *See Thomas v. State*, 625 So. 2d 1149, 1153 (Ala. 1992). Samra contends that because his involvement with the FOLKS gang was not in any way relevant to the guilt or sentencing determinations for the murders at issue, the gang-related evidence was wholly irrelevant and inadmissible, and Bell's failure to object to its admission on those grounds was constitutionally deficient. Samra also asserts that Bell should have objected to the introduction of the evidence because, even if Samra's membership in the FOLKS gang was relevant, the prejudicial effect of the visual evidence of gang involvement outweighed its probative value, considering that Samra admitted to involvement in the FOLKS gang and the murders for which Samra and Duke were

convicted were not alleged to be gang-related.   Samra contends in a conclusory

fashion that the ACCA's determination that Bell's performance was not ineffective

on this ground was contrary to, or an unreasonable application of, *Strickland*, *Wiggins*,

*Williams,* and *Sears*, *supra*.

In rejecting this claim, the ACCA again quoted extensively from the Rule 32

Court's order, as follows:

> In paragraph 8(D) of the petition, Samra claims his
> trial counsel was ineffective for failing to object to the
> evidence regarding wall-etchings and gang-type writings on
> the wall of Mark Duke's bedroom and tattoos on Samra's
> arm.   This claim is wholly without merit because, as
> discussed above, trial counsel's theory of defense was to
> show that Samra did not know the difference between right
> and wrong because of the gang influence exerted upon him
> by Mark Duke.   At the evidentiary hearing, Mr. Bell
> testified that he was limited to presenting evidence of
> Samra's gang activity to establish a mental defect defense
> because he had no other evidence of any other mental
> defect.  [R32 at 289-91.]

> This Court recognizes that there are countless ways
> to provide effective assistance in any given case.   Even the
> best criminal defense attorneys would not defend a
> particular client in the same way.   See Dobyne v. State, 805
> So. 2d at 743 (citing Strickland v. Washington, 466 U.S. at
> 689; Ex parte Lawley, 512 So. 2d 1370, 1372 (Ala. 1987)).
> To prevail on a claim that counsel was deficient in choosing
> a particular trial strategy, the petitioner must demonstrate
> that the strategy was unreasonable. See Chandler v. United

States, 218 F.3d 1305, 1316 n. 16 (11th Cir. 2000).

> In his affidavit, Mr. Bell stated that he had no other evidence that Samra was suffering from any mental defect and that he had no prior history of violence before his gang involvement.  Further, the evidence of gang involvement was used by trial counsel to put more of the blame on Mark Duke and to make Duke look more culpable because he was considered the leader of the gang.  Therefore, Mr. Bell's choice to present evidence that Samra committed this crime as a result of gang influence was a reasonable strategic decision.  As such, this choice did not constitute deficient performance.

(C.R. Vol. 49, at 126-27 (quoting Vol. 49, at 97-99)).

Bell's decision not to object to the admission of evidence of Samra's gang affiliation was in keeping with his penalty-phase strategy to present Samra as easily-influenced and led into committing the crime by Duke.  Bell arrived at this strategy only after conducting a thorough investigation and realizing that he had no evidence that Samra suffered from a mental defect.  For the reasons stated in the previous section, the ACCA's determination that Bell's strategy did not deprive Samra of his Sixth Amendment rights is not contrary to clearly established Supreme Court precedent, and habeas relief is not warranted on this ground.

>> d.    Samra's claim that the cumulative effect of the previous ineffective assistance of trial counsel claims prejudiced him

Samra contends that the cumulative effect of the three previously-stated unmeritorious claims "deprived him of a fair sentencing proceeding." In denying this claim, the ACCA noted that there was no support in *Strickland* that requires a cumulative analysis of multiple non-meritorious claims of ineffective assistance of counsel. The ACCA further noted that "if we were to evaluate the cumulative effect of the instances of alleged ineffective assistance of counsel, we would find that Samra's substantial rights had not been injuriously affected, as we have found no error in the instances argued in this petition." (C.R. Vol. 49 at 129.) Samra has not demonstrated that the ACCA's adjudication of this issue is contrary to, or an unreasonable application of, *Strickland*. Therefore, the "cumulative effects" claim is due to be denied.

> 3.  Samra's claim that he was deprived of effective assistance of appellate counsel when Bell failed to raise the argument on direct appeal that due process required the prosecutor to give advance notice of the statutory aggravating factor that made him eligible for the death penalty

Samra argues that Bell's failure to raise on direct appeal the claim that "he was entitled to pre-trial (or at least pre-sentencing hearing) notice of the statutory aggravating circumstances that the state would be relying on in attempting to prove his eligibility for the death penalty," constitutes ineffective assistance.

As an initial matter, although the Rule 32 Court never addressed this claim in its order denying Rule 32 relief, the ACCA stated that it was " reluctant to hold that this claim is procedurally barred because it is being raised for the first time on appeal" and considered the merits of the claim anyway.  (C.R. Vol. 49, at 112.)  The ACCA's decision to consider the claim was appropriate because the record reveals that Samra did plead this claim in his third amended Rule 32 Petition.  (C.R. Vol. 42, at 159-60 (" In addition, in this case the petitioner's sentence of death violates the due process clause of the Fourteenth Amendment because the petitioner did not receive notice of the actual statutory aggravating circumstances used at the sentencing phase, until after he had already been convicted of capital murder." )).  Additionally, the Rule 32 Court acknowledged the claim during a hearing held on September 25, 2002, and stated that it would address the claim in its order granting or denying relief, although it never did.  (C.R. Vol. 42, at 160-61.)

Although the ACCA correctly held that the claim was not procedurally defaulted, it nonetheless appears to have mischaracterized Samra's claim.  The ACCA described the claim as follows: " [Samra] was entitled to have advance notice of the statutory aggravating circumstances that the State intended to prove by including those circumstances in the indictment."   (C.R. Vol. 49, at 112.)  The ACCA then

stated the following in rejecting this claim:

> . . . Samra's claim must fail.  In June 2002—at almost the same time as Samra filed his second amended Rule 32 petition—the United States Supreme Court released <u>Ring v. Arizona</u>, 536 U.S. 584 (2002) and <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002)—two cases that dramatically impacted death-penalty cases throughout the United States.  In <u>Ring</u>, the Court applied its earlier holding in <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), to death-penalty cases and held that "capital defendants . . . are entitled to a jury determination on any fact on which the legislature conditions an increase in their maximum punishment."  <u>Ring</u>, 536 U.S. at 589.  However, in subsequent cases, this Court determined that neither <u>Ring</u> nor <u>Apprendi</u> modified prior Alabama caselaw, "which holds that aggravating circumstances do not have to be alleged in the indictment."  <u>Stallworth v. State</u>, 868 So. 2d 1128, 1186 (Ala. Crim. App. 2001) (opinion on return to remand).  Thereafter, relying on <u>Schriro v. Summerlin</u>, 542 U.S. 348, (2004), we held that the decision in <u>Ring</u> did not apply retroactively to cases on collateral review; that is, to cases that were already final at the time that <u>Ring</u> was announced.  <u>See, e.g., Hunt v. State</u>, 940 So. 2d 1041, 1057 (Ala. Crim. App. 2005).  Thus, the decision in <u>Ring</u> was not applicable in Samra's case.  Accordingly, counsel cannot be ineffective for failing to raise a meritless claim.  <u>See, e.g., Bearden v. State</u>, 825 So. 2d 868, 872 (Ala. Crim. App. 2001).  Indeed, we note that the appeals stage of Samra's case began in 1998 and continued until 2000, when Samra's conviction and sentence became final—approximately two years before the decision in <u>Ring</u> was announced.  Counsel is not ineffective for failing to anticipate changes in the law.  <u>See, e.g., Holladay v. State</u>, 629 So. 2d 673, 685 (Ala. Crim. App. 1992) ("It is clear that the constitutional guaranty of effective counsel does not require a defense attorney who can foresee future decisions.").  Therefore, no basis for relief exists regarding this claim.

(C.R. Vol. 49, at 112-13.)

Samra now asserts that his claim was not and is not based on *Ring* and that he

is not arguing that his indictment is defective, but rather, that due process mandates that he be provided with *some form* of pre-trial or pre-sentencing-hearing notice—in the indictment or otherwise—of what the claimed aggravating factors were. *See* Petitioner's Traverse and Reply Brief, Doc. 41, at 35 ("This is not an argument about a defective indictment, its an argument about notice to the defense prior to trial as to what the defense will have to address and respond to at trial.").

Because Samra contends that the ACCA misinterpreted his claim, this Court must first satisfy itself that Samra presented the same constitutional claim to the Rule 32 courts that he is presenting here and is not impermissibly expanding his claim for the first time before this Court. As explained by the Eleventh Circuit:

> The Supreme Court has instructed us that if "the substance of a federal habeas corpus claim [was] first . . . presented to the state courts," "despite variations in the . . . factual allegations urged in its support," the claim is exhausted. *Picard v. Connor*, 404 U.S. 270, 277–78, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971).
>
> Based on Supreme Court law, we have held that "courts should exercise flexibility in determining whether defendants have met [the exhaustion] requirement." *Cummings v. Dugger*, 862 F.2d 1504, 1507 (11th Cir.1989); *see also Henry v. Dept. of Corr.*, 197 F.3d 1361, 1367 (11th Cir.1999) ("The exact presentation of the claims in the state and federal courts may vary some."). In other words, an issue is exhausted if "the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation" to be the same as it was presented in state court. *Kelley v. Sec'y for Dept. of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004).

*Pope*, 680 F.3d at 1286.

Considering this standard, the Court is satisfied that Samra exhausted this claim. His brief before the ACCA argued that due process requires that a criminal defendant be entitled to pre-trial notice—"via indictment *or other means*" (C.R. Vol. 42, at 158-59) (emphasis added)) of the charges against him, and he cites the same Supreme Court decisions in support that he cites to this Court. It appears that the ACCA, in focusing on the "defective indictment" argument, never addressed Samra's argument that some form of pre-sentencing hearing notice should have been given.

Because the state courts did not resolve the merits of the claim that Samra adequately presented to them, § 2254(d)(1)'s requirement that the federal courts defer to state court decisions that are not contrary to, or an unreasonable application of, clearly established federal law, does not apply. *Davis,* 341 F.3d at 1313. Under these circumstances, this Court's review of the claim is *de novo. See id.*

Nonetheless, even under a *de novo* review, the cases Samra contends his claim is based on—*In re Ruffalo*, 390 U.S. 544, 88 S. Ct. 1222 (1968), *Cole v. Arkansas*, 333 U.S. 196, 68 S. Ct. 514 (1948), *Gray v. Netherland*, 518 U.S. 152, 116 S. Ct. 2074 (2002), and *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215 (1999), do not help

him.  Taken together, these cases stand for the unremarkable position that a criminal defendant is entitled to notice of the charges against him so that he may defend against those charges.  *In re Ruffalo* was a disbarment proceeding against an attorney accused of soliciting clients.   390 U.S. at 545, 88 S. Ct. at 1223.   The original charge enumerated twelve distinct counts of barratry.  *Id.* at 546, 88 S. Ct. at 1224.  At the hearing, however, a thirteenth count was added after the attorney had presented his defense, and the state board sanctioned the attorney on the thirteenth count.  *Id.*  The Supreme Court reversed, holding that the disbarred attorney's procedural due process rights had been violated when he was not given notice of the charges against him.  *Id.* at 551-52, 88 S. Ct. at 1226.  The Court described the disbarment proceedings as "adversary proceedings of a quasi-criminal nature,"  and stated that the "charge must be known before the proceedings commence.  They become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused."  *Id.* at 551, 88 S. Ct. at 1226.

In *Cole*, the defendants were found guilty at trial of violating section 2 of Act 193 of the Arkansas legislature for promoting an unlawful assemblage near a labor dispute.  333 U.S. at 198, 68 S. Ct. at 515.  The Arkansas Supreme Court affirmed the conviction, finding that defendants violated only section 1 of the same act, which

made it unlawful to use force or violence to prevent another person from engaging in an unlawful vocation.  *Id.* at 200, 68 S. Ct. at 516.  The United States Supreme Court overturned the conviction, finding that the defendants had been tried and convicted on section 2, not section 1, and stated that "[n]o principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by the charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal."  *Id.* at 201, 68 S. Ct. at 517.

Finally, *Gray* was a capital habeas case in which the Supreme Court cited *In re Ruffalo* and *Cole* for the proposition that "[a] defendant's right to notice of the charges against which he must defend is well established."  518 U.S. at 167-68, 116 S. Ct. at 2083.  The Court in *Gray* found those cases inapplicable, however, because it was dealing with the petitioner's claim that he did not have notice of *additional evidence* that the state planned to use to prove the charges at the sentencing phase, not the charges the state brought against him.  *Id.* at 168, 116 S. Ct. at 2083 ("We have said that 'the Due Process clause has little to say regarding the amount of discovery which the parties must be afforded.'")(citation omitted).

These cases do not aid Samra because the due process clause requires only fair

notice of the *charges*. Such notice was given in this case. Samra was also on notice that the State would be seeking the death penalty. Samra has presented no case indicating that a defendant's procedural due process rights are violated when the prosecution does not reveal the specific statutory aggravating circumstances that will be used to support the death penalty until the penalty phase of the trial. Because Samra can cite to no case at the time of his direct appeal recognizing the doctrine he now says Bell had a duty to raise, Bell could not have been ineffective for not raising a novel claim that was not supported by existing law. *See Engle v. Isaac*, 456 U.S. 107, 134, 102 S. Ct. at 1575 (1982) (" [T]he Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim.").

Nor should the Supreme Court's decision in *Jones* have alerted Bell that he should have raised this argument on direct appeal, contrary to Samra's assertion. Samra relies on *Jones*, in which the Supreme Court considered the relationship between "elements" of a crime and "sentencing enhancements" under the federal car jacking statute, *see* 526 U.S. at 243, 119 S. Ct. at 1224, as well as the Supreme Court's subsequent decision in *Apprendi v. New Jersey*, in which the Court explained that when a fact (other than a prior conviction) increases a sentence beyond the

maximum authorized statutory sentence, such fact must be submitted to a jury and proven beyond a reasonable doubt, *see* 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000), to advance the following argument.  According to Samra, because criminal defendants have a procedural due process right to advance notice of the elements of the crimes for which they are charged, and this advance notice must be provided via indictment in federal prosecutions but, in state prosecutions, may be provided in other ways, and the "elements" of a crime include any fact (other than a prior conviction) that increases the maximum penalty for a crime, then the aggravating circumstances set forth in Ala. Code § 13A-5-49 are "elements" of the crime under Alabama's capital sentencing scheme.  As such,  Samra insists he was entitled to pre-trial, or at least pre-sentencing hearing, notice of the statutory aggravating circumstances that the State would be relying on in attempting to prove his eligibility for the death penalty.  In Samra's view, Bell was ineffective for failing to raise this argument, since the Supreme Court granted certiorari in *Jones* one month before Bell filed Samra's notice of appeal.  However, Samra ignores the fact that the Supreme Court in *Jones* was interpreting the construction and constitutionality of the federal car jacking statute and was certainly not establishing a rule that a criminal defendant in a state capital case must be provided notice of the statutory aggravating factors for the death

penalty such that he may prepare his defense accordingly.  Bell simply cannot be ineffective for failing to raise a novel claim that was not supported by existing law.  *See Engle*, 456 U.S. at 134, 120 S. Ct. at 1575.[7]  Because the Court finds that Bell's performance was not deficient, it need not reach the prejudice prong.  For these reasons, habeas relief is not warranted on this claim.

C.   Samra's claim that his death sentence violates the Eighth and Fourteenth Amendments given that, after *Roper* was decided by the Supreme Court, his co-defendant Duke had his death sentence vacated due to his age

Samra's final claim stems from the following facts.  On September 27, 2007, Samra filed his Successive Rule 32 Petition, arguing that because Duke's degree of culpability was greater than Samra's, but Duke could not be sentenced to death due to the Supreme Court's decision in *Roper*, Samra's death sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment and is excessive and disproportionate.  Samra contended that a decision by the Shelby County Circuit Court granting a 2002 Rule 32 petition of LaSamuel Lee Gamble constituted "newly

---

[7] Samra points out that the Second Circuit has "held that the logic of [Apprendi and Ring] requires that statutory aggravating factors be alleged in the indictments in capital cases." *Matthews v. United States*, 622 F.3d 99, 102 (2d Cir. 2010).  Notwithstanding the fact that Samra claims not to be making a "defective indictment" argument, the rule announced by the Second Circuit is only applicable to federal capital cases, not state capital cases, and it was not binding precedent when Samra's case was on direct appeal, nor is it now.

discovered evidence" under Alabama Rule of Criminal Procedure 32.1(e)[8] and

justified the filing of a successive petition.  Gamble and his co-defendant, Marcus

Presley, had both received death sentences following a capital murder conviction.

Gamble was more than 18 years old and Presley was 16 years old at the time they

committed their capital murder.  Based on the 2005 decision in *Roper* holding that it

was unconstitutional to impose the death penalty on a criminal defendant who was less

---

[8] Rule 32.1(e) allows a petition to be filed on the ground that:

Newly discovered material facts exist which require that the conviction or
sentence be vacated by the court, because:

> (1) The facts relied upon were not known by the petitioner or the
> petitioner's counsel at the time of trial or sentencing or in time to file a
> posttrial motion pursuant to Rule 24, or in time to be included in any
> previous collateral proceeding and could not have been discovered by any
> of those times through the exercise of reasonable diligence;
>
> (2) The facts are not merely cumulative to other facts that were known;
>
> (3) The facts do not merely amount to impeachment evidence;
>
> (4) If the facts had been known at the time of trial or of sentencing, the
> result probably would have been different; and
>
> (5) The facts establish that the petitioner is innocent of the crime for
> which the petitioner was convicted or should not have received the
> sentence that the petitioner received.

Ala. R. Crim. P. 32.1(e).

than 18 years of age at the time of the crime, the Shelby County Circuit Court vacated Presley's death sentence and sentenced him to life without the possibility of parole. Gamble requested in his Rule 32 petition that his death sentence likewise be vacated, arguing that Presley, who was the triggerman, was more culpable than he. The Shelby County Circuit Court granted Gamble's Rule 32 petition, vacated his death sentence, and sentenced him to life without the possibility of parole. Samra thus contended in his Successive Rule 32 Petition that, like Gamble, his death sentence should be vacated. However, by the time the Rule 32 Court issued its order denying Samra's Successive Rule 32 Petition, the ACCA had reversed the Shelby County Circuit Court in Gamble's Rule 32 proceeding and reinstated Gamble's death sentence. *See Gamble v. State*, 63 So. 3d 707 (Ala. Crim. App. 2010). The Rule 32 Court summarily denied Samra's successive petition, holding that it was precluded from considering Samra's claim pursuant to Alabama Rules of Criminal Procedure 32.1(e) and 32.2(b)[9] and (c),[10] and in the alternative, that the claim failed on the merits.

---

[9] Rule 32.2(b) provides that a successive petition based on different grounds from the initial petition must be denied unless the petitioner shows either that 1) the court was without jurisdiction to render a judgment or impose a sentence or that 2) good cause exists why the new grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard and that failure to entertain the petition will result in a miscarriage of justice. Ala. R. Crim. P. 32.2(b).

[10] Rule 32.2(c) sets out the various limitations periods in which a petitioner must file a post-conviction petition. Ala. R. Crim. P. 32.2(c).

In affirming the Rule 32 Court's decision, the ACCA first quoted extensively

from the Rule 32 Court's order, as follows:

The present Petition is a successive petition within the meaning of Rule 32.2 of the Alabama Rules of Criminal Procedure. Samra makes two interrelated claims. He first claims that his death sentence is in violation of the 8th Amendment to the Constitution of the United States prohibiting the imposition of cruel and unusual punishment. The second claim is that a ruling by [a circuit judge] in another circuit court case would constitute a newly discovered material fact which would require the Court to vacate his death sentence to avoid a manifest injustice.

[The previous circuit judge] had issued a ruling in an unrelated case setting aside a sentence of death of a defendant where a more culpable co-defendant's death sentence had been commuted to "Life without Parole." The co-defendant had been less than seventeen years of age when the offense was committed and his sentence was reduced as a result of the decision of the United States Supreme Court in Roper v. Simmons, 543 U.S. 551 (2005). [The previous circuit judge] found the death sentence of the co-defendant disproportional where a more culpable co-defendant was sentenced to "Life without Parole." The Alabama Court of Criminal Appeals affirmed the trial court's finding of ineffective assistance of counsel during the sentencing phase but declined to recognize a claim that a death sentence should be set aside if not proportional with a sentence given to a co-defendant. Gamble v. State, 63 So. 2d 707 (Ala. Crim. App. 2010).

In the present case, Samra is sentenced to death while a younger co-defendant's sentence was reduced by the application of the decision in Roper.

The State has responded by asserting the applicable procedural bars as well as arguing the facts themselves justify the sentence of death. Samra had an active role in a [sic] multiple slayings . . . .

The Court finds that Samra's successive petition is procedurally barred from consideration.

    1.    A ruling by the trial court in an unrelated matter does not constitute "a newly discovered material fact" within the meaning of Rule 32.1(e).

    2.    Even if such a ruling could be construed as a fact it could not meet the requirements of Rule 32.1(e)(1) through (5).

    3.    Even assuming somehow somewhere a ruling might be found which could be construed as a fact that met the requirements of Rule 32.1(e), it would have to comply with Rule 32.2(c) and in this case the further limitation imposed by 32.2(b) for successive petitions.  The present petition does not.

The present case overcomes none of the above procedural bars. In addition, as previously noted the Alabama Court of Criminal Appeals rejected the proportionality in sentence argument upon which Samra now seeks to rely.  <u>Gamble v. State</u>, 63 So. 2d 707 (Ala. Crim. App. 2010).

For the foregoing reasons the Petition is summarily DENIED.

(C. 426-27.)

(C.R. Vol. 49, at 141-43  (quoting Vol. 49, at 136-37.))

The ACCA then went on to quote its opinion in *Gamble* extensively, effectively adopting its reasoning in that case as its own.  The court first noted that in *Gamble*, it discussed whether a circuit court had the authority to conduct a proportionality

review of a defendant's sentence on a Rule 32 petition and determined that it did not

because, pursuant to the Alabama Supreme Court's decision in *Ex parte Thomas*, 460

So. 2d 216 (Ala. 1984), a proportionality review is conducted by an appellate court

and not a trial court.[11]   The ACCA then noted that in *Gamble*, it determined that the

circuit court's setting aside of Gamble's death sentence based on his co-defendant

being re-sentenced to life without parole violated the principle that a defendant has

a constitutional right to have an individualized sentencing determination made.

---

[11] *See Ex parte Thomas*, 460 So. 2d at 226-67 ("the disproportionality question involving consideration of co-defendant sentences is something to be addressed by the appellate courts instead of at the trial level") (citing *Coulter v.* State, 438 So. 2d 336 (Ala. Crim. App. 1982) and *Miller v. Florida*, 459 U.S. 1158 (1983) (Marshall, J., dissenting from the denial of certiorari)).   As explained by Justice Marshall in *Miller*:

> An appellate court, in the performance of the reviewing function which this Court has held indispensable to a constitutionally acceptable capital punishment scheme, must examine the sentences imposed in all capital cases in the jurisdiction in order " to ensure that similar results are reached in similar cases." [] The sentencer has a different role. The sentencer's duty is to determine in the first instance whether a death sentence is warranted for a particular defendant. That determination can only be made on the basis of the evidence that the judge has heard with respect to that defendant, and, under the Florida procedure, on the recommendation made by the jury that heard that evidence. A capital sentencing determination cannot properly be made on the basis of evidence presented in another trial or a recommendation made by another jury.

459 U.S. at 1161-62 (Marshall, J., dissenting from denial of certiorari)(internal quotation marks and citations omitted).

Third, the ACCA noted that in *Gamble*, it determined that there is no constitutional right to have a proportionality review in death-penalty cases, and in fact, the Supreme Court has specifically rejected a claim that a capital defendant can prove an Eighth Amendment violation by showing that his co-defendant's death sentence was vacated. The ACCA ultimately found that because it had rejected in *Gamble* the same argument Samra was making, i.e., that a defendant's death sentence could be vacated because it was found to be disproportionate in relation to his co-defendant's sentence, Samra's claim was meritless. The ACCA concluded its opinion by stating:

> Because Samra's claims do not have merit, they do not impugn the trial court's jurisdiction. Thus, the circuit court correctly applied the preclusive bar of Rule 32.2(c) because the petition was untimely. The circuit court also correctly applied the preclusive bar of Rule 32.2(b), because the claims were raised in a successive petition and were not jurisdictional claims. Because the petitioner's claims were without merit and were precluded, summary disposition was appropriate.

(C.R. Vol. 49 at 149.)

Samra now raises the same Eighth Amendment claim[12] before this Court, and

---

[12] Samra also adds a Fourteenth Amendment claim for the first time before this Court. Because Samra did not raise a Fourteenth Amendment claim in his Successive Rule 32 Petition nor did he raise such a claim on appeal, this Court is precluded from granting relief on this claim. Any attempt by Samra to return to state court to exhaust this unexhausted claim would be barred under Alabama's procedural rules. It is too late for Samra to raise this claim on direct appeal; *see* Ala. R. Crim. P. 4(a)(1); a third Rule 32 petition would be successive; *see* Ala. R. Crim. P. 32.2(b); and this claim would also be subject to other procedural bars in Rule 32, *see* Ala. R. Crim. P. 32.2(a)(3)-(5). As such, this claim is procedurally defaulted. "It is well established that when a petitioner has failed to exhaust his claim by failing to fairly present it to the state courts and the

because the ACCA not only ruled that the claim was barred by state procedural rules but also denied the claim on its merits, this Court must determine whether the ACCA's merits determination " (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" pursuant to § 2254(d)(1)-(2).  *See Ward*, 592 F.3d 1144 (in order for a state court's procedural ruling to constitute an independent and adequate state rule of decision and thus preclude federal court review, " the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim" ) (internal quotation marks and citation

---

state court remedy is no longer available, the failure constitutes a procedural bar."  *McNair v. Campbell*, 416 F.3d 1291, 1305 (11th Cir. 2005).  Samra is not entitled to federal habeas review of this claim unless he shows cause for and prejudice from his failure to raise the claim, or that a fundamental miscarriage of justice would result from this Court's failure to review the merits of the claim.  Samra makes no showing of cause and prejudice, or a miscarriage of justice, in order to excuse the default.  In his reply brief, Samra indicates that his focus is on the Eighth Amendment violation, and states that he " only refers to the Fourteenth Amendment in its function incorporating the Eighth Amendment to the states."  (Petitioner's Traverse and Reply Brief, Doc. 41 at 41 n.4).  This statement is not sufficient to excuse the procedural default.  Accordingly, this Court is precluded from granting habeas relief on Samra's claim that his death sentence violates the Fourteenth Amendment to the U.S. Constitution.

omitted).[13]

To that end, Samra contends that the ACCA's decision affirming the death penalty imposed upon him was an unreasonable application of the principle of proportionality in criminal sentencing pursuant to *Kennedy v. Louisiana*, 554 U.S. 407, 128 S. Ct. 2641 (2008); *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002); *Harmelin v. Michigan*, 501 U.S. 957, 111 S. Ct. 2680 (1991); *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909 (1976); *Miller v. Alabama*, 132 S. Ct. 2455 (2012); and *Roper*, *supra*.

As an initial matter, none of the cases cited by Samra holds that a capital murder defendant has an Eighth Amendment right to have his death sentence vacated solely because his co-defendant received a lesser sentence than the death penalty. *See Washington v. Crosby*, 324 F.3d 1263, 1265 (11th Cir. 2003) (indicating that a petitioner must cite to Supreme Court precedent that confronts nearly identical facts but reaches the opposite conclusion in order to show that a state court decisions was contrary to law). To the contrary, and as discussed by the ACCA, such a bright-line rule would violate Supreme Court precedent mandating that a defendant is entitled to an *individualized* sentencing determination. *See Lockett v. Ohio*, 438 U.S. 586, 605,

---

[13] Because the Court will engage in AEDPA review under § 2254(d), it need not address Samra's argument that this Court should review his claim on the merits because the ACCA erroneously ruled that his Successive Petition was untimely under Ala. R. Crim. P. 32.2(c).

98 S. Ct. 2954, 2965 (1978) ("Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases."); *Williams v. Illinois*, 399 U.S. 235, 243, 90 S. Ct. 2018, 2023 (1970) ("[T]here is no requirement that two persons convicted of the same offense receive identical sentences."); *Zant v. Stephens*, 462 U.S. 862, 879, 103 S. Ct. 2733, 2743-44 (1983) ("What is important . . . is an individualized determination on the basis of the character of the individual and the circumstances of the crime.").

Thus, while "proportionality" in criminal sentence has been described by the Supreme Court as "an abstract evaluation of the appropriateness of a sentence for a particular crime," *Pulley v. Harris*, 465 U.S. 37, 42-43, 104 S. Ct. 871, 875 (1984) (internal citations omitted), Samra is not arguing that his sentence is "disproportionate to the crime in the traditional sense." *Id.* at 43; 104 S. Ct. at 875. In other words, he does not deny that he killed four people in the course of one scheme or course of conduct, the penalty for which can be death under Alabama law. The type of proportionality review Samra is seeking is "of a different sort," *see id.*, 104 S. Ct. at 876,—a consideration of the appropriateness of his sentence in light of his co-defendant Duke's lesser sentence.  However, and as stated by the ACCA, the

Supreme Court has held that "[c]omparative proportionality review is not constitutionally required in every state court death sentence review." *Id.* at 50-51, 104 S. Ct. at 879 (considering whether the Eighth and Fourteenth Amendments require a state appellate court, before it affirms a death sentence, to compare the sentence in the case before it with the penalties imposed in similar cases if requested to do so by the prisoner, and holding that they do not).[14] Moreover, as also stated by the ACCA, the Supreme Court has rejected a defendant's attempt to "prove a[n] [Eighth Amendment] violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." *McCleskey v. Kemp*, 481 U.S. 279, 306-07, 107 S. Ct. 1756, 1775 (1987) (emphasis in original).[15]

_____

[14] Alabama requires a proportionality review to be conducted by the appellate court on every death sentence, in which the court compares the capital defendant's sentence to the sentences imposed in other similar capital cases in the jurisdiction. *See* Ala. Code § 15A-5-53(b)(3) (1975).

[15] In *McCleskey*, the defendant argued that his death sentence was disproportionate to the sentences in other murder cases. 481 U.S. at 306, 107 S. Ct. at 1774. The Supreme Court held that, on the one hand, he could not base a constitutional claim on an argument that his case differs from other cases in which defendants *did* receive the death penalty because the Georgia Supreme Court found that his death sentence was not disproportionate to other death sentences imposed in the state, and such proportionality review is not even constitutionally required. *Id.*, 107 S. Ct. at 1774-75 (citing *Pulley*, 465 U.S. at 50-51, 104 S. Ct. at 879). The Court then held that, on the other hand, the only way the defendant could show that his sentence was disproportionate to similarly situated defendants who did *not* receive the death penalty would be by demonstrating that Georgia's capital punishment system operates in an arbitrary and capricious manner. *Id.* at 306-07, 107 S. Ct. at 1775. The Court stated that it had previously rejected a prisoner's claim that the opportunities for discretion and leniency inherent in the processing of a murder case rendered the capital sentence imposed arbitrary and capricious. *Id.* at 307, 107 S. Ct. at 1775 (citing *Gregg*, 428 U.S. at 199, 96 S. Ct. at 2937). Because the

This rule is especially appropriate in this case, considering the fact that the reason that Mark Duke did not receive the death penalty had nothing to do with the circumstances of Duke and Samra's crime or the presence or absence of aggravating or mitigating factors. The basis was purely legal. Despite the fact that a jury analyzed the facts and considered the aggravating and mitigating circumstances and recommended that Duke be sentenced to death, and the trial court imposed such a sentence, the court later concluded as a matter of law that Duke was ineligible for the death penalty. Duke's sentence reduction has no connection to the nature or circumstances of the crime or to Samra's character or record. Under *Lockett*, Duke's sentence reduction is irrelevant as a mitigating circumstance in Samra's case. *See* 438 U.S. at 605, 98 S. Ct. at 2965.

Under the Eighth and Fourteenth Amendments, Samra was entitled to receive an individualized sentencing determination, and the record reflects that he received that. In its sentencing order, the trial court stated the following in support of its finding that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses:

---

defendant's death sentence was imposed under Georgia sentencing procedures that focused discretion "on the particularized nature of the crime and the particularized characteristics of the individual defendant," the Court held that it was not disproportionate "within any recognized meaning under the Eighth Amendment." *Id.* (internal quotation marks omitted).

WHEREAS, the Court finds that the evidence at trial was that [Samra], along with one or more co-Defendants planned the murder of Randy Gerald Duke and [Samra] chose to carry out the murder at a time when it would also be necessary, in order [sic] cover up the murder of Randy Gerald Duke, to murder Dedra Mims Hunt, Chelisa Nicole Hunt and Chelsea Marie Hunt. [Samra] carried out the plans and in doing so obtained weapons including two (2) handguns.  Defendants then went to the home of Randy Gerald Duke and assisted co-Defendant in the murder of Randy Gerald Duke.  [Samra] shot Dedra Mims Hunt in the face which shot did not immediately kill Dedra Mims Hunt and then proceeded to chase Dedra Mims Hunts and the two minor victims upstairs, at which point Dedra Mims Hunt, Chelisa Nicole Hunt and Chelsea Marie Hunt were all killed by means of being cut with a knife. The evidence showed that [Samra] actually cut the throat of at least one of the minor children and was actively involved in killing all victims in this case.

After the murders took place, [Samra], along with co-Defendants then disposed of the various weapons. [Samra] and/or co-Defendants, after being arrested assisted the police in obtaining the various weapons.

WHEREAS, the Court hereby FINDS that the offense was particularly heinous, atrocious and cruel when compared to other capital offenses.  Evidence showed at trial that the victims in this case were killed in a very cruel and heinous manner.  The minor children's throats were actually cut and according to testimony of the medical examiner, they drowned in their own blood.   The photographs and other demonstrative evidence in this case leads to one and only one conclusion, that the manner in which the victims were killed was much more heinous and atrocious and cruel than would be necessary in any killing.

This case stands out as particularly heinous, atrocious and cruel when it is considered that at least one victim, according to the admission of Defendant, begged not to be killed. All of the victims died very painful and brutal deaths.  The victims apparently struggled for life and breath

and that very struggle caused one or more of the victims to drown in their own blood.

(C.R. Vol. 49, at 5.)   The trial court found that this aggravating circumstance "substantially outweigh[ed]" the mitigating circumstances and accordingly sentenced Samra to death.

In affirming Samra's conviction and death sentence, the ACCA concluded that "[t]he sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced [Samra] to death." *Samra*, 771 So. 2d at 1121.  In addition, the ACCA stated as follows:

> Section 13A-5-53(b)(2) requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's death sentence.   After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
>
> As required by § 13A-5-53(b)(3), we must determine whether the appellant's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases.   The appellant killed four people pursuant to one scheme or course of conduct.   Similar crimes are being punished by death throughout this state.   *Taylor v. State*, 666 So. 2d 71 (Ala. Crim. App. 1994), aff'd, 666 So. 2d 73 (Ala. 1995); *Holladay v. State*, 549 So. 2d 122 (Ala. Crim. App. 1988), aff'd, 549 So. 2d 135 (Ala. 1989); *Siebert v. State*, 555 So. 2d 772 (Ala. Crim. App. 1989), aff'd, 555 So. 2d 780 (Ala. 1989); *Peoples v. State*, 510 So. 2d 554 (Ala. Crim. App. 1986), aff'd, 510 So. 2d 574 (Ala. 1987).   Thus, we find that the sentence of death was neither disproportionate nor excessive.

*Id.*  Because the ACCA held that the trial court's finding regarding the aggravating

and mitigating circumstances was supported by the evidence and because the court found that Samra's death sentence was neither excessive nor disproportionate to the penalty imposed in similar cases, the court affirmed his death sentence. *Id.* Nothing has happened in Samra's case that alters the state courts' finding that his death sentence is proportionate to his crime.

In light of his role in the crime and his culpability for the murder of the four victims, Samra's death sentence is proportionate to his crime.   Overwhelming evidence established that Samra was a full and active participant in the commission of the crime and that he acted with a clear intent to kill the victims.   According to his own statement, Samra shot Dedra Hunt in the face.   That bullet entered her cheek, knocking out some of her teeth on both sides of her mouth and grazing the top of her tongue.   Despite that gruesome injury, Ms. Hunt was able to flee up the stairs with her daughters, where she and one of her daughters sought shelter in an upstairs bathroom.   Mark Duke kicked in the bathroom door, shot and killed Ms. Hunt, and then executed her little girl, by slicing her throat.   After the two killings took place in the bathroom, Samra took it upon himself to kill Ms. Hunt's other little girl by slicing her throat while Duke held her down.   In sum, the evidence showing that Samra was a full and active participant in the crime, was prepared to kill, intended to kill, was

present with the intent to render aid and support to his co-defendant, Mark Duke, in killing the victims, and did, in fact, aid and support Duke in killing them, is overwhelming.  Plainly, even if this Court could now re-weigh the aggravating and mitigating circumstances and take Duke's sentence of life without parole into consideration in doing so, which it cannot do, the balance of the aggravating and mitigating circumstances would not change.  Nor can it be said that Samra's sentence of death suddenly has become "disproportionate" simply because Duke was re-sentenced to life without parole.  Habeas relief is not warranted on this claim.

## V.    CONCLUSION

For the foregoing reasons, Samra's petition for habeas relief is due to be denied. A final judgment will be entered.

Done this 5th day of September 2014.

_____
L. Scott Coogler
United States District Judge
[160704]